1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                    Newport News Division

3

4   - - - - - - - - - - - - - - - - - -
                                      )
5   UNITED STATES OF AMERICA,         )
                                      )
6            Plaintiff                )   CRIMINAL ACTION NO.
                                      )    4:08cr35
7   v.                                )
                                      )
8   HECTOR JAVIER CARABALLO,          )
                                      )
9            Defendant.               )
    - - - - - - - - - - - - - - - - - -
10

11

12                  TRANSCRIPT OF PROCEEDINGS

13                           DAY 1

14                  Newport News, Virginia

15                    December 10, 2008

16

17  BEFORE:   THE HONORABLE HENRY C. MORGAN, JR.
              United States District Judge

18

19  APPEARANCES:

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Eric Hurt
21                 Katherine Martin
                   Assistant United States Attorney
22                 Counsel for the United States

23            FEDERAL PUBLIC DEFENDER'S OFFICE
              By:  Larry Dash
24                 Assistant Federal Public Defender
                   Counsel for the Defendant
25

2

1                        **I N D E X**

2    GOVERNMENT'S
     WITNESSES                                         PAGE
3
       MURLIE ANGELINE TYLER
4           Direct Examination by Mr. Hurt              90
            Cross-Examination by Mr. Dash             103
5      ANGEL L. WRIGHT
            Direct Examination by Mr. Hurt            113
6           Cross-Examination by Mr. Dash             127
       JENNIFER PHINNEY
7           Direct Examination by Mr. Hurt            133
            Cross-Examination by Mr. Dash             144
8      MARY JO LANE
            Direct Examination by Mr. Hurt            148
9           Cross-Examination by Mr. Dash             161
       LINDA REED
10          Direct Examination by Mr. Hurt            167

11

     DEFENDANT'S
12   WITNESSES                                         PAGE

13   NONE

14

15

16

17

18

19

20

21

22

23

24

25

                 JODY A. STEWART, Official Court Reporter

3

1                              **E X H I B I T S**

2       GOVERNMENT'S
        NO.             DESCRIPTION                          PAGE
3
        1-A             Photograph                            92
4       1-C             Photograph                            93
        1-B             Photograph                            94
5       1-E             Document                             103
        1-F             Document                             115
6       1-D             Photograph                           119
        1-G             Document                             138
7       2-A             Document                             138
        2-B             Photograph                           139
8       2-C             Photograph                           141
        2-D             Photograph                           142
9       2-E             Photograph                           153
        3-B             Photograph                           154
10      3-A             Photograph                           156
        3-C             Photograph                           159
11      3-D             Photograph                           174

12

        DEFENDANT'S
13      NO.             DESCRIPTION                          PAGE

14      NONE

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter

1          THE CLERK:  United States of America versus Hector
2     Javier Caraballo, criminal number 4:08cr35.
3              Is the Government ready, Mr. Hurt, Ms. Martin?
4              MR. HURT:  The Government is ready.  Good morning,
5     Judge.
6              THE COURT:  Good morning.
7              THE CLERK:  Defense ready, Mr. Dash?
8              MR. DASH:  Yes, we are.
9              THE CLERK:  Thank you.
10             THE COURT:  All right.  I believe that there was a
11    superseding indictment filed?
12             MR. HURT:  Yes, sir.
13             THE COURT:  All right.  The defendant obviously
14    hadn't been arraigned on that?
15             MR. HURT:  That's correct, Your Honor.
16             THE COURT:  All right.  All right, Mr. Dash.  You
17    want to come forward to the podium with your client.
18             Mr. Dash, I wanted you to let your client know, I
19    didn't realize it until I was getting into my final trial
20    preparations, but I'm a stockholder in BB&T, and I didn't
21    notice until we were going over the indictment to prepare for
22    the trial that BB&T was the bank apparently involved in each
23    of these incidents.
24             MR. DASH:  There were several of them, yes.
25             THE COURT:  And I want you to have a chance to

1    discuss that issue with your client --

2              MR. DASH:  Yes, sir.

3              THE COURT:  -- before we proceed further.

4              (Pause)

5              MR. DASH:  Your Honor, I have discussed it with

6    Mr. Caraballo, and we are still willing and ready to go

7    forward today with you as sitting as the judge.

8              THE COURT:  All right.  He understands that the

9    Court has a financial interest in this bank that he is

10   alleged to have robbed here?  You advised him of that?

11             MR. DASH:  Yes, sir.

12             THE COURT:  And he's willing to waive any conflict

13   of interest the Court may have in this proceeding?  Is he

14   willing to do that?

15             MR. DASH:  Yes, sir, he is.

16             THE COURT:  Do you understand what we are saying,

17   Mr. Caraballo?

18             THE DEFENDANT:  Yes, I do, Your Honor.

19             THE COURT:  Do you understand what it means to be a

20   stockholder?

21             THE DEFENDANT:  Yes, I do, Your Honor.

22             THE COURT:  All right.  And I don't know what the

23   extent of the loss was to BB&T in this proceeding, but that

24   would affect, whatever the loss was to BB&T, would affect, in

25   some degree, the Court's ownership of that bank.  Do you

1    understand that?

2              THE DEFENDANT:  I understand.

3              THE COURT:  And you wish to go forward with this

4    trial with me as the judge, understanding that; is that

5    correct?

6              THE DEFENDANT:  Okay, Your Honor.

7              THE COURT:  All right.  There has been a superseding

8    indictment filed in the case, and the defendant has to be

9    arraigned on that, so I'll ask the clerk to administer the

10   oath to the defendant.

11             (Defendant was sworn.)

12   BY THE COURT:

13   Q.  How old are you, Mr. Caraballo?

14   A.  40, 40 years old, Your Honor.

15   Q.  And how many years of formal education do you have?

16   A.  I have some college.

17   Q.  All right.  It appears to the Court that you are able to

18   read, write, and speak the English language; is that

19   accurate?

20   A.  Yes, Your Honor.

21   Q.  If I ask you any question that you don't understand, you

22   may confer with your attorney before answering the question

23   because I don't want you to answer it unless you understand

24   it.

25             Now, as you appear in court today, are you under the

1    influence of any drugs, narcotics, or alcohol?

2    A.  No, Your Honor.

3    Q.  Have you ever been treated for mental illness or

4    addiction to drugs, narcotics, or alcohol?

5    A.  No, Your Honor.

6    Q.  All right.  Have you had an opportunity to review the

7    superseding indictment with Mr. Dash?

8    A.  Yes, Your Honor.

9    Q.  As I understand it, the superseding indictment does not

10   add any charges, it simply corrects what were some technical

11   or typographical errors in the indictment; is that accurate,

12   counsel?

13          MR. DASH:  Yes, Your Honor.  As far as -- I believe

14   it corrects the spelling of his name as well as some errors

15   in the 924(c) counts, technical errors.

16          And I will tell you, Judge, that Mr. Hurt contacted

17   me about two weeks ago, told me that he was going to be

18   superseding and correcting the technical errors, provided me

19   an advanced copy of the superseding indictment last week so

20   that I had time to review it, go over it, and discuss it with

21   my client.

22          And although I only received the actual one that was

23   filed with the court yesterday, as the rest of us did, it

24   comes as no surprise to us, that we are certainly ready to go

25   forward.  In fact, our jury instructions that were submitted

1    a week ago comport with what I believe would have been the

2    superseding indictment.

3              THE COURT:  All right.

4    BY THE COURT:

5    Q.  You're charged in the superseding indictment,

6    Mr. Caraballo, with five counts of bank robbery, that is

7    counts 1, 6, 9, 12, and 13.  Now, the fact that this

8    indictment is pending against you in this court is no

9    evidence against you.  You're presumed to be innocent of all

10   of these counts, and the burden is on the Government to prove

11   your guilt beyond a reasonable doubt as to each and every one

12   of them.

13             Now, what is your plea to the five counts of bank

14   robbery, guilty or not guilty?

15   A.  Not guilty, Your Honor.

16   Q.  All right.  You're charged with the use of a firearm

17   during a crime of violence, and those charges are contained

18   in counts 2, 3, 4, 5, 7, 8, 10 and 11.  What is your plea to

19   those charges?

20   A.  Not guilty, Your Honor.

21   Q.  And you're charged in count 14 with being an unlawful

22   user of a firearm.  What is your plea to that charge?

23   A.  Not guilty, Your Honor.

24   Q.  All right.  And you've had an opportunity to review the

25   indictment and discuss all of the charges with your attorney?

1    A.   Yes, Your Honor.

2    Q.   And you've requested trial by jury?

3    A.   Yes, Your Honor.

4    Q.   And you understand that the jury will be convened and the

5    trial will go forward today?

6    A.   Yes, Your Honor.

7    Q.   And the fact that this superseding indictment is filed at

8    the last minute, so to speak, I assume, does not affect you,

9    based on what your attorney said, that you've known about it,

10   and it doesn't change any of the charges against you, it just

11   changes some technical language in the indictment; is that

12   right?

13   A.   Yes, Your Honor.

14        THE COURT:  All right.  You may have a seat with

15   your client.

16        All right.  John, when the jurors come in, would you

17   have them come in alphabetically so that they can be better

18   identified by counsel during the jury selection process?

19        We are ready for the jury now, counsel?

20        MR. DASH:  Yes, Your Honor.

21        MR. HURT:  Yes, sir.

22        THE COURT:  All right.  Both counsel are familiar

23   with the Court's procedure in jury selection?

24        MR. HURT:  Judge, I'm familiar with the ladder

25   method.  I have tried a case before Your Honor but --

1      THE COURT:  Well, we always do the defendant first

2   and then the Government.

3      MR. HURT:  Yes, sir.

4      THE COURT:  And we are going to put 12 names in

5   there, and you can strike as many of those 12 as your strikes

6   permit, but whoever both of you don't strike is on the jury.

7   And let's say that collectively the two of you strike eight

8   of the first 12 jurors, for example.  The four remaining

9   jurors are on the jury at that point.  You don't have another

10  opportunity to strike those four.

11      We'll put eight more jurors on there, and then your

12  strikes have to come from those eight.  And we'll keep

13  following that procedure until we get 12 jurors, and then

14  we'll pick two alternates.  And what I'll do for the

15  alternates is I'll put three names in the box, whatever you

16  call it, and each of you get one strike as to each alternate.

17  I think two alternates should be sufficient.

18      MR. HURT:  Judge, if I may inquire.  As we take our

19  strikes, is it one strike, one strike back and forth?

20      THE COURT:  Yes.

21      MR. HURT:  Thank you.

22      THE COURT:  You have one first, the defendant, and

23  then the Government and so on until they're all used up.  And

24  I give the jury the preliminary instructions while you're

25  doing the peremptory strikes, and I explain to them why I'm

1    doing that.  So you don't have to concern yourself with the

2    preliminary instructions I give to the jury because you're

3    familiar with what I'm telling them.

4         MR. DASH:  Judge, while we are waiting for them to

5    come in, just one other quick thing.  I had submitted some

6    proposed voir dire, and they are dealing with questions

7    specifically about whether or not they worked at a bank or

8    had family members that worked at a bank or financial

9    institution.

10        I don't know if the Court's inclined to ask those

11   questions, but we certainly would ask that when you go

12   through, in addition to your standard questions, the proposed

13   voir dire.

14        THE COURT:  All right.  For some reason -- well,

15   yeah.  I have your questions, and I don't have any problem

16   with any of them.  I'll ask all of them.

17        MR. DASH:  Thank you, sir.  And just one other quick

18   thing to just put it on the record before the jury comes in.

19   I've talked to Mr. Caraballo.  Whenever we have a bench

20   conference, or if you call us to the bench, he has decided

21   that he would like to stay at the table, and then I will back

22   brief him on what takes place up at the bench, unless you

23   decide that he needs to be there for some reason.

24        THE COURT:  All right.

25        MR. DASH:  Thank you, sir.

1          THE COURT:  I notice there is a spectator on the

2    right-hand side of the courtroom.  I think we are going to

3    have to seat the jury during the jury selection process.  So

4    if you don't mind sitting over here until we complete that

5    process.

6          (Jury panel enter courtroom.)

7          THE COURT:  You want to call the case again for the

8    jury.

9          THE CLERK:  Yes, sir.  Case of United States of

10   America versus Hector Javier Caraballo, criminal number

11   4:08cr35.

12         THE COURT:  All right.  Good morning, ladies and

13   gentlemen.  My name is Henry Morgan, and I'm the judge who

14   will be presiding over the trial which comes before you

15   today.  The first step of the trial is the selection of the

16   jury, and we're going to select 12 people and two alternates

17   to be members of the jury.

18         There are two parts to the selection process:  The

19   first part consists of questions that I will ask you for the

20   purpose of attempting, as best we can, to determine whether

21   you would be fair and impartial jurors in this particular

22   case.

23         I want to point out to you that the questions that I

24   ask you are general in nature, and that's because I don't

25   know, and the attorneys don't know, anything about your

1   background, other than what's on the jury information cards
2   that you filled out in connection with your service.
3           So I will have to rely upon you to be forthcoming in
4   responding to my questions, not only with information that
5   will answer the particular question, but also you should
6   supplement your responses with any information which in your
7   judgment you think might affect your ability to be a fair and
8   impartial juror in this case.
9           Now, remember, it's not only important that you be a
10  fair and impartial juror, but it's also important that it's
11  perceived that you will be a fair and impartial juror.  For
12  example, one of you might be related to one of the attorneys
13  in the case, and that doesn't mean that you would not be able
14  to fairly and impartially decide the issues, but it would
15  create a perception that perhaps you wouldn't be fair and
16  impartial in your judgment.  And that's the type of thing I'm
17  talking about.
18          So when the Court asks you questions, it's important
19  that you give them the broadest possible interpretation in
20  responding.  You should not find some reason not to respond
21  to a question.  You should always err on the side of giving
22  more rather than less information, and you should, if you in
23  your minds and hearts know of some information which you
24  think might affect your fairness and impartiality, or which
25  the public might think would affect it if the public had this

1    information, you should give that information to the Court

2    and the parties.

3            Now, before I begin asking you these questions, the

4    clerk will call the roll.  As your names are called, I will

5    ask each of you to stand and answer present.  I will ask you

6    to remain standing until the next juror's name is called.  At

7    that point you may take your seat.  So each juror will stand

8    as their name is called and remain -- and answer present and

9    remain standing until the name of the next juror is called.

10           All right.  Would you call the roll of the jury.

11           THE CLERK:  Yes.

12           (Roll call of jury panel.)

13           THE CLERK:  They are all present, Judge.

14           THE COURT:  All right.  If you would administer the

15   oath to the jurors on the voir dire examination.

16           THE CLERK:  Yes, sir.

17           If you'll please stand and raise your right hand.

18   You shall true and perfect answer make to such questions as

19   may be propounded to you by the Court or counsel, so help you

20   God.

21           THE JURY PANEL:  I do.

22           THE COURT:  You may have a seat.

23           All right, ladies and gentlemen.  There are two

24   basic questions which the Court must ask all potential

25   jurors.  The first is are each of you able to read, write,

1    and speak the English language sufficiently to be able to

2    understand and appreciate the evidence you hear, and review

3    any documents or other exhibits that may be presented in

4    evidence in the course of the trial?  If you are able to do

5    that, please stand at this time.

6         All right.  It appears to me that everyone is

7    standing, so I assume that all of your answers are in the

8    affirmative.

9         The second question is are all of you able to see

10   and hear well enough so that you will be able to listen

11   carefully to the testimony and observe accurately any

12   exhibits that are presented in evidence in the course of the

13   trial?

14        If you're able to do that, please be seated at this

15   time.

16        Yes, ma'am.  Would you give your name, please.

17        PROSPECTIVE JUROR:  Sandra Ray.

18        THE COURT:  All right.  It's Sandra Ray?

19        PROSPECTIVE JUROR:  Yes, sir.

20        THE COURT:  And what is your situation, Ms. Ray?

21        PROSPECTIVE JUROR:  Your Honor, I cannot actually

22   hear every word you're saying.  I'm having problems hearing

23   you.

24        THE COURT:  All right.  Well, I understand your

25   problem.  I have a hearing aid in both ears.

```
1              PROSPECTIVE JUROR:  I don't have good hearing, and I
2     have ringing of the ears, and when it's totally quiet and
3     you're the only one speaking, it is hard to hear you.
4              THE COURT:  All right.  Well, we -- whenever anyone
5     testifies, they have a microphone in front of them as I do.
6     Do you think that with the microphone being available that
7     you'll be able to hear all right?
8              PROSPECTIVE JUROR:  Yes, sir.
9              THE COURT:  All right.  That's fine.
10             All right, ladies and gentlemen.  The reason that I
11    ask you a series of questions is that we're attempting to
12    select a fair and impartial jury for this case.  Now, in
13    saying that, I'm not saying that we're trying to pass
14    judgment on whether you're a fair and impartial people.  I
15    assume that you are.  And obviously we're not going to be
16    able to go into any great depth with respect to your
17    individual situations because we don't know that much about
18    you.  And I say that in the hopes that you will speak up if
19    there's anything in your background that you believe might
20    affect your ability to be a fair and impartial juror.
21             And, again, when I ask you these questions, please
22    be forthcoming.  Don't try to think of some reason not to ask
23    a question.  Always err -- or not to answer question, always
24    err on the side of speaking up rather than not speaking up.
25             Now, I'm going to advise you of what the charges are
```

1   against the defendant in this case.  The reason I'm going to

2   do that is because I want you to understand the nature of the

3   case that will come before the Court beginning today.  I want

4   you to understand that the fact that criminal charges are

5   pending against the defendant does not constitute any

6   evidence against him.

7        At this stage of the proceeding, there's no evidence

8   against the defendant, and the defendant is presumed to be

9   innocent of all charges against him until the Government

10  presents evidence which persuades you beyond a reasonable

11  doubt that he's guilty of one or more of the charges against

12  him.  That is the foundation of our law, and if you're

13  selected to serve on a jury, you must accept that as the law

14  and not say to yourself, well, if the defendant wasn't

15  guilty, he wouldn't be in court.

16       I'm sure that you have all heard people say that,

17  perhaps in a light-hearted manner.  But this is not a

18  light-hearted situation, and that's not the law.  The law is

19  he's presumed to be not guilty of all charges unless and

20  until the contrary is proven beyond a reasonable doubt.  That

21  is the way you must look at this case.  And if you're not

22  willing to do that, then you're not going to be a fair and

23  impartial juror in this case.

24       Now, the Government is bringing the charges.  The

25  United States of America is bringing the charges.  The name

1    of the defendant is Hector Javier Caraballo.  I'm going to

2    first ask counsel for the United States to introduce himself

3    and his co-counsel and the other person at counsel table.

4           Now, I'll ask you to pay attention when these people

5    are introducing themselves because I'm going to later ask you

6    if you are related to these people or know them or have had

7    any contact with them.

8           All right, Mr. Hurt.

9           MR. HURT:  Good morning, ladies and gentlemen.  My

10   name is Eric Hurt.  I'm with the United States Attorney's

11   office.  Seated at counsel table with me is Katherine Martin,

12   also with the United States Attorney's office, and Special

13   Agent Scott Bailey with the FBI.

14          THE COURT:  All right, Mr. Dash.

15          MR. DASH:  Good morning, ladies and gentlemen.  My

16   name is Larry Dash, and I'm with the Federal Public

17   Defender's office.  I work out of Norfolk and Newport News

18   office.  With me today assisting me is our investigator, John

19   Mitchell, and we are representing Mr. Hector Caraballo.

20          THE COURT:  All right, ladies and gentlemen.  My

21   first question for you is are any of you related by blood or

22   marriage to counsel in the case or the people seated with

23   them at counsel table, whether it's the agent for the United

24   States or the defendant?  Are any of you related by blood or

25   marriage to any of these individuals?

1          All right.  The United States is represented by two

2    Assistant United States Attorneys who work for the United

3    States Attorney's office in the Eastern District of Virginia,

4    and they have offices in Newport News as well as Norfolk,

5    Richmond and Alexandria.

6          The defendant is represented by Larry Dash who works

7    with the United States Public Defender's office which also

8    has offices in Newport News, Norfolk, as well as Richmond and

9    Alexandria.

10         Now, I would like to ask you if any of you are

11   acquainted with not only with these attorneys but with any

12   employee in the office of the United States Attorney or the

13   United States Public Defender or whether you have any contact

14   with the agent for the United States or the defendant or know

15   them in any way for any reason whatsoever?  If you do, please

16   indicate such by standing.  I might add at this point that

17   the way you indicate to the Court that you have an

18   affirmative answer to a question is by standing.

19         Now, some questions that I ask you, a number of you,

20   I know, will have affirmative answers, so I'll ask you to

21   stand and remain standing until I call on you.  And questions

22   of that nature is the next one I have for you which is

23   whether any of you have previously served on a jury either in

24   state or federal court in Virginia or any other state?  And

25   when I say served on a jury, I don't mean been a member of

1    the jury panel, which is what you are now.  I mean have you

2    been actually selected to serve on a jury which has reached a

3    verdict in either a criminal or civil case?  If you've ever

4    done that before, please stand at this time.

5          All right.  I'm going to start on the first row on

6    my left and work my way back, and I want each of you to give

7    me four items of information.  And I'm going to ask you to

8    speak loudly because we want everybody in the courtroom to

9    hear you, and as you heard me indicate before, I'm a little

10   bit hard of hearing.  So I need to have you speak loudly.

11         I want you to give me your name first, always,

12   whenever you answer a question, even if you've answered a

13   question before, always begin by stating your name.  And I

14   want to know the court in which you served and the type of

15   case it was.  That is, was it a case where criminal charges

16   were brought against someone, or was it a case where people

17   had a dispute over money or property, which would be what we

18   call a civil case.  And finally, I want to know what the

19   outcome of the case was.  If it was a criminal case, did you

20   find the defendant guilty or not guilty, and what was the

21   nature of the charge, and if you decided punishment, what was

22   the punishment that you imposed?

23         In some courts the jury makes a determination of

24   punishment.  That is not the case in this court.  The Court

25   determines the punishment if the defendant is found guilty by

1   a jury.  But in some courts, the jury determines the

2   punishment.

3           So if you've sat on a jury and found someone guilty,

4   I want to know what the punishment was that you recommended

5   for the Court.  If it was a civil case, I want to know what

6   the outcome was.  Did you award money or some form of damages

7   to the plaintiff or did you find for the defendant?

8           All right.  Ma'am, on the first row.

9           PROSPECTIVE JUROR:  My name is Cynthia Carlson.

10          THE COURT:  I'm sorry.  I can't hear you.

11          PROSPECTIVE JUROR:  My name is Cynthia Carlson.

12          THE COURT:  All right.

13          PROSPECTIVE JUROR:  I served -- I don't remember how

14  long ago, many years ago, on court here in Newport News.  It

15  was a criminal court.  It was a robbery charge, and the

16  gentleman was charged with the crime.

17          THE COURT:  Did you find him guilty or not guilty?

18          THE DEFENDANT:  He was guilty.  And I do not

19  recall --

20          THE COURT:  Did you determine the punishment?

21          PROSPECTIVE JUROR:  I do not recall.

22          THE COURT:  All right.  Do you think that prior

23  service would affect your ability to be a fair and impartial

24  juror in this case?

25          PROSPECTIVE JUROR:  No.

```
 1              THE COURT:  All right.  Thank you, ma'am.  You may
 2     have a seat.
 3              Gentleman on the second row.
 4              PROSPECTIVE JUROR:  My name is James Chapman.  I've
 5     served on two juries.  First was in Virginia Beach.  It was a
 6     person was charged with arson, the jury found him guilty, and
 7     I don't know what the punishment was.
 8              THE COURT:  All right.
 9              PROSPECTIVE JUROR:  It was determined by the judge.
10     The second was the City of Hampton in the circuit court.  It
11     was a case of burglary, and the jury found the defendant
12     guilty, and, again, I don't know what the punishment was.
13              THE COURT:  All right.  Do you believe that your
14     service on either of those juries would affect your ability
15     to be a fair and impartial juror in this case?
16              PROSPECTIVE JUROR:  Yes, sir.
17              THE COURT:  Why do you feel that way?
18              PROSPECTIVE JUROR:  I feel it wouldn't affect me.
19              THE COURT:  What?
20              PROSPECTIVE JUROR:  I guess I didn't understand your
21     question.
22              THE COURT:  My question is do you think your service
23     on either of those juries would affect your ability to be a
24     fair and impartial juror in this case?
25              PROSPECTIVE JUROR:  No, sir.
```

```
 1             THE COURT:  All right.  Thank you, sir.
 2             All right.  Gentleman on, I believe, the third row.
 3             PROSPECTIVE JUROR:  My name is Matthew Wayne
 4   Grizzard.  I served in Circuit Court here in Newport News on
 5   Grand Jury duty, one day service.
 6             THE COURT:  Grand Jury, that is when you heard --
 7             PROSPECTIVE JUROR:  Approximately 200 cases, sir.
 8             THE COURT:  All right.  That is a little different
 9   than this service.  Do you think your service on the Grand
10   Jury would affect your ability to be a fair and impartial
11   juror on this case?
12             PROSPECTIVE JUROR:  No, sir.
13             THE COURT:  Thank you, sir.
14             Yes, ma'am.
15             PROSPECTIVE JUROR:  Judy North.  I served on a jury
16   in Newport News.  The charge was capital murder, and the
17   defendant was found guilty, but we did not determine his
18   sentence.
19             THE COURT:  All right.  Do you believe your service
20   on that jury would affect your ability to be a fair and
21   impartial juror in this case?
22             PROSPECTIVE JUROR:  No, sir.
23             THE COURT:  All right.  Thank you, ma'am.
24             Yes, sir.
25             PROSPECTIVE JUROR:  My name is Stephen Quick.
```

1          THE COURT:  I'm sorry?

2          PROSPECTIVE JUROR:  Stephen Quick.  I served on two

3    military court-martials.  The first was robbery.  We gave --

4    we found him guilty, gave him jail time, reduction in rank.

5    Second was a drug charge, found him guilty.  We gave him jail

6    time, discharged him from service.

7          THE COURT:  All right.  Do you think your service on

8    those military courts would affect your ability to be a fair

9    and impartial juror in this case?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  All right.  Thank you, sir.  You may

12   have a seat.

13         Yes, sir, on the back row.

14         PROSPECTIVE JUROR:  My name is Larry Sanderson.

15   About five years ago I served in York County.  The case was a

16   police officer charged with bribery.  The judge dismissed the

17   charges while waiting for trial.

18         THE COURT:  All right.  Do you think that your

19   service in that case would affect your ability to be a fair

20   and impartial juror in this case?

21         PROSPECTIVE JUROR:  No, sir.

22         THE COURT:  Thank you, sir.

23         Yes, sir.

24         PROSPECTIVE JUROR:  My name is John Swartzbaugh.  I

25   served on the Circuit Court of Newport News.  The defendant

1   was --

2           THE COURT:  I'm sorry.  You served on what now?

3           PROSPECTIVE JUROR:  City of Newport News Circuit

4   Court.  The charges were assault, and the defendant was found

5   guilty, and we did not decide punishment.

6           THE COURT:  All right.  Do you think your service in

7   that case would affect your ability to be a fair and

8   impartial juror in this case?

9           PROSPECTIVE JUROR:  No, sir.

10          THE COURT:  All right.  Thank you.  You may have a

11  seat.

12          Yes, sir.

13          PROSPECTIVE JUROR:  My name is John Williams, and I

14  served in Newport News, Virginia.  I think the guy robbed a

15  store or something.  He was found guilty.

16          THE COURT:  I'm sorry.  What was the charge?

17          PROSPECTIVE JUROR:  I think the guy robbed something

18  or stole something and was found guilty.

19          THE COURT:  Do you think your service on that jury

20  would affect your ability to be a fair and impartial juror in

21  this case?

22          PROSPECTIVE JUROR:  No, sir.

23          THE COURT:  All right.  Thank you, sir.

24          All right, ladies and gentlemen.  Ladies and

25  gentlemen, I'm going to give you the dates and places where

1   it's alleged that these offenses took place.  The reason I'm

2   doing that is because I'm going to then ask you if you have

3   any personal knowledge from any source regarding these

4   occurrences or whether you have gained any knowledge from any

5   media sources or from any source.

6         If you think that you have, just stand at the time

7   that I review whatever it is that you think you might be

8   familiar with and remain standing until I complete the review

9   of all of the incidences and the time and location.

10        The first count relates to an alleged offense which

11  occurred at the BB&T branch at 6720 Mooretown Road in York

12  County on November 6, 2006.

13        There is another count involving an alleged offense

14  which took place at the same BB&T branch at 6720 Mooretown

15  Road in York County, Virginia, on September the 8th, 2007.

16        The next location is the same, that is, 6720

17  Mooretown Road in York County on November the 10th, 2007.

18        The next event is alleged to have occurred on

19  February 25th, 2008 at the bank of McKenney, 4700 Jefferson

20  Park Road, Hopewell, Virginia.

21        The next offense relates to the date of March 5th,

22  2007 in Henrico County, Virginia; and also June 30th, 2007 in

23  Henrico County, Virginia; and August 24th, 2007 in Henrico

24  County, Virginia; September 29th, 2007 in Henrico County,

25  Virginia; and December 21st, 2007 in Henrico County,

1  Virginia; and February 25th, 2008 at the BB&T branch at 5100

2  Oaklawn Boulevard in Hopewell, Virginia.

3         All right.  I realize that that information is not

4  completely descriptive, but with that information, anybody

5  thinks they know anything about this case from any source,

6  please stand at this time.  I notice we have two people

7  standing.

8         First the gentleman on my left, if you will first

9  give us your name, and secondly give us the particular

10  incident about which you think you may have received

11  information.

12         PROSPECTIVE JUROR:  My name is Edwin Cooke.

13         THE COURT:  Can you speak a little louder,

14  Mr. Cooke.

15         PROSPECTIVE JUROR:  My name is Edwin Cooke, and I

16  remember a robbery at the bank.  I can't tell you any dates,

17  but I read in the paper, and I remember it being robbed maybe

18  two times, but I can't remember the information.  I know it

19  was robbed.

20         THE COURT:  All right.  What you remember, then, is

21  a particular bank being robbed two or three times?

22         PROSPECTIVE JUROR:  Right.

23         THE COURT:  And that would be the BB&T branch?

24         PROSPECTIVE JUROR:  Yes, sir.

25         THE COURT:  Is that the one you're talking about?

1           PROSPECTIVE JUROR:  Yes, sir.

2           THE COURT:  All right.  Now, do you think having

3    that information would affect your ability to be a fair and

4    impartial juror in this case?

5           PROSPECTIVE JUROR:  I don't think so.

6           THE COURT:  All right.  Thank you, sir.

7           Yes, sir.

8           PROSPECTIVE JUROR:  Your Honor, my name is Davison

9    Douglas.  I live in the City of Williamsburg.  You mentioned

10   a robbery on Mooretown Road, which is part of the city or

11   right outside the city.  If memory serves correctly, I

12   remember reading about that in the local newspaper the fact

13   that there had been a robbery.

14          At some point in time I had a conversation with the

15   BB&T employee at a different BB&T branch --

16          THE COURT:  Not to mention the content of that

17   conversation.

18          PROSPECTIVE JUROR:  Simple reference.

19          THE COURT:  Right.  So you had a conversation with

20   somebody at a BB&T bank.  Is there anything about your

21   reading about this or about the conversation you had that you

22   think would affect your ability to be a fair and impartial

23   juror in this case?

24          PROSPECTIVE JUROR:  No, sir.

25          THE COURT:  All right.  I'm going to ask you and

1   counsel to approach the bench so that you can tell me what

2   the nature of that conversation was.  If you'll just come

3   forward.

4           Ladies and gentlemen, let me explain to you, the

5   reason we have people come forward to the bench and whisper

6   to them is so, as you might suspect, so you won't hear us.  I

7   don't -- I hope you won't be offended by that or think we're

8   trying to hide something from you, but if somebody has

9   information which might be prejudicial to the jury, we have

10  to sometimes hear it out of your hearing.

11          Now, what I could do is ask every one of you to step

12  outside of the courtroom, which would be a bit awkward.  So

13  instead of doing it, what we do is we ask counsel to approach

14  the bench, and we talk about it up here in a low tone so that

15  you won't hear us.  So please understand that we do that to

16  be efficient, and I hope you won't think we are being

17  discourteous in doing it that way.

18          All right.  Please come forward.

19          (Side-bar conference:)

20          THE COURT:  Can you tell me what the nature of the

21  conversation was that you had with BB&T employee you think is

22  a employee at a different branch?

23          PROSPECTIVE JUROR:  I was at a different BB&T branch

24  in Williamsburg.  I was closing an account, and in the course

25  of my dealings with the branch employee, there had been a

1   robbery at another BB&T branch in Williamsburg, and I think I

2   said --

3           MR. HURT:  The clerk suggested we might be a little

4   quieter.

5           PROSPECTIVE JUROR:  So I think in the course of

6   closing out the account, I said I heard about the robbery,

7   and just said yes.  And I don't know if it was this one.  I

8   don't remember when that conversation took place.  It could

9   have been sometime in the last three or four years.  So

10  that's pretty general.

11          THE COURT:  It sounds pretty general to me.  Do you

12  think that would affect your ability to be fair?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Doesn't sound like it would affect.  I

15  mean, does anybody have any problem?

16          MR. HURT:  No, sir.

17          THE COURT:  All right.  Thank you.

18          (Prospective juror left side bar.)

19          MR. DASH:  While I'm up here, I wanted the Court to

20  know this morning as I was coming in court, I didn't

21  recognize -- I didn't know what she was here for, Ms. Kinsey,

22  number 16.  She asked me, she stopped me in the parking lot

23  and asked me for directions, and I just kind of gave her

24  directions as far as where the parking was and things like

25  that.  We didn't get into anything.  I didn't realize she was

1    a juror because I knew there was magistrate court going on,

2    as well, as other things going.  But I just wanted the Court

3    to know about I did have a conversation with her, however

4    brief it was with her.  I recognized her when roll was taken.

5              MR. HURT:  No problem.

6              THE COURT:  Okay.  Thank you.

7              (End of side-bar conference.)

8              THE COURT:  Counsel, did I cover all the locations?

9    Are there any locations that I left out?

10             MS. MARTIN:  No, Your Honor.

11             MR. HURT:  Judge, if I might.  Those locations in

12   Henrico County, there are some financial institutions

13   attached to those.  I don't know if the Court would be

14   inclined to give the names of those institutions.

15             THE COURT:  Well, if you have them, you can -- why

16   don't you give them to us at this time.  They're not in the

17   indictment so I don't have them.

18             MR. HURT:  For the March 5th, 2007 date, that

19   involves a Citizens & Farmers Bank on Williamsburg Road in

20   Henrico, County.

21             For the June 30th, 2007 date, that involved the

22   River City Bank at Nine Mile Road in Richmond.

23             The June 24th, 2007 date involved the Franklin

24   Savings & Loan on Nine Mile Road in Richmond.

25             The September 29th, 2007 charge involves, again,

 1  Citizens & Farmers Bank, this time on New Market Road in

 2  Henrico, County.

 3          The December 21st, 2007 event involves, again, the

 4  Citizens & Farmers bank on New Market Road in Henrico County.

 5  Those are the institutions the Court did not mention, Your

 6  Honor.

 7          THE COURT:  All right.  With that additional

 8  information, is there anyone on the jury panel who thinks

 9  that they have any knowledge of any of these incidents or

10  have gained any information from any other source about any

11  of these incidents?

12          Seeing no one standing, I assume that your answer is

13  in the negative.

14          All right.  Ladies and gentlemen, these incidents

15  involved financial institutions -- I guess they were all

16  banks, actually.  I would like to ask you a question, and I'm

17  going to phrase the question, "You or any member of your

18  immediate family."  Now, when I ask for any member of your

19  immediate family, what I mean by that is any person to whom

20  you are related who has -- who is now or has in the past

21  lived in the same household with you.  I'm not asking for

22  anybody that you're related to, but, rather, for anyone who's

23  related to you and who has lived in the same household with

24  you.

25          Now, if you have a particularly close relationship

1   with any other relative that you think would be relevant,

2   then you would respond in the affirmative.  So have any of

3   you or any members of your immediate family ever worked at a

4   bank or similar financial institution at any time in the past

5   or at the present?

6            All right.  Again, I'm going to begin in the front

7   and work my way back, first on the left side, and again I'll

8   ask you to give me your name and who it is that worked at

9   this bank or financial institution, whether it was you or if

10  it was your relative, who the relative was.

11           All right, ma'am, on the first row.

12           PROSPECTIVE JUROR:  My name is Cynthia Carlson.  My

13  husband a long time ago worked at the Bank of America in New

14  York City.

15           THE COURT:  All right.  Do you think your

16  association with the bank would affect your ability to be a

17  fair and impartial juror in this case?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  All right.  Thank you, ma'am.

20           Yes, ma'am.

21           PROSPECTIVE JUROR:  My name is Janine Carneal.  My

22  sister works for Wells Fargo Bank.

23           THE COURT:  Who works for Wells Fargo?

24           PROSPECTIVE JUROR:  My sister, she works for Wells

25  Fargo in Hampton, and always been in banking.  She worked for

1   Wachovia and then graduated from UVA.

2         THE COURT:  Do you think that would affect your

3   ability to be a fair and impartial juror in this case?

4         PROSPECTIVE JUROR:  No.

5         THE COURT:  Thank you, ma'am.

6         Yes, ma'am.

7         PROSPECTIVE JUROR:  My name is Jean Miller.

8         THE COURT:  I'm sorry.  I can't hear you.

9         PROSPECTIVE JUROR:  My name is Jean Miller, and my

10  son worked at Capital One in Richmond.  It is not a bank, a

11  financial institution.

12        THE COURT:  Do you think that would affect your

13  ability to be a fair and impartial juror in this case?

14        PROSPECTIVE JUROR:  No, I don't.

15        THE COURT:  Thank you, ma'am.

16        Yes, sir.

17        PROSPECTIVE JUROR:  Matthew Wayne Grizzard.  My wife

18  worked with the local credit union approximately 14 years

19  ago.

20        THE COURT:  Do you think that would affect your

21  ability to be a fair and impartial juror in this case?

22        PROSPECTIVE JUROR:  No, sir.

23        THE COURT:  Thank you.

24        Yes, ma'am.

25        PROSPECTIVE JUROR:  My name is Nancy Lee.  I work at

1    Towne Bank.

2            THE COURT:  Do you think that would affect your

3    ability to be a fair and impartial juror in this case?

4            PROSPECTIVE JUROR:  No, sir.

5            THE COURT:  Thank you.  You may have a seat.

6            Yes, ma'am.

7            PROSPECTIVE JUROR:  My name is Barbara Morris.  I

8    previously worked for Bank of America and currently work for

9    USAA, not in banking institution but still a financial

10   institution.

11           THE COURT:  Do you think that would affect your

12   ability to be a fair and impartial juror in this case?

13           PROSPECTIVE JUROR:  No, sir.  No, sir.

14           THE COURT:  Thank you.

15           Yes, ma'am.

16           PROSPECTIVE JUROR:  Judy North.  My daughter worked

17   for Old Point National Bank at one point when she was in

18   college, and my son-in-law worked for Wachovia and Capital

19   One in Richmond.

20           THE COURT:  Do you think that would affect your

21   ability to be a fair and impartial juror in the case?

22           PROSPECTIVE JUROR:  No, sir.

23           THE COURT:  Thank you.

24           Yes, sir.

25           PROSPECTIVE JUROR:  My name is Jason York.  I

1  currently own a mortgage company.

2          THE COURT:  I'm sorry?

3          PROSPECTIVE JUROR:  I currently own a mortgage

4  company in Williamsburg.

5          THE COURT:  All right.  Do you think that would

6  affect your ability to be a fair and impartial juror in this

7  case?

8          PROSPECTIVE JUROR:  Probably not, depending on the

9  exact nature of the claim.

10          THE COURT:  Well, what do you mean by probably not?

11          PROSPECTIVE JUROR:  I mean, I don't know all of the

12  financial stuff of what is being charged.

13          THE COURT:  I'm sorry.  I can't hear you.

14          PROSPECTIVE JUROR:  I don't know all the financial

15  charges that are being brought.  More than likely no.  I

16  don't think so.

17          THE COURT:  All right.  What is your name, sir?

18          PROSPECTIVE JUROR:  Jason York.

19          THE COURT:  Thank you.

20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  All right.  Now, I'm going to ask you

22  the same question only with respect to any close, personal

23  friend of yours.  Now, those of you who answered the first

24  time around, you don't have to respond again unless you think

25  that it might affect your ability to be a fair and impartial

1    juror.  But I'm going to expand the question that I just

2    asked about working with the bank and ask any of you if you

3    have what you would describe as a close, personal friend who

4    is now or who has worked at a financial institution?

5         Yes, sir.

6         PROSPECTIVE JUROR:  William Barker.  A close friend

7    of mine worked for Old Paint National Bank about 20 years

8    ago.

9         THE COURT:  Do you think that would affect your

10   ability to be a fair and impartial juror?

11        PROSPECTIVE JUROR:  No, sir.

12        THE COURT:  All right.

13        Yes, ma'am.

14        PROSPECTIVE JUROR:  Dyora Kinsey.  I have an

15   ex-sister-in-law that worked at a financial institution, and

16   I believe I had a cousin, who I don't have a lot of contact

17   with, that worked in Michigan at a financial institution.

18        THE COURT:  Do you think that would affect your

19   ability to be a fair and impartial juror in this case?

20        PROSPECTIVE JUROR:  No, sir.

21        THE COURT:  Thank you.

22        Yes, ma'am, in the back.

23        PROSPECTIVE JUROR:  Peggy Roach.  I have a close

24   personal friend that manages a bank and ex-daughter-in-law

25   that has been in banking in Northern Virginia.

1          THE COURT:  Do you think that would affect your
2    ability to be a fair and impartial juror in this case?
3          PROSPECTIVE JUROR:  I don't think so.
4          THE COURT:  Thank you, ma'am.
5          All right.  I want to ask the same question that I
6    asked you before, generally speaking.  I want to know if you
7    or any member of your immediate family or a close, personal
8    friend has ever worked as a security guard?
9          Yes, sir.
10          PROSPECTIVE JUROR:  My name is Vernon.
11          THE COURT:  I'm sorry.  Who worked?
12          PROSPECTIVE JUROR:  Vernon Beck.  I used to be a
13    security guard in Newport News Shipyard back in the early
14    '80s.
15          THE COURT:  Do you think that would affect your
16    ability to be a fair and impartial juror in this case?
17          PROSPECTIVE JUROR:  No.
18          THE COURT:  Thank you.
19          Yes, sir.
20          PROSPECTIVE JUROR:  My name is John Williams.  I
21    worked security guard at the Shipyard, also at a bank in
22    Norfolk about eight years ago.
23          THE COURT:  Do you think that would affect your
24    ability to be a fair and impartial juror in this case?
25          PROSPECTIVE JUROR:  No, sir.

1          THE COURT:  All right.  Now, ladies and gentlemen, a
2    number of the charges in this case have to do with possession
3    of a weapon in a situation where it is alleged that it could
4    have been a violent situation.
5          Now, I would like to ask if any member of the jury
6    or any member of your immediate family has ever been the
7    victim of any crime which involved the use of a weapon?
8          All right.  I'll start with the gentleman, I think
9    on the second row.
10         PROSPECTIVE JUROR:  Yes, sir.  My name is Davison
11   Douglas.  Some years ago I was held up on the streets of New
12   York at gunpoint.
13         THE COURT:  All right.  Do you think that experience
14   would affect your ability to be a fair and impartial juror in
15   this case?
16         PROSPECTIVE JUROR:  No, sir.
17         THE COURT:  Thank you, sir.
18         Yes, sir.
19         PROSPECTIVE JUROR:  Wayne Grizzard.  I have an
20   ex-brother-in-law that was shot here in the City of Newport
21   News in a robbery.
22         THE COURT:  Do you think that would affect your
23   ability to be a fair and impartial juror in the case?
24         PROSPECTIVE JUROR:  No, sir.
25         THE COURT:  Thank you, sir.

1          Yes, sir -- yes, ma'am.

2          PROSPECTIVE JUROR:  Kathleen Ring.

3          THE COURT:  I'm sorry?

4          PROSPECTIVE JUROR:  Kathleen Ring.  My closest

5   friend was raped at gunpoint.

6          THE COURT:  Do you think that would affect your

7   ability to be a fair and impartial juror in this case?

8          PROSPECTIVE JUROR:  I have very strong feelings

9   about the legal possession of firearms, and I do hold

10  a concealed weapons permit.

11         THE COURT:  And you do have a concealed weapon

12  permit?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  All right.  Does that mean that you

15  think you might have difficulty being a fair and impartial

16  juror in this case?

17         PROSPECTIVE JUROR:  I have strong feelings about the

18  legal possession of firearms.  I don't know -- I don't know.

19         THE COURT:  What was your name, ma'am?

20         PROSPECTIVE JUROR:  Kathleen Ring.

21         THE COURT:  Okay.  Thank you.

22         Yes, ma'am.

23         PROSPECTIVE JUROR:  My name is Katie Ross.  My

24  younger brother was physically assaulted and threatened with

25  a weapon.

1        THE COURT: Do you think that would affect your

2  ability to be a fair and impartial juror in this case?

3        PROSPECTIVE JUROR: No, sir. No.

4        THE COURT: Okay. Yes, sir.

5        PROSPECTIVE JUROR: My name is Paul Zoboli. My

6  father's uncle was murdered years ago. It was a robbery, was

7  hit -- beat up and hit with a small ax, died from it. My

8  mother's first husband was found dead in an apartment, and we

9  weren't sure if he had fallen or was hit in the head. But

10  both cases were never -- they were let go.

11        THE COURT: All right. Do you think that would

12  affect your ability to be a fair and impartial juror in this

13  case?

14        PROSPECTIVE JUROR: No.

15        THE COURT: All right. Thank you.

16        All right, ladies and gentlemen. Whenever we have a

17  case involving the placing of criminal charges, we always

18  have the involvement of law enforcement. I would like to

19  know if any of you or any members of your immediate family

20  are now or have been employed in any local, state, federal,

21  or law enforcement agency? If they have, please stand at

22  this time.

23        Yes, sir.

24        PROSPECTIVE JUROR: My name is James Davenport. I

25  have an uncle who used to be a Newport News police officer.

1    He has since retired.

2            THE COURT:  Do you think that would affect your

3    ability to be a fair and impartial juror in this case?

4            PROSPECTIVE JUROR:  No, sir.

5            THE COURT:  Thank you, sir.

6            Yes, sir.

7            PROSPECTIVE JUROR:  My name is Chuck Dofflemeyer.  I

8    was a military policeman at the Military Academy in West

9    Point.

10           THE COURT:  Do you think that would affect your

11   ability to be a fair and impartial juror in this case?

12           PROSPECTIVE JUROR:  No, sir.

13           THE COURT:  Yes, sir, on the first row.

14           PROSPECTIVE JUROR:  My name is Vernon Beck.  I was a

15   military policeman for twelve years.

16           THE COURT:  Do you think that would affect your

17   ability to be a fair and impartial juror in this case?

18           PROSPECTIVE JUROR:  No, sir.

19           THE COURT:  Thank you, sir.

20           Yes, ma'am.

21           PROSPECTIVE JUROR:  My brother is retired police

22   officer in Los Vegas, Nevada.

23           THE COURT:  Do you think that would affect your

24   ability to be a fair and impartial juror in this case?

25           PROSPECTIVE JUROR:  No, sir.

1              THE COURT:  Thank you.

2              Yes, ma'am.

3              PROSPECTIVE JUROR:  My name is Ann Nelin.  My

4    brother-in-law is a narcotics detective.

5              THE COURT:  Do you think that would affect your

6    ability to be a fair and impartial juror in this case?

7              PROSPECTIVE JUROR:  No, sir.

8              THE COURT:  Thank you, ma'am.

9              Yes, sir.

10             PROSPECTIVE JUROR:  My name is Steven Petrine.  I

11   have a in-law who was a police detective in New York City for

12   a number of years.  He has been dead a number of years, too.

13             THE COURT:  Do you think that would affect your

14   ability to be a fair and impartial juror in this case?

15             PROSPECTIVE JUROR:  No, I don't.

16             THE COURT:  Thank you.

17             Ma'am.

18             PROSPECTIVE JUROR:  My name is Deborah Wells, and my

19   daughter is a deputy in York County.

20             THE COURT:  Do you think that would affect your

21   ability to be a fair and impartial juror in this case?

22             PROSPECTIVE JUROR:  I do not.

23             THE COURT:  Thank you.

24             Ladies and gentlemen, I'm going to give you the

25   names of some individuals who may be witnesses in the case.

1           Now, this court serves a large community, and it

2     frequently is the case that there's more than one person in

3     the community with the same name.  So the fact that a name is

4     familiar to you doesn't mean that that person is a witness in

5     the case.  But if the name is familiar to you, I want you to

6     stand, and I'll ask you a couple more questions in an attempt

7     to determine if the person you know is a witness.  And I'm

8     going to read these, and I'm going to ask counsel if they

9     know of any other person who might be a witness whose name I

10    haven't called.

11          Angie Taylor, who I believe is an employee at the

12    BB&T on Mooretown Road -- Tyler, not Taylor.  Excuse me.

13    Angel Wright, who is also an employee of BB&T on Mooretown

14    Road; Jennifer Phinney, also a BB&T on Mooretown Road; Mary

15    Jo Lane at BB&T on Mooretown Road; Linda Reed at BB&T on

16    Mooretown Road; Sandra Gimbert at C&F on Williamsburg Road.

17    I don't know what C&F stands for.

18          MS. MARTIN:  Citizens & Farmers, Your Honor.

19          THE COURT:  All right.  Jennifer Sluder at Citizens

20    & Farmers on Williamsburg Road; Amanda Horsley at Citizens &

21    Farmers on Williamsburg Road; Karen Martin, River City on

22    Nine Mile Road; Vicki Sharp at Franklin S&L on Nine Mile

23    Road; Charlotte Thornton at Citizens & Farmers on New Market

24    Road; Paula Tiller at Citizens & Farmers on New Market Road;

25    Hollis Rocca at Citizens & Farmers on New Market Road;

1    Barbara Trivelli at McKenney at Jefferson Park Road; Jim

2    Nicol at the same location; Lillian Vega-Caraballo; Victor

3    Garcia; Scott Baber, special agent of the FBI; Jennifer

4    Collins, special agent of the FBI; Greg Federico, special

5    agent of the FBI; George DeShazor, special agent of the FBI;

6    mark Marshall of the Hampton Police Department; Charles

7    Matkovich of the Drug Enforcement Administration; Jason

8    Brewer, chemical unit of the FBI, and, of course, possibly

9    the defendant.

10          I don't see anybody rising so I assume that your

11   answer would be that you don't believe that you know any of

12   the individuals of whom I just called.

13          All right.  Ladies and gentlemen, this is a case in

14   which the United States has brought criminal charges against

15   a defendant.  A defendant is presumed to be innocent of

16   charges unless and until the prosecution, which in this case

17   is the United States, proves the defendant's guilt beyond a

18   reasonable doubt.  A defendant has the right to choose not to

19   testify in a criminal case, and if the defendant chooses not

20   to testify, you may not use that choice against the defendant

21   in determining his guilt or innocence.

22          Now, we've all heard people say, well, if the

23   defendant doesn't testify, he must be guilty.  Well, that's

24   simply not the law or the case in this situation or in any

25   other situation that comes before any court.  If you think

1    about it, it doesn't make sense that a defendant has to

2    testify when the burden is upon the prosecution to prove his

3    guilt.  So it's only logical that there's no duty on the

4    defendant to testify.  Under our Constitution he has the

5    right to remain silent, and you may not use that right

6    against him or may not use that choice against him in

7    determining his guilt or innocence regardless of what

8    feelings you may have about that right.

9         Now, with those basic principles in mind, is there

10   any member of the jury panel who thinks that they would not

11   be able to follow those principles for any reason, either

12   because you don't believe in those principles, or because you

13   don't believe that I'm correctly stating them, or for any

14   other reason?

15        Now, we're about at the end of my questions, and

16   when we finish the questions, then the next part of the jury

17   selection process involves the attorneys exercising what we

18   call their peremptory strikes.  And they have a right to

19   strike any member of the jury panel.  And in exercising their

20   right to strike them, they are entitled to full disclosure

21   from you as members of the jury, as is the Court entitled to

22   full disclosure.

23        Once the jury is selected, it's too late to make any

24   disclosure.  I've been a judge for a long time, and I've had

25   it happen many times when somebody was selected, and they

1    were sitting in a jury box on the panel, and they all of a

2    sudden raised their hand, and they wanted to bring something

3    to the Court's attention.  Well, it's too late.  It's too

4    late because by that time we've excused all of the people

5    that have been not selected to serve, and there you have it.

6    We can't do anything about it.

7            So if there's anything that you want to bring to the

8    Court's attention, this is the time to do it.  And only you

9    know in your own minds and hearts whether you can be fair and

10   impartial jurors in this case.  We can ask questions for as

11   long as we want, but only you know whether you can do it.  So

12   if any of you have any reason why you think you might not be

13   able to be a fair and impartial juror in this case, or

14   there's any information that you think that the parties are

15   entitled to know, this is the time to give it to me.

16           Now, if you have information that is of such a

17   private or confidential nature that you'd be uncomfortable

18   stating it in open court, you can stand, and I'll let you

19   write it down, and I'll look at it.  Now, of course I'll have

20   to show it to the attorneys, but I won't read it in open

21   court, and the attorneys and I won't use it for any purpose

22   other than jury selection.

23           But I understand that sometimes people have private

24   feelings that they're not comfortable stating in a public

25   arena such as this.  So this is it.  You got anything you

1   want to tell the Court, this is the time to do it, stand up,

2   and let me know what it is.

3           All right.  I assume that all of you, subject to

4   what you've previously said, believe you can be fair and

5   impartial jurors in this case?

6           All right.  I'll ask counsel to again approach the

7   bench.

8           (Side-bar conference:)

9           MR. DASH:  Judge, before we start, I think I know

10  where you're going, but one thing oftentimes judges ask, and

11  given this particular case, I think it's important that it be

12  asked, is since this case may go three to five days --

13          THE COURT:  Yeah, that's a good point.

14          MR. DASH:  -- want to know if anybody has any issues

15  with that.

16          THE COURT:  Yeah.  I'll do that.

17          MR. DASH:  Okay.

18          THE COURT:  Yeah, I usually do that.  I didn't think

19  about it.

20          All right.  I think this juror number 29, she was a

21  little squirrelly but I asked her --

22          MR. DASH:  I agree.

23          THE COURT:  I think she should be stricken for

24  cause.  I didn't have anybody else that I thought should be

25  stricken for cause.  Counsel feel otherwise about any juror?

```
 1              MR. HURT:  No, sir.

 2              MR. DASH:  I don't.

 3              THE COURT:  All right.  Then I will tell them about

 4    the time, and depending on what happens as a result of that,

 5    we'll proceed.

 6              Now, I don't announce that any particular juror has

 7    been excused.  What I do, I just tell Elva to remove her name

 8    so that she won't ever be put in the -- what we call that

 9    thing.

10              THE CLERK:  The box.

11              THE COURT:  -- whatever you call it, to be eligible

12    to be picked.

13              THE CLERK:  Yes, sir.

14              MR. HURT:  Yes, sir.

15              THE COURT:  All right.

16              (End of side-bar conference.)

17              THE COURT:  All right, ladies and gentlemen.  When

18    we select people to come to court to be on a jury panel --

19    I'll start over.  I forgot to turn the microphone back on.

20              When we select people to come to court to be on a

21    jury panel, they are selected from the community at large.

22    The reason for that is because we want the jury to select --

23    to represent the community as a large.  We don't want to

24    eliminate people because of any occupation or because of

25    race, religion, or national origin, or any such reason as
```

1   that.  We don't want to eliminate somebody because they are a

2   housewife.  We realize that people make varying degrees of

3   sacrifices to serve on a jury, but service on a jury is one

4   of the most important duties a citizen can perform.  So we

5   don't excuse people because they have young children at home

6   or because they're a commissioned salesman, because we don't

7   want to eliminate categories of people from the jury panel.

8          Now, this is a case that's probably -- I suspect the

9   evidence in this case will probably take approximately three

10  days to present, maybe four days to present.  When the

11  evidence is completed, then it'll -- after we give the jury

12  instructions and the attorneys argue the case, then it's

13  presented to the jury, and the jury begins its deliberations.

14  It's up to the jury to decide how long they need to

15  deliberate to reach a fair and impartial verdict.  So it's

16  difficult to predict exactly how long the case is going to

17  last.

18         And when I say the evidence will take approximately

19  three days, maybe four days, that's not exact either.  That's

20  simply my best estimate based on the advice of counsel.  I

21  haven't heard the evidence in this case before, either.  I've

22  heard bits and pieces of evidence in the case, but I haven't

23  heard the complete case.  So I'm like you, I'll be hearing it

24  for the first time.

25         The reason I bring this up is because there may be

1    some particular hardship that would be imposed on a member of

2    the jury panel to serve on a case that could take four --

3    three, four, probably four, maybe five days to resolve.  Now,

4    if any member of the jury panel thinks that they have some

5    particular hardship that's out of the ordinary that other

6    members of the jury panel don't have, then I'll be glad to

7    hear from you at this point.

8              Yes, ma'am.

9              PROSPECTIVE JUROR:  My name is Katie Ross.  I'm not

10   sure if other people have this situation, but I'm a student,

11   and I have finals this week.  My last final is Monday, and I

12   believe that if -- if I -- I have been told by my professor

13   that if I do not schedule them by a certain date, then I will

14   receive an incomplete for the whole semester.  So just

15   depending on how long it takes, I will miss out on a whole

16   semester of work.

17             THE COURT:  What is your name, ma'am?

18             PROSPECTIVE JUROR:  Katie Ross.

19             THE COURT:  Okay.  Thank you.

20             Yes, ma'am.

21             PROSPECTIVE JUROR:  My name is Christie Matthews.

22   My hardship is I'm a single mom with three kids.

23             THE COURT:  I'm sorry.  I can't hear you.

24             PROSPECTIVE JUROR:  I am a single mother of three

25   kids, and I don't live in this area, and if I'm here for

1   three or four days, I'm not sure what I will do with my kids.

2          THE COURT:  You're not sure what?

3          PROSPECTIVE JUROR:  I'm not sure who I will get to

4   care for my kids, put them on bus, activities.  I'm not sure.

5          THE COURT:  Yes, ma'am.

6          PROSPECTIVE JUROR:  I don't know if mine will

7   qualify as a hardship but my name is Dyora Kinsey.  I just

8   have some work requirements --

9          THE COURT:  I'm sorry.  What was your name, ma'am?

10         PROSPECTIVE JUROR:  Dyora Kinsey.

11         THE COURT:  And you have work requirements?

12         PROSPECTIVE JUROR:  And briefings.  I'm not sure if

13  that qualifies as a hardship but thought I'd bring it up.

14         THE COURT:  Yes, sir.

15         PROSPECTIVE JUROR:  David Shepherd.  I'm

16  self-employed at the present, and it costs me about a

17  thousand, $1200 as to whether I make a trip or not with that

18  truck.  I leave out on Wednesdays, come back on Saturdays.

19  I've got jury duty here, and then I'm right back up with jury

20  duty for Gloucester County, and that goes through February

21  the 27th.  If I've got to serve jury duty between now and the

22  27th of February, do you all give applications for welfare

23  and food stamps because I can't live that long and not make a

24  salary.

25         THE COURT:  Usually if you're called for jury

1    service twice within such a short period of time, they'll

2    excuse you in Gloucester.  And if you have a problem with

3    that, you let the Court know, this Court know, and we'll see

4    about it because usually they don't call people twice within

5    such a short time.  I mean, many people go their entire

6    lifetime and they're never called, and other people seem to

7    be called more often.  It's all a random thing, but that

8    happens.  But you shouldn't have to serve twice within such a

9    short period of time.

10           PROSPECTIVE JUROR:  Thank you.

11           THE COURT:  Thank you.

12           Yes, sir.

13           PROSPECTIVE JUROR:  Jason York.  I'm a sole

14   proprietor in a mortgage company.

15           THE COURT:  I'm sorry?

16           PROSPECTIVE JUROR:  Jason York.  As a sole owner of

17   my mortgage company, I have several files and customers that

18   are pretty much, their files are in limbo right now.  Once

19   I'm not there, everything stops.  They can't close, they

20   can't lock their loans.  So if it was a shorter time, I would

21   probably be okay, but if it is longer, especially with the

22   holidays coming up where everybody wants to close right

23   before the holidays, kind of a tough time for me and them

24   with no answers.

25           THE COURT:  All right.  Okay.

1              Well, yes, ma'am.

2              PROSPECTIVE JUROR:  Candyce Mayo.  I am also on a

3    jury panel for the City of Newport News that we have to

4    report again on next Monday.

5              THE COURT:  I'm sorry.  You have what Monday?

6              PROSPECTIVE JUROR:  On a jury panel for the City of

7    Newport News Circuit Court.

8              THE COURT:  On Monday?

9              PROSPECTIVE JUROR:  Yes, sir.

10             THE COURT:  Well, we can certainly take care of that

11   for you.

12             PROSPECTIVE JUROR:  No problem.

13             THE COURT:  All right.  I'll ask counsel if they'd

14   approach the bench again.

15             (Side-bar conference:)

16             THE COURT:  Well, I think we probably ought to get

17   rid of that student.

18             MR. DASH:  I would agree with that.

19             THE COURT:  That is number 31.  Okay.  Probably we

20   should get rid of the single mother.  That's -- I think she

21   has three children, number 18.  But that's it.  She and the

22   others are okay.

23             MR. DASH:  Judge, I just put it on the record, I do

24   have some concerns about the two individuals that basically

25   own their own business.  That would be number 38, Mr. York;

JODY A. STEWART, Official Court Reporter

1    and number 33, Mr. Shepherd.

2            THE COURT:  That is always the case with truck

3    drivers.  I don't think that's a reason to excuse them.  I

4    mean, people, you know -- that's the case with anybody who

5    works off commission or salary or hourly worker.  They

6    possibly -- we can't let everybody in that situation, in my

7    judgment.

8            MR. DASH:  Just put it on the record.  Thank you,

9    sir.

10           THE COURT:  Okay.

11           (End of side-bar conference.)

12           THE COURT:  All right, ladies and gentlemen.  We are

13   now going to begin the second phase of the jury selection

14   process.  Counsel for both sides has a right to exercise what

15   we call peremptory strikes.  While they're doing that, I'm

16   going to give you certain preliminary instructions.

17           Now, while I'm doing that, counsel will be working

18   on their peremptory strikes.  Now, they won't be paying

19   attention to what I say, but I don't want you to think

20   they're being impolite.  I've already told them I was going

21   to do this.  The reason I do this is to save time because

22   there are certain preliminary instructions that the Court

23   always gives to a jury.  And if I give it to you while

24   they're doing their strikes, that simply saves everybody's

25   time.  And they don't need to hear what I'm saying because

1   they are both -- they are all experienced attorneys, and what

2   I'm saying to you is mostly for the benefit of those of you

3   who haven't served on a jury before, or perhaps as a

4   refresher course for those of you who haven't served on a

5   jury in a long time.

6          Now, I'd like to begin by introducing to you the

7   other court officials who are working on the case.  Seated

8   directly in front of me is Elva Evans, who is what we call

9   the courtroom deputy clerk.  She keeps all of the court

10  records, she assists in administering the oath to the

11  witnesses, and is the custodian of all of the exhibits that

12  are introduced in evidence during the course of the trial.

13         Seated to her left and my front left is Jody

14  Stewart, who is the court reporter.  She transcribes all of

15  the proceedings including the testimony of the witnesses and

16  everything that the judge says and that you've said in your

17  response to questions.  However, I want to make it clear to

18  you that there will not be a transcript, that is a written

19  record, of the evidence in the case available to the jury

20  while the jury deliberates.  So don't rely on that.

21         It's up to the jury to listen carefully to the

22  evidence as it's presented.  Experience over many centuries

23  has taught us that a jury of 12 people, who are willing to

24  listen carefully to the evidence, will be able to remember

25  the evidence necessary to reach a fair and impartial verdict.

1   So it's up to you to listen to the evidence as it's

2   presented, and don't think that you'll have the luxury of

3   being able to go back and read it because that won't be

4   available to you.

5           Now, the gentleman seated to my right is John King.

6   He's the court security officer.  As his name suggests, it's

7   up to him to maintain the security in the courtroom.  He also

8   assists us in the handling of exhibits.  He will show the

9   jury in and out of the courtroom during recesses and when we

10  adjourn.  He's also available in the event the jury wishes to

11  communicate with the Court during the trial, and you

12  otherwise find it difficult to do so, you can always give the

13  information to Mr. King, and he'll pass it on to me.

14          Seated to my left is Joe Davis who's the law clerk

15  assigned to the case.  It's his job to assist the Court in

16  legal research and legal issues as they arise during the

17  course of the trial.  He also assists in administering the

18  oath to witnesses and sometimes in the handling of exhibits,

19  as well.

20          As I told you at the beginning, my name is Henry

21  Morgan.  I'm the judge who's presiding over the trial.

22          Now, we're going to select a jury of 12 persons and

23  two alternates.  The two alternates will not know who they

24  are.  The order in which you call -- in which you're called

25  to be seated in the jury box will not in any way reflect who

1    the alternates are, and the reason we don't identify them is

2    because until it becomes time for the jury to deliberate, the

3    duties of an alternate are no different than the duties of

4    anybody else on the jury.  However, in a criminal case, we

5    are not permitted by law to have more than 12 jurors.  So you

6    say why do we have 14, and that's because in a case which

7    takes several days, it's sometimes the case that someone

8    becomes ill.  You never know what's going to happen.

9            One case I had where two jurors were riding to court

10   together, and they got in an automobile accident, had to go

11   to the hospital.  They weren't, fortunately, injured very

12   seriously, but you never know what's going to happen.  So we

13   select two extra jurors so that in the event something

14   unforeseen happens and one of the original 12 are not able to

15   complete their service, we'll have somebody available to take

16   their place.

17           Now, it's the function of the jurors to be the judge

18   of the facts.  It's my job to be the judge of the law.  I

19   decide what the law is, and at the conclusion of the case, I

20   will give you instructions on what the law is and how you

21   should apply it to the facts.  But you decide the facts.  If

22   somebody says the light's green and another one says the

23   light's red, it's up to you to decide what color the light

24   is.

25           You're the judges of the facts.  You determine the

1   facts and the weight of the evidence, and you apply the facts

2   to the law as the judge gives it to you.  Now, I've given you

3   certain basic principles of law.  You must apply those

4   principles.  It's not up to you to substitute what you think

5   the law is or what the law ought to be but what the judge

6   tells you the law is.  You must follow the law as the Court

7   gives it to you.

8        Now, there'll be times during the course of the

9   trial that the Judge will make comments to the attorneys, or

10  I might ask a question of a witness, or I might ask to see an

11  exhibit, such as that.  Nothing that I do is intended to be a

12  suggestion to you as to what the outcome is of any issue or

13  what your decision is as to the facts.  Sometimes I do

14  something to try to make the case more efficient.

15       If I think an attorney is being repetitive, I might

16  make that observation.  I have to rule on objections.  If an

17  attorney does anything I think is wrong, it's up to me to

18  call the attorney down.  I doubt that'll happen in this case

19  because we have experienced counsel on both sides of the

20  case.  But if they did anything improper, I -- it would be my

21  job to correct that as best I could.

22       Now, let's talk about the evidence in the case.  The

23  evidence in the case consists of the answers that the

24  witnesses give to the questions put to them by the attorneys.

25  Questions are not evidence unless and until they're answered.

1    Now, some answers have no context without the question

2    because some questions are answered yes or no.  And without

3    the question, the answers standing alone would be

4    meaningless.  But the point we want to make is here that not

5    all questions are answered.  Some questions are objected to,

6    and sometimes the Court sustains the objection.

7          If I sustain the objection to a question, you should

8    ignore the question and act as if it had never been asked.

9    Sometimes that's difficult to do.  Sometimes you'll wish that

10   I had let the witness answer the question because you might

11   want to know what the answer is.  But the answer -- the

12   question may be an improper one.  The evidence may not be

13   proper evidence, so it's my job not to allow that to be

14   presented.

15         It's also the job of the attorneys to object when a

16   question is asked that they don't think is proper.  You

17   should not hold it against an attorney because he or she

18   makes an objection.  That's their job.  But what you should

19   not do is preoccupy yourself with trying to imagine what the

20   answer may be to a question which hadn't been answered, nor

21   should you occupy yourself with thinking of questions that

22   you would like to have asked that nobody asked because

23   perhaps those questions would not be proper evidence in the

24   case, and that's why they weren't asked.  Or perhaps nobody

25   knows the answer to the question, which might be another

1   reason why it hasn't been asked.

2          So don't focus your attention or allow yourself to

3   be distracted by speculating on questions that weren't asked

4   or on the answers to questions to which objections were

5   sustained.  Focus on the questions that were properly

6   answered and on the exhibits that are presented here in

7   court.

8          Now, sometimes an exhibit'll be presented and you'd

9   like to examine it more closely, and you don't have an

10  opportunity to do that, perhaps, during the course of the

11  trial.  Don't let that concern you because the exhibits will

12  go with you to the jury room during your deliberations.  So

13  you'll have an opportunity to examine the exhibits while you

14  deliberate.  If you don't have that opportunity in the course

15  of the trial, remember that you will in the future.

16         Now, we've talked about what evidence is, which is

17  answers to proper questions by witnesses.  What is not

18  evidence?  Well, obviously a question which isn't answered

19  isn't evidence.  And I have to fall back on some movies and

20  TV shows which I've seen in the past.  I try to stay away

21  from them because I'm offended by their inaccuracy in

22  portraying what really happens in the courtroom.  But at the

23  same time, I understand that they're intended to entertain

24  the audience, not to portray accuracy, and that's what you've

25  got to understand.

1           For example, when you're watching some show on

2     television, they'll have an attorney come up and ask a

3     question which the attorney knows is an improper question,

4     and the judge will glare at the attorney, and the attorney

5     will say "withdrawn" or some kind of thing like that, or the

6     objection sustained, and the attorney will turn around and

7     walk back with his or her back to the judge with a snide

8     expression on their face as if to say, well, I may not have

9     gotten an answer to that question but I planted an idea in

10    the minds of the jury.

11          Well, that sort of conduct is clearly improper, and

12    I don't think you'll see any of it in this case.  But if you

13    do, the Court'll let you know about it, and you should ignore

14    it.

15          Unfortunately, what really happens in a courtroom is

16    usually not of sufficient entertainment value to be presented

17    realistically in the movies or television.  Bear that in

18    mind.

19          What else is not evidence in the case?  Well, when

20    we finish selecting the jury, one of the first things we'll

21    do is we'll have opening statements from the attorneys.  The

22    attorneys will give you a road map of what they expect the

23    evidence to show.  But that's not evidence.  It's a

24    prediction on their part of what the evidence will be.  While

25    it's not evidence, it's very important because evidence is

1   presented one question at a time, one witness at a time, and

2   sometimes at the beginning of a case, in particular, you'll

3   wonder why somebody's asking a particular question.  It won't

4   perhaps make a lot of sense to you.  Well, hopefully, the

5   opening statements of the attorneys will allow you to put the

6   evidence in context so that as you hear it, you'll understand

7   why it's being asked.  So even though the opening statements

8   are not evidence, they're an important part of the case and

9   merit your attention.  Arguments by the attorneys are not

10  evidence in the case.

11          At the conclusion of the case, the attorneys have

12  the right to make closing arguments, and they will summarize

13  for you what they believe the important portions of the

14  evidence are.  But their arguments are not evidence in

15  itself.  So if, for example, the issue in the case was, was

16  the light red or green, and nobody testified as to that in

17  the course of the trial, then an attorney would not be

18  entitled to argue that the light was either red or green

19  because it wouldn't be any evidence on the point.

20          So they are entitled to summarize the evidence but

21  they can't add missing elements into the evidence that were

22  not presented in the course of the trial.  Sometimes I have

23  to tell you to disregard something that you've heard.  I know

24  that's difficult to do, and we go to great lengths to avoid

25  having to do that.  But if something of that nature occurs,

1    and I ask you to disregard it, you'll have to do that.

2    Anything you see or hear outside of the courtroom is not

3    evidence.

4            If, for example, there was an article written about

5    this case or it was on television, whatever was said there is

6    not evidence in the case.  If you happen to hear somebody

7    talking about the case in the hall, give them a wide berth.

8    Don't try to overhear what they're saying.  They might be

9    talking about the case and not realize you're a juror.

10           But in any event, anything you see or hear outside

11   of the courtroom is not evidence in the case.  For example,

12   it would not be proper for you to visit the site of any of

13   the incidents which are described in the evidence in this

14   case because that would be something outside of the evidence.

15   Your decision must be based on the evidence presented here in

16   the courtroom, not based on any predisposition you had before

17   you got here or anything that happened outside of court

18   during the time that you serve as a juror.

19           Now, evidence may be direct or circumstantial.  For

20   example, we may have a situation where -- and I'll use the

21   color of the light because it's a simplistic way to explain

22   it, but let's say we had an intersection where on one street

23   the cars were all stopped and on the other streets they were

24   all going through the intersection.  And let's say there was

25   a light at that intersection.  And let's say we had a witness

1    who said, well, I was looking at the intersection, and I saw

2    that the light was red or green or whatever.  That would be

3    what we would consider direct evidence.  We might have

4    another witness who said, well, I wasn't looking at the

5    light.  I was looking at the traffic, and all the traffic on

6    Washington Street was stopped and all the traffic on

7    Jefferson Street was moving.  Well, that would be evidence

8    that the light was green for the traffic on Jefferson Street.

9    That would be circumstantial evidence.  You would be entitled

10   to draw inference from the fact that all the traffic on

11   Jefferson Street was moving through the intersection and all

12   the traffic on Washington Street was stopped.

13          So either type of evidence is admissible, and it's

14   up to you to determine the weight to give direct or

15   circumstantial evidence.  You may believe, for example, that

16   the witness who saw the traffic moving on one street and

17   stopped on another is more persuasive to you than the witness

18   who said, well, I saw the car below.  That is your job as

19   jurors to consider all the evidence, to weigh the evidence,

20   and to make the determination as to what evidence is more

21   persuasive.

22          Suppose the testimony of two witnesses was

23   contradicted, which it might sometimes be.  It might be

24   contradictory because people observing the same offense

25   sometimes see it a little different, or it might be because

1    somebody is not telling the truth.  That's up to you to

2    decide.

3            The credibility of the witnesses, that is, the

4    weight their testimony deserves, who's being truthful and

5    who's not being truthful, is a decision for the jury.  And

6    you might say, well, how do I make such a decision?  Well, I

7    don't suggest to you that it's easy, but the way you make it

8    is to draw on your human experience.  Look at the weight.

9    Pay attention to the demeanor of the witness.  Think about

10   the opportunity the witness had to observe what he or she

11   testified to.  Think about whether he or she has an interest

12   in the outcome of the case, whether the testimony is

13   consistent with other evidence in the case which you find

14   believable, or whether it's inconsistent, or whether the

15   witness may have made prior statements which are inconsistent

16   with what they say in court.

17           In other words, draw on your human experience in

18   determining the credibility of the witnesses and the weight

19   that the testimony of different witnesses deserves.  Now,

20   this is a case involving criminal charges.  As I said to you,

21   there are certain basic principles that apply where criminal

22   charges are before you as jurors.  The first is that the

23   defendant is always presumed to be innocent until his guilt

24   is proven beyond a reasonable doubt.

25           Second, the Government always has the burden of

1   proof.  They must prove the guilt beyond a reasonable doubt.

2   If you think the evidence is in equipoised, then obviously

3   you cannot find the defendant guilty on such evidence.  They

4   have the burden of proving guilt beyond a reasonable doubt.

5           Also, since the government has the burden of proof,

6   the defendant has no obligation to testify or to present any

7   evidence.  The defendant does not have to prove his

8   innocence.  The Government has to prove his guilt.  So he may

9   elect not to testify or not to present any evidence.  If that

10  is the election he makes, that's not a reason to find him

11  guilty.  You cannot find the defendant guilty because he

12  elects to exercise his right not to testify.  You must find

13  him guilty -- if you find him guilty -- based on evidence

14  presented by the Government which persuades you beyond a

15  reasonable doubt that he's guilty.

16          I've been over the basic charges with you.  I'm not

17  going to give you my final instructions on the law applicable

18  to the case until I hear the evidence.  As I said to you, I

19  haven't heard all the evidence in the case, and until I do, I

20  cannot give you the final instructions.  When the evidence is

21  concluded, I will give you the final instructions on the law

22  applicable to the case.  I'll read them to you.

23          I will also have them in writing so that you can

24  take them with you into the jury room and review while you're

25  in there.  Now, if you're wondering why I'm going to read

1    them to you if you have them in writing in the jury room,

2    it's because the way the trial proceeds is that I read the

3    instructions to you and then the attorneys argue the case.

4         It will help you understand the arguments of the

5    attorneys if you hear the instructions first.  It will also

6    help you understand the instructions, experience tell us, to

7    have them read to you in addition to being able to read them

8    yourself while you're in the jury room.  So that's why we do

9    it that way.

10        Now, the way the case progresses is after we select

11   a jury, the next step in the process is the opening

12   statements of the attorneys.  Since the Government has the

13   burden of proof, the Government makes the first opening

14   statement.  Then the defendant has an opportunity to make his

15   opening statement.

16        After the opening statements are completed, then the

17   evidence is presented.  At this point there is no evidence

18   against the defendant.  At the conclusion of the opening

19   statement, there'll still be no evidence against the

20   defendant.  Until the Government begins its case, there is no

21   evidence against the defendant.  The fact that charges are

22   pending against him is not evidence against the defendant.

23        When the United States completes its evidence, then

24   the defendant has a right to present evidence and the right

25   to testify.  But there's no obligation on his part to testify

1   or to present any evidence.  If the defendant chooses to

2   present evidence or to testify, the Government, in some

3   circumstances, has the right to present what we call rebuttal

4   evidence.  That's not always the case but sometimes it is.

5   We'll have to wait and see.  After all the evidence is

6   concluded, the Court will give you its instructions.

7          After I give you most of the instructions, the

8   attorneys will argue the case.  When they finish arguing,

9   then I will give you a few closing instructions, and you will

10  begin your deliberations.

11         Now comes the part that most people find

12  counterintuitive, and that is, you're not permitted to

13  discuss the case with anybody, including your fellow jurors,

14  until you begin your deliberations.  Why, you say?  Well, two

15  major reasons.  First, you're not to decide any issue in the

16  case until you've heard all the evidence in the case, the

17  instructions of the Court, and the argument of the attorneys.

18  It would not be proper for you to even think about deciding

19  any issue until you've heard all of those matters.

20         Secondly, you may only discuss the case in the

21  presence of all of your fellow jurors.  Now, remember I said

22  that you won't have a written record of the testimony in the

23  case, but that we believe that if the jury listens carefully,

24  the combined memory of the 12 jurors will enable you to

25  remember all the evidence.

1          It would be very unlikely that any one juror could
2   remember all the evidence in the case.  But it is very likely
3   that all the jurors collectively will be able to remember all
4   the important evidence in the case.  So there are two very
5   good reasons why you cannot discuss the case with anybody
6   during the course of the trial, including your fellow jurors.
7          Now, even if you're deliberating and somebody goes
8   to the men's room or the lady's room, while they're gone, no
9   discussion of the case.  You can only discuss it when all the
10  jurors are present and not until you begin your
11  deliberations.
12          Now, what'll happen is you'll go home tonight, those
13  of you selected to serve on a jury, and your friends and
14  family will want to know what you're doing.  Well, what you
15  tell them is that you've been selected to serve on a jury in
16  this court and that's all you tell them.  You don't tell them
17  what kind of case it is.  You don't say whether it's a civil
18  case or criminal case.  You don't give them any details to
19  the case or anything such as that.
20          You can give them a prediction of how long the case
21  might last, for obvious reasons, but that's it.  Because if
22  you go any further than that, they might say something that
23  might inadvertently influence you, and that would mean that
24  you are depriving the parties of a fair trial.
25          So we've gone to all this trouble to try to give

1   them a fair trial, if you go home and talk about it with your

2   family, you are wiping that out, because your family hadn't

3   heard the evidence.  Your family hadn't answered any

4   questions on voir dire, and they may innocently say something

5   that might unintentionally affect your thinking, and all of

6   the hard work that we've done to try to select a fair and

7   impartial jury would be adversely affected.

8           So it's most important that when you go home at

9   night that you not discuss the case or allow anybody to

10  discuss it with you or read anything or watch anything on

11  television about the case.  If you want to go to lunch

12  together when we take a lunch break, that's fine, but you

13  can't talk about the case.  If you want to ride to court

14  together, that's fine, as long as you don't talk about the

15  case.

16          As I said, when you're entering and leaving the

17  courthouse, don't get in a conversation with anybody you see

18  around the courthouse because if somebody sees you talking to

19  somebody, they might be associated with the case and that

20  might give the appearance of impropriety.  And while you're

21  serving as a juror, you should conduct yourself the way you

22  would hope a judge would conduct himself or herself.  That

23  is, you should not allow your conduct to suggest in any way

24  that you're being anything less than fair and impartial.

25          So if you see people talking, give them a wide

1    berth.  That doesn't mean you can't say good morning or good

2    evening to somebody, but don't talk to them about anything,

3    even the weather, because it could be misinterpreted and

4    misunderstood.  You can't visit the scene of where any

5    incident in this case occurred.  You can't conduct any

6    research on your own, read anything to improve your knowledge

7    about any aspect of the case.  The knowledge that you're

8    supposed to base your decision is limited to the instructions

9    you get from the Court and the evidence that's presented here

10   in court.

11          You may, if you wish, take notes in the course of

12   the trial.  There is nothing magic about taking notes.  The

13   fact that one juror has written something down doesn't mean

14   that that note is more effective than another juror's memory

15   because we all know, sometimes when you take notes, you miss

16   something else.  If you're writing one thing down, then you

17   miss something else.  So I'm not saying to you that you

18   should or shouldn't take notes.  I'm just saying to you that

19   pay close attention, and obviously keep an open mind.  Don't

20   try to decide any issue until your deliberations begin.

21          Our schedule is that we begin in the morning at

22   approximately 10:00.  We go to lunch somewhere around 1:00,

23   come back at maybe 2:15.  We might go to lunch a few minutes

24   before 1.  We don't stop and start exactly at any particular

25   time.  We try to base it on where we stand so that we don't

1    have to interrupt a witness's testimony.  That's one of the

2    things we try to do.  We take a break in the middle of the

3    morning and in the middle of the afternoon.  We normally

4    adjourn around 5:00, but that's not exact.  We might adjourn

5    a few minutes before 5 or a few minutes after 5.  It depends

6    on where we stand with respect to the witnesses when 5:00

7    comes.

8            My prediction, based on what I've been told by

9    counsel, is that the evidence will take approximately three

10   days.  That's only a prediction.  When the evidence is

11   completed, it'll take us some time to put together the

12   instructions on the law applicable to the case.  I can't tell

13   you exactly how long that will take.  It depends on the

14   evidence.

15           But after we complete the evidence, the next step in

16   the case is the Court giving you its specific instructions

17   that'll deal with every single charge against the defendant.

18   And then after I give you the instructions, the Government

19   will make an argument.  After the Government makes its

20   argument, the defendant will make its argument.  And since

21   the Government has the burden of proof, the Government has

22   the right to make their final or rebuttal argument.  That's

23   the end.  We don't keep going back and forth taking turns

24   because it would never come to an end.

25           So the deal is the Government presents its evidence

```
1    first, then the defendant has an opportunity to present
2    evidence, then if the defendant presents evidence, the
3    Government may, not necessarily will, present rebuttal
4    evidence.  Same thing applies on closing argument.  The first
5    one goes to the Government, then the defendant argues, then
6    the Government has the right to make a rebuttal argument
7    because it has the burden of proof.
8          After the arguments are completed, the Court will
9    have two or three general instructions for you, and then you
10   will begin your deliberations.  The important thing to
11   remember is that you cannot talk to anybody, including your
12   fellow jurors, about the case until you begin your
13   deliberations.
14         How long you deliberate is up to you.  You
15   deliberate for whatever length of time it takes to arrive at
16   a fair and impartial verdict.
17         All right.  Where are we?
18         THE CLERK:  We are getting there, Judge.  We are not
19   there yet.
20         THE COURT:  Okay.  Well, we are most of the way
21   toward completing this process but we haven't quite completed
22   it, ladies and gentlemen.  It will probably take another,
23   say, five to ten minutes.
24         (Pause)
25         THE CLERK:  Judge, I've got a jury.
```

1          The following jurors have been selected for trial of
2     this case.  As I call your name, please come forward and have
3     a seat in the jury box.
4               (Roll call of jury.)
5               THE CLERK:  Please stand and raise your right hand.
6               You shall well and truly try and true deliverance
7     make between the United States of America and Hector Javier
8     Caraballo, the defendant at the bar, who you shall have in
9     charge, and a true verdict give according to the evidence, so
10    help you God.
11              THE JURY:  I do.
12              THE CLERK:  Thank you.
13              THE COURT:  All right, ladies and gentlemen.  We
14    normally take a recess after the jury is selected.  I have an
15    unusual situation today.  I have another matter I have to
16    take care of that's unrelated to this case.  So what I'm
17    going to do at this point is let you step in the jury room
18    and get yourself situated, and then we're going to take a
19    recess until 2 o'clock.  We normally take closer to an hour
20    for lunch, but I'm going to give you a little longer than
21    that because there is another matter that I have to rule on.
22    It won't take very long, but I'll do that.  So you'll have a
23    little longer lunch break than usual.
24              So as soon as you get yourself situated in the jury
25    room, you can just leave, take your lunch break, come back

1    directly to the jury room at 2:00, and we will then begin the

2    next phase of the case, which is the opening statements of

3    the attorneys.  So you can adjourn to the jury room.

4              (Jury out at 12:38 p.m.)

5              THE COURT:  All right, ladies and gentlemen.  I want

6    to thank each and every one of you for coming here today and

7    making yourselves available to serve on a jury.  We always

8    have to call a lot more jurors in for potential service than

9    end up serving, obviously, for two primary reasons:  The

10   first is that we don't know what your answers are going to be

11   to the questions we ask you until we've asked them and gotten

12   your answers, and so we don't know which members of the panel

13   should be excused.

14             Secondly, we have to have enough people here so that

15   counsel on both sides can exercise the peremptory strikes

16   that I mentioned to you.  Peremptory strikes are not anything

17   magic.  Sometimes jurors are stricken for reasons which are

18   not very scientific.  For example, some attorneys

19   automatically strike anybody that wears a necktie to court.

20   Some may strike everybody who doesn't.  So I say that simply

21   because I don't want you to feel that there is any personal

22   reflection on anybody because they're not selected to serve.

23   Not everybody on the panel makes it to the board where you're

24   either stricken or not stricken peremptorily.  So it doesn't

25   mean anything that you weren't selected.

1              It does mean something that you've come here today

2       and willing to serve.  The Court appreciates that.  Because

3       we know of the inconvenience associated with jury service,

4       your term of service is only two weeks long in this court.

5       It used to be two months.  Actually, it used to be four

6       months.  So I don't know how much longer you have in your

7       term but I would ask that you keep whatever communications

8       you've established with the clerk's office until your time is

9       completed.

10             If you wish to leave at this time, you may do so.

11      You don't have to leave.  If you would like to stay and

12      witness any portion of the trial, you have a right to do

13      that, as well.  But if you would like to leave at this time,

14      you may do so with the thanks of the Court.

15             All right.  As I mentioned to the jury, we have

16      another matter the Court will hear.  So we'll adjourn this

17      case till 2 o'clock.  I'm going to remain on the bench

18      informally.  That is, everybody except Mr. Dash has to deal

19      with this other situation, as well.

20             It's not necessary to rise when the jury enters or

21      leaves the courtroom.

22             The marshals may take charge of the defendant, and

23      we'll be adjourned in this case until 2 o'clock.

24             (Luncheon recess from 1:00 p.m. to 2:03 p.m.)

25             THE COURT:  All right, Mr. Hurt.  You wanted to

1    bring something up?

2         MR. HURT:  Judge, I've not tried a case before Your

3    Honor before, and I just wanted some clarification on the

4    Court's preferences as far as the introduction of physical

5    evidence and photographs.  We have provided the Court and

6    defense counsel with photographic copies of all of our

7    potential exhibits, which we hope correspond to the list that

8    we also provided to the Court.

9         There are, in many cases, tangible objects which

10   those photographs represent, which the witness will actually

11   see.  I did not know if the Court wants only the photograph

12   introduced into evidence or if the tangible object should be

13   introduced into evidence, and then at a later date the

14   photographs substituted?  The Government's open to any --

15        THE COURT:  Well, normally we would just introduce

16   the tangible exhibit, and we usually don't substitute

17   photographs until after the verdict.  I assume that any

18   weapons would have been disabled?

19        MR. HURT:  Yes, sir.

20        THE COURT:  As long as that's the case, we'll just

21   use the exhibit.

22        MR. HURT:  Yes, sir.  Thank you.

23        THE COURT:  All right.  Are we ready for the jury?

24        MR. DASH:  Yes, sir.

25        THE COURT:  Okay, Mr. King.

1              (Jury in at 2:06 p.m.)

2              THE COURT:  All right.  Good afternoon, ladies and

3     gentlemen.  The next step in the process is the opening

4     statements of the attorneys.  Before we get to that, I

5     believe one of the members of the jury indicated she'd been

6     summoned to Newport News Circuit Court?

7              A JUROR:  Yes, sir.

8              THE COURT:  If you'll bring your summons in tomorrow

9     and give it to Mr. King, we'll contact them.

10             The first opening statement we'll hear is from the

11    Government and then from the defendant.  As I mentioned to

12    you before, the opening statements are not evidence, but

13    they're a very important part of the case because they'll

14    give you a road map to what to expect from the evidence.

15             All right, Mr. Hurt or Ms. Martin.

16             MS. MARTIN:  May it please the Court, defense

17    counsel.  Ladies and gentlemen of the jury, the case that

18    you're about to decide is about a serial bank robber who

19    robbed eight banks at gunpoint and attempted to rob three

20    others.  During the first half of this trial, you're going

21    the hear from employees at each of those banks as they

22    describe each individual robbery.

23             During the second half of the trial, you'll hear how

24    the investigation of those robberies led law enforcement to

25    the person responsible for them, the defendant Hector

1    Caraballo.

2           Beginning in November 2006 up until February 2008,

3    the defendant robbed banks in York, Henrico and Prince George

4    Counties.

5           Beginning in November -- I'm sorry, the first

6    robbery on November 7th, 2006, took place at a BB&T Bank in

7    Williamsburg.  You'll hear employees at that bank as they

8    tell you that they saw the bank robber get into a silver

9    vehicle as he was leaving.

10          On March 5th, 2007, the Citizens & Farmers Bank in

11   Sandston was robbed.  Employees at that bank will testify

12   that the bank robber threatened that if any of them gave him

13   a bank security dye pack, that he would come back and get one

14   of them.

15          Several months later on June 30th, 2007, the River

16   City Bank in Highland Springs was robbed.  A bank employee at

17   that bank will testify that the bank robber threatened to

18   shoot an employee unless one of them let him into the bank

19   vault.  Fortunately, they were able to convince him that none

20   of them knew the combination.

21          Next, on August 24th, 2007, there was an attempted

22   robbery at the Franklin Federal Savings & Loan in Richmond.

23   Now, at that bank there's a plate of glass that separates

24   bank tellers from their customers.  A Franklin Federal

25   employee will testify that the bank robber tried to stick his

1    gun up under that glass to get them to open their door.  But

2    once he realized that they'd activated the alarm, he fled.

3         On September 8th, 2007, the first bank that was

4    robbed, that BB&T Bank in Williamsburg, was robbed a second

5    time.  Now, on that occasion a bank employee will testify

6    that she watched as the bank robber got into a silver vehicle

7    to leave, and she had time to write down the license plate

8    number.

9         Several weeks later, on September 29th, 2007, the

10   Citizens & Farmers Bank in Verona was robbed.  A bank

11   employee will testify that when the bank robber entered the

12   bank, he ran and jumped over the teller counter to get behind

13   the teller line and then forced tellers to empty their

14   drawers of money.

15        On November 10th, 2007, that BB&T Bank in

16   Williamsburg was robbed again, a third time.  A bank employee

17   will testify that she was watching as a dark blue vehicle

18   backed into the parking space at the front of the bank, and

19   she noticed that the license plate on that car matched the

20   license plate from the September robbery two months earlier.

21   She had just enough time to alert the other employees that

22   they were about to be robbed when the bank robber entered the

23   front door.

24        On December 21st, 2007, the Citizens & Farmers Bank

25   in Verona was robbed a second time.  On that occasion a bank

1    employee was going to the front door to lock up for the
2    evening when she saw the bank robber approaching.  She'll
3    testify that she quickly locked the front door, ran into the
4    bank, alerted the other employees, and some of them hid in a
5    back kitchen.
6              Moments after hiding in the kitchen, they heard
7    glass shattering as the bank robber broke in through a front
8    widow.  He jumped over the teller counter and then forced his
9    way into the kitchen where they were hiding.  He then herded
10   them back out to the teller line.
11             Finally, on February 25th, 2008, there was an
12   attempted robbery at the bank of McKenney in Hopewell.  A
13   bank employee will testify that when the bank robber found
14   the inside door of the bank locked, because it was after
15   closing time, he fled.  But a bank vice-president will tell
16   you that he followed the bank robber as he left the Bank of
17   McKenney in his late model silver Toyota Corolla.  He will
18   tell you that he later saw that vehicle parked up the street
19   in the parking lot of the BB&T Bank, and that he watched as
20   the bank robber tried the front door on that bank and also
21   found it locked.
22             Now, ladies and gentlemen, as you hear testimony
23   about each of those eight robberies and three attempted
24   robberies, the testimony of different employees at different
25   banks working during different robberies will start to sound

1   strikingly similar to you.  You will repeatedly hear bank

2   employees, different employees at different banks, testify

3   that the bank robber wore a black wig and a fake beard, that

4   he had a bandage covering his nose, that he wore a baseball

5   hat, gloves and a plaid flannel jacket, that he carried a

6   camouflage bag, that he had a medium build, that he spoke

7   with a foreign accent, and that he used a small silver

8   revolver.

9         On March 4th, 2008, the FBI, along with the York

10  County Sheriff's office and the Henrico Police Department,

11  held a press conference in an attempt to solicit help from

12  the public in catching this bank robber.  They provided

13  details about each of those robberies, and posted bank

14  surveillance photographs taken during several of the

15  robberies.  They also announced that a $20,000 reward would

16  be offered for information leading to an arrest and

17  conviction.

18        Now, that same day, Lillian Vega-Caraballo, the

19  defendant's ex-wife, happened to be watching television, and

20  she saw coverage of that press conference.  She will testify

21  that the build, the demeanor, the posture of the person in

22  those bank surveillance photographs instantly reminded her of

23  the defendant.  Not only that, but she will testify that the

24  clothes warn by the bank robber matched clothes regularly

25  warn by the defendant.

```
1          What's more, Lillian knew that the defendant, who is
2   originally from Puerto Rico, speaks with a heavy Hispanic
3   accent.  Now, while Lillian will testify that she struggled
4   with her decision, ultimately she decided to contact the FBI.
5          After the tip from Lillian, the FBI, along with
6   local law enforcement, began surveillance outside the
7   defendant's apartment in Newport News.  Over the course of
8   several weeks, in March of this year, they followed the
9   defendant as he got in his 1988 silver Toyota Corolla and
10  drove up 64 toward Mechanicsville, Virginia.
11         On each of those occasions they watched as the
12  defendant would put up window tinting on the windows of his
13  car before he got on the highway.  They watched as halfway up
14  64, he would exit, change the license plate on the car, and
15  then get back on the highway.
16         They watched as once he was in Mechanicsville, he
17  drove back and forth on Route 360, stopping and parking in
18  parking lots across from at least two separate banks.  They
19  also watched as the defendant repeatedly traveled to known
20  drug areas in Hampton, Virginia.
21         Now, after several weeks of surveillance, the FBI
22  obtained an executed search warrant for the defendant's car
23  and his apartment.  From the apartment they recovered -- and
24  you will have an opportunity to see during this trial -- a
25  black wig and a fake beard, a fake nose, and costume make-up.
```

1    They recovered baseball hats matching those warn during

2    several of the robberies.  They found a plaid flannel jacket

3    just like the one warn by the bank robber.  They found black

4    gloves.  They also found a number of license plates,

5    including a license plate matching the one used during that

6    September and November robbery at that BB&T in Williamsburg.

7           They also found a camouflage bag that appears to be

8    burned and stained with red bank dye.  They found money that

9    appears to be burned -- I'm sorry, stained with bank dye.

10   They also found a loaded .38 caliber silver revolver, and

11   they found drug paraphernalia.

12          The defendant was arrested, and in April of 2008 a

13   Federal Grand Jury returned a 14-count indictment charging

14   Hector Caraballo with eight counts of use of a firearm during

15   a crime of violence, five counts of bank robbery, and one

16   count of being an unlawful user in possession of a firearm.

17          Ladies and gentlemen, at the end of this trial,

18   after you've heard all of the testimony and you've seen all

19   of the evidence, the Government will ask you to return the

20   verdict that the testimony and evidence demands, the verdict

21   that justice demands, guilty on all counts.  Thank you.

22          THE COURT:  Mr. Dash.

23          MR. DASH:  Thank you, Your Honor.  May it please the

24   Court, counsel, members of the jury.  It's my pleasure today

25   to be representing Hector Caraballo on these charges that are

JODY A. STEWART, Official Court Reporter

1    currently pending before the court.

2           Assisting me, as I introduced earlier, is Shawn

3    Mitchell, who is an investigator with our office.  And what

4    you're going to see during the course of this trial is a lot

5    of inconsistencies and a lot of different types of testimony.

6           Now, Ms. Martin has gone through and explained to

7    you what she anticipates her evidence will be, and certainly

8    she has put that in the light that is most favorable to the

9    Government.

10          However, what we ask you to listen to is listen to

11   the evidence carefully and note the numerous discrepancies

12   that will arise during the course of the testimony.  There'll

13   be discrepancies as far as the race of the individual who has

14   robbed the banks.  There will be discrepancies as far as the

15   accent that the individual that robbed these banks spoke.

16   Some of them will say it was a middle eastern accent.  Some

17   of the individuals will testify, I anticipate, that it was a

18   black person versus a Hispanic person that robbed the banks.

19          Now, the Government obviously would like you to

20   believe that Hector Caraballo is responsible for every one of

21   these bank robberies.  And certainly when you listen to all

22   of the testimony and you listen to the discrepancies, that

23   isn't necessarily going to be the conclusion that you can

24   make.

25          Now, when you're listening to the evidence and the

1  discrepancies and such, I also ask that you pay attention

2  carefully to what one of the first things that the judge told

3  you when you came in here this morning, and that is that

4  Hector Caraballo is presumed innocent and carries that

5  presumption throughout the trial.  And it's the Government's

6  burden to prove beyond a reasonable doubt that he committed

7  each and every one of these robberies or attempted robberies.

8         In addition to the discrepancies, as you're

9  listening to the testimony, you're going to find that the FBI

10 had certain pieces of evidence that they could have tested

11 and did, in fact, test that does not match evidence that was

12 taken from Mr. Caraballo's residence.

13        For instance, on two of the robberies up in the

14 Richmond area, there were shoe prints that were left on the

15 countertop.  As whoever robbed the bank, jumps over the

16 counter, he left a shoe print.  And those shoe prints were

17 matched against the shoes that were about 10 or 12 pairs of

18 shoes that were taken out of Mr. Caraballo's residence, and

19 they were all sent to the lab, and none of those shoes

20 matched the actual shoe print that was left at the scene.

21        There's also at one of the robberies a fake nose

22 that was -- that had come off the robber.  That particular

23 item was checked, and there's no evidence that would match

24 that against Mr. Caraballo, no DNA, no skin that was sluffed

25 off or anything like that.  So there are discrepancies.  And

1      although Ms. Martin has laid out what she believes is the

2      perfectly good picture as far as implicating Mr. Caraballo in

3      all the robberies, there are numerous discrepancies that you

4      will see in each and every one of these robberies.  Some of

5      it is discrepancies amongst the actual individuals, the

6      victims that went through this ordeal of being robbed.

7              In fact, the BB&T Bank robberies that have been

8      mentioned -- this is the bank that was robbed three times in

9      Williamsburg -- through a good portion of the time, even the

10     BB&T employees, kept calling York County and saying, we think

11     we've seen the individual before.  We think we've seen him in

12     the bank before, and each and every time they described a

13     black man, and they turned over information to York County

14     indicating a black person that had robbed the banks.

15             Well, you can see for yourself that Mr. Caraballo is

16     not a black individual, and maybe there's discrepancies

17     amongst race and things like that, but the big thing is,

18     ladies and gentlemen, you have to evaluate all of the

19     evidence, and you have to look at each one of these robberies

20     individually, and it's you that has to determine whether or

21     not each robbery was committed by Mr. Caraballo or if it was

22     committed by somebody else.

23             Now, the Government has charged eight separate

24     robberies, basically, and some attempts, but you have to take

25     each one one by one and determine whether or not

1    Mr. Caraballo is guilty of robbery one, and then move on to

2    the second robbery and the third and the fourth and the

3    fifth.

4         Now, in addition to the robberies themselves, the

5    Government has charged use of a firearm during the commission

6    of these robberies.  And this is another area that I ask that

7    you listen to the evidence carefully because there's going to

8    be some witnesses that I would anticipate are going to say

9    they think or they thought it was a fake gun, wasn't even a

10   real gun.

11        You're going to find that one of the things that the

12   Government must prove is that a real gun was used in each of

13   these robberies.  In order to satisfy the elements of the

14   offense, they have to prove a real gun, not some replica, not

15   some toy gun, not some plastic thing that looks like a real

16   gun, but an actual, real firearm.

17        You're going to hear discrepancies amongst the guns.

18   Some are going to describe it as a black gun.  Some are going

19   to describe it as a silver gun.  There were discrepancies as

20   each person saw what really happened.

21        That, ladies and gentlemen, I will -- I'll have

22   another chance, one more chance to talk to you directly at

23   the end of the evidence, the conclusion of the case.  That,

24   ladies and gentlemen, I would submit, will be able to create

25   reasonable doubt as to the guilt of Hector Caraballo on each

1   and every one of these charges that are currently before you.

2         So, again, I ask that you listen to all of the

3   evidence with an open mind, look for discrepancies, listen

4   for discrepancies, and when all of the evidence is in, and

5   you've heard the instructions from the judge as far as what

6   the Government must prove beyond a reasonable doubt, it's

7   their burden, there will only be one verdict that can

8   logically be obtained, and that would be a verdict of not

9   guilty on each of the charges.  Thank you.

10        THE COURT:  All right.  Is the Government ready?

11        MR. HURT:  Your Honor, the United States calls Angie

12  Tyler.

13        THE COURT:  All right.

14         MURLIE ANGELINE TYLER, called by the Government,

15  having been first duly sworn, was examined and testified as

16  follows:

17                    DIRECT EXAMINATION

18  BY MR. HURT:

19  Q.  Good afternoon, Mrs. Tyler.  Would you please state your

20  full name and spell it for the court reporter, please.

21  A.  Absolutely.  It's Murlie Angeline Tyler, M-u-r-l-i-e,

22  middle name Angeline, A-n-g-e-l-i-n-e, last name Tyler,

23  T-y-l-e-r.

24  Q.  And how are you employed, Mrs. Tyler?

25  A.  I'm currently employed at BB&T.

1    Q.  And how long have you been employed there?

2    A.  I've been employed at BB&T since January 31st of 2006.

3    Q.  And do you have a specific branch that you are employed

4    at?

5    A.  At the current time I just accepted a promotion so I've

6    transferred to a different location.  My original location

7    was for the Lightfoot office in Williamsburg, Virginia.

8    Q.  And is that located on Mooretown Road?

9    A.  Yes, sir, it is.

10   Q.  Taking you back to November 7 of 2006, were you working

11   at that branch on that day?

12   A.  Yes, sir, I was.

13   Q.  And did anything unusual happen at the Mooretown Road

14   branch on November 7th of 2006?

15   A.  Yes, sir.  Um, we were robbed, basically.  I, um, was in

16   the process of being on the telephone speaking with a client

17   and sitting with my shoulder and my back area to the

18   entryway.  I was the only person on the platform side of our

19   branch, and I just had a feeling that there was a presence

20   there, and I turned around, and when I did, there was a

21   gentleman standing there with a gun in my face telling me to

22   get up and move.

23   Q.  Mrs. Tyler, if we could step back a little bit.  If I can

24   show you what has previously been marked as Government's

25   Exhibit 1-A and ask you to take a look at that.  Do you

1   recognize that item?

2   A.  Yes, sir.  That's the Lightfoot branch on Mooretown Road.

3           MR. HURT:  Your Honor, we would ask that

4   Government's Exhibit 1-A be introduced into evidence.

5           THE COURT:  Exhibit 1-A will be admitted.

6           (The document was received in evidence and marked as

7   Government's Exhibit No. 1-A.)

8   BY MR. HURT:

9   Q.  And this picture which has just appeared on the monitor,

10  is that the front of your bank?

11  A.  Yes, sir, it is.

12  Q.  Go ahead.

13  A.  It's the only entrance and exit besides the emergency

14  exit which is never used.

15  Q.  Now I would ask you to take a look at Government's

16  Exhibits 1-B and 1-C.  First, if you would look at 1-B, do

17  you recognize that, ma'am?

18  A.  Yes, I do.

19  Q.  What is that, please?

20  A.  This is the current floor plan at the Lightfoot branch as

21  it is today.

22  Q.  And how about 1-C?

23  A.  I recognize this one, as well.  This is our teller line

24  there, and it's -- there have been modifications to it.  It

25  was prior to our glass that was put up.

1    Q.  Is that the way the teller line looked on November 7th of

2    2006?

3    A.  Yes, it is.

4              MR. HURT:  Your Honor, at this time we would move

5    into evidence Government's Exhibit 1-B and 1-C.

6              THE COURT:  Is 1-B the way it was when the event

7    occurred, as well?

8              THE WITNESS:  1-B is not the way it is when my

9    robbery took place.  My desk was actually located in front of

10   the end office where the sitting furniture is now.  We

11   switched and moved my desk directly in front of the door

12   after other events there.

13             THE COURT:  Well, we'll admit 1-C.  It appears there

14   is some changes to 1-B.

15             (The photograph was received in evidence and marked

16   as Government's Exhibit No. 1-C.)

17             MR. HURT:  Judge, if I might.

18   BY MR. HURT:

19   Q.  Is the building, the way the building is laid out, is it

20   the same as it was in November of 2006?

21   A.  Yes, it is.

22   Q.  It is just the furniture has been moved around?

23   A.  Yes, it has.

24             THE COURT:  Can you show on there what's been moved?

25             THE WITNESS:  Yes, sir, I can.

1           THE COURT:  Okay.

2           THE WITNESS:  If you look at the diagram.

3           THE COURT:  Have you got something you can mark on

4    there with?

5           THE WITNESS:  I could mark.  These two areas, these

6    two items changed places.  So this was where the desk was in

7    11 of '06.  And also prior to the -- and this is the location

8    where it was moved to after that event.  So the furniture was

9    here.

10          THE COURT:  All right.  You have written on 1-B what

11   it looked like when this incident occurred?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  All right.  You can show that to

14   Mr. Hurt and maybe he can -- all right.  With those changes,

15   then, the Court will admit Exhibit 1-B.

16          (The photograph was received in evidence and marked

17   as Government's Exhibit No. 1-B.)

18   BY MR. HURT:

19   Q.  Now, Mrs. Tyler, you said that at the time of the bank

20   robbery or at the time that you were sitting at your desk,

21   you noticed a presence beside you?

22   A.  (Nods head.)

23   Q.  If you would, for purposes of this, mark where your desk

24   was located in November of 2006.

25   A.  (Witness complied.)

Tyler, M. - Direct                                             95

1   Q.  You've just put a red "X" over some chairs.  The chairs

2   are there as of today's date?

3   A.  Currently, yes.

4   Q.  Now, when you noticed this presence and you turned, what

5   did you see?

6   A.  I saw a gentleman standing there with a mask, was like a

7   plastic silicone -- may be the word for it -- mask in this

8   part of his area and bearded area here (indicating).  He was

9   wearing a white shirt, dark pants.  He was holding a

10  camouflage bag and a revolver.

11        He -- at first I was stunned.  I thought it was --

12  it wasn't real.  It didn't register for me what was actually

13  happening because it was a time in which the bank -- we

14  hadn't had customers for a little bit, and I had addressed

15  other administrative things that I needed to get done, like

16  making my phone calls.  So I was a little laid back, and he

17  told me to move, and I just didn't respond.

18        And his exact words in the beginning were, "Get up

19  and move."  And I sat there, and I looked at him, and I

20  couldn't move.  I froze.

21  Q.  So let me interrupt you for a minute.  After he said move

22  and you didn't move, what did he do next?

23  A.  He took the gun and put it closer to me and said, "Get up

24  and move now."

25  Q.  Now, this gun that you mentioned, can you describe it?

1    A.   I know that it was silver.  Um, I -- that's all that I

2    can say about it is that it was a silverish color.

3    Q.   When you say he put it close to you, where on your body

4    did he point the gun?

5    A.   At that time he had it in my space.  It wasn't actually

6    on my body.  It was pointed at me at this side of my

7    shoulder, because the way that we were sitting, he was

8    standing here to the left side of me, and I was still sitting

9    at my desk in my chair, and I had done a half turn to

10   where -- because when I very first recognized him, he was in

11   front of me as in at the point of the stand here.

12        And he came around my desk the first time when he

13   told me to get up and move, and that's when he put the gun on

14   me, and then I sat there.  I froze.  I turned -- my shoulder

15   area is where he had the gun, with this portion from the side

16   (indicating).

17   Q.   Now, the desk that you're sitting at, when you look

18   across your desk, what are you looking at?

19   A.   When I look across my desk, it would be diagonal -- well,

20   straight across would be my tellers.  To the left of me would

21   be the front door.  To the right of me would be our

22   conference area and our break room.  And behind me is my

23   manager's office.  And there are a work room directly beside

24   me to the left.  And then you would have, at the time was

25   Mary Jo Lane's office, and that is to the left beside the

1    work room.  Then you have the entrance to the bank and then

2    two other offices.

3    Q.  So as you look at this diagram in front of you which has

4    been admitted as 1-B, can you put an X -- or I'm sorry, can

5    you put a "T" where the teller line is on that?

6    A.  Absolutely.

7    Q.  So as you look across your desk, that -- you look across

8    the lobby of the bank?

9    A.  Correct.

10   Q.  Now, after this person put the gun closer to you, did you

11   ultimately get up?

12   A.  Yes, I did.

13   Q.  And how did that happen?

14   A.  Um, I rose.  He was standing in front of me with the gun

15   on me and at the same time walking towards the teller lines.

16   We got up to the portion right after where the podium was,

17   and he started brandishing the gun to the other two

18   individuals that were in the bank behind the teller line,

19   Angel Wright and Jenny Phinney, in this sort of a motion

20   (indicating) but still turning back to the side making sure

21   that I'm moving in the direction that he wanted me to.

22          When we got up to the corner of the teller line

23   where you actually have to go down the little tiny area that

24   is there to enter into the teller line, he put me in front of

25   him and started guiding me behind a teller line with the gun.

1              At that point in time, I felt the gun right at the

2    back of my head, my neck area.  He -- when we got to the

3    teller line entrance, there's a half door there that you

4    actually have to open.

5              When you go to open the door, it's a security

6    feature underneath where you have to take your finger and

7    press it in just the right spot to make that door open.  And

8    when we got up there, he was going over trying to figure out

9    how to open that door, and I remember him frantically trying

10   to shake that door and do it, and every time he did, I felt

11   the gun right at the back of my head.

12             And so I just said, "I'll get it.  I'll get it."

13   And I put my hand over and I opened it.

14   Q.  Now, the diagram in front of you, on the teller line

15   where you've marked a "T," there's a small indentation.  Is

16   that the door that you were referring to?

17   A.  Yes, sir.

18   Q.  So you opened the door for him?

19   A.  Yes, sir, I did, after his attempt failed and feeling the

20   pressure and the uneasiness that was there for me.

21   Q.  So once the doors opened, what did you do next?

22   A.  When the door was open, I entered in.  He was behind me.

23   He told me to open the door that leads into our vault room.

24   I immediately put my hands up and said, "I don't have my

25   keys.  They are back at my desk."  Because I couldn't get in

1   there, I didn't have my keys, and at that point it was almost

2   like a panic because -- for me, I didn't know what he was

3   going to do next.

4          He then turned, and in the same space -- I was

5   standing approximately at the second to third teller lane

6   there, and in the very same space, we are right behind the

7   teller, and he turns to Angela Wright and says to her, "Give

8   me all your money, no dye packs, no funny stuff, or I shoot

9   her right now."

10  Q.   And who was the "her" that he is referring to?

11  A.   To myself, to me.

12  Q.   So what happened next?

13  A.   From there, Angel is opening up her drawer.  She is like,

14  "Okay.  Okay.  No -- I'm doing it.  I'm doing it."  And she

15  is going to gather the money.  From there, he was back and

16  forth gathering the money and putting the money in his bag

17  but looking at myself and Jenny, who was the drive-through

18  teller, making sure that we were in position, and he was

19  taking his gun and aiming it at her and then back at Angel,

20  and then he grabbed me again and had me right there at him

21  with the gun.

22  Q.   Now, did you see whether or not money was actually taken

23  out of the drawers?

24  A.   Yes.

25  Q.   And where was that money put?

1   A.   That money was put into a green camouflage bag.  It was

2   like canvas material, something like what you see with the

3   sports bags that the kids will carry on their backs that have

4   the little strings.  It was that same material but it was

5   definitely camouflage.

6   Q.   So what happened next?

7   A.   From that point, he -- we have a car drive up at our

8   drive-through window, and he sees this, and he's like, "Oh,

9   man, that's messed up.  That's messed up.  She's calling the

10  police.  She's calling the police," is what he said over and

11  over again.  And he takes the money, he continues to say,

12  "Give me the money.  Hurry up."

13         He tells Angel or he says -- he makes the

14  statement -- neither one of us were clear which one he was

15  talking about at first.  He says, "You're coming with me."

16  And then he stepped back and came towards my direction with

17  the gun and said, "You're coming with me."  I started

18  stepping back towards our night drop, and I said, "No, I'm

19  not going with you.  I'm a mother.  I have two kids at home.

20  You need to get out of here and you need to get out of here

21  now before the cops get here."

22         And at that point in time, there was delay in

23  hesitation.  It was like he was kind of back and forth,

24  jittery.  He wasn't sure what course of action he wanted to

25  take.  But eventually he did turn and leave the branch.

1    Q.  Now, after he left the branch, what did you do?

2    A.  Oh, um, locked -- Angel locked the doors.  I got

3    immediately on the phone with the response -- 911 and with

4    our center, our emergency center.  And in addition to that,

5    we have plans in place by BB&T that we have to react to.

6    Q.  Now, the person that you've described who did all of

7    these acts, were you able to see what any distinguishing

8    characteristics or anything about the person behind the mask?

9    A.  Absolutely.  There was, in the back, one of the -- the

10   wig that he wore was, like, long, straight, black, greasy

11   stuff.  But when he would move a certain way, you could see

12   the skin color here being of a light olive complexure (sic).

13   Q.  I'm sorry to interrupt you but you just motioned or

14   marked or indicated the back of the neck area?

15   A.  Right in here, like right in here (indicating) was an

16   area that was open.

17   Q.  The side of the neck?

18   A.  Uh-huh.  It was like when this moved, when that area

19   moved right there (indicating).  The other place that I could

20   see was his glove.  He wore black leather gloves, and right

21   here in-between his turtle neck (indicating), and when he

22   would move his hand downward or flex his hands, I could see

23   his skin tone there.

24          Other distinguishing factors, he spoke with an

25   accent.  To me it seemed like it was Spanish.  It took me a

1   few minutes to kind of register that in my head because at

2   first it was, like, very poor.  And I thought maybe he was

3   just pretending, but then the more I heard it, it was very

4   fluent that he was trying to cover up a Spanish accent or a

5   heavy accent that was there.

6   Q.  And how large was this person?

7   A.  I'm not for sure what the height.  I had the height

8   screen there that I was able to match him to, but this has

9   been two years ago.  So for the exact height, I couldn't tell

10  you.  He was a pretty -- I don't know what the right word is.

11  He was not overweight like extremely overweight but not a

12  small person either.

13  Q.  Now, as an employee of BB&T Bank, are you familiar with

14  what's called the Federal Deposit Insurance Corporation or

15  the FDIC?

16  A.  Yes, sir, I am.

17  Q.  And do you know whether or not BB&T is insured by the

18  FDIC?

19  A.  Yes, sir.  We provide it for our customers.

20  Q.  So that's an -- the bank is insured by FDIC?

21  A.  Yes, sir.

22      MR. HURT:  Your Honor, at this time we would ask

23  that the item on the screen be printed, and we would move

24  that into evidence as Government's Exhibit 1-E.

25      THE COURT:  All right.  You can do that.

1          (The document was received in evidence and marked as

2    Government's Exhibit No. 1-E.)

3          MR. HURT:  I have no further questions.

4          THE COURT:  All right, Mr. Dash.

5                    CROSS-EXAMINATION

6    BY MR. DASH:

7    Q.  Good afternoon, Ms. Tyler.

8    A.  Good afternoon, sir.

9    Q.  Now, Ms. Tyler, this happened on November 7th of 2006,

10   two years ago, correct?

11   A.  That is correct.

12   Q.  And certainly since that period of time you've had plenty

13   of chances to think about what happened and discuss it with

14   other employees that were at the bank that day and such like

15   that, correct?

16   A.  We dealt with it the next morning in a crisis situation,

17   and then we were instructed, and based upon BB&T policy, that

18   we were to not discuss it.  If we needed to discuss it, we

19   were to discuss it with our individual counseling crisis

20   specialist.

21   Q.  And you've talked to the agents and the attorneys in

22   preparation for this also, correct?

23   A.  Yes, sir.  I was interviewed at my branch in reference to

24   this on a formal interview.

25   Q.  Was that an interview where they did several people at

1   the same time or was that a one-on-one?

2   A.  It was a one-on-one.  It was myself and two other

3   representatives.

4   Q.  Now, when this first took place on November 7th, 2006,

5   you actually provided a written statement to the York County

6   Sheriff's office, correct?

7   A.  I did.

8   Q.  In fact, you were probably interviewed on at least a

9   couple of occasions by a couple different officers and then

10  provided the statement, correct?

11  A.  I don't recall how many different officers it was.  I was

12  interviewed, but I wasn't taken to different locations.

13  There were people in and out and --

14  Q.  Most likely a uniformed --

15  A.  Well, to be honest with you, at that point in time I was

16  very much in shock, and I was very upset.  After we got

17  through doing the policies and procedures that we needed to

18  do, I broke down.  So I can't really --

19  Q.  Ma'am, if I could just ask --

20          THE COURT:  Wait.  Don't interrupt the witness's

21  answer, Mr. Dash.

22          MR. DASH:  Well, Judge, I would object as

23  nonresponsive to my question.

24          THE COURT:  Overruled.  Go ahead.  Finish your

25  answer.

1    BY MR. DASH:

2    Q.   Okay.   When this first happened, uniformed officers

3    showed up, correct?

4    A.   That is correct.

5    Q.   And interviewed you and talked to you about what happened

6    just briefly?

7    A.   I don't believe it was a uniformed officer.   The first

8    person who started -- I cannot be 100 percent positive, but

9    it was a detective that I actually spoke with, I believe.

10   Q.   Well, you did speak with Investigator Ivy from the York

11   County Sheriff --

12   A.   That is correct.

13   Q.   And when you talked to Investigator Ivy, you actually

14   described this bag, this cloth bag as a beige in color bag,

15   correct?

16   A.   It had beige in it, yes, sir.   It was camouflaged.

17           THE COURT:   Do you have a copy of what you're using

18   to cross-examine the witness?

19           MR. DASH:   I do, Your Honor.

20           THE COURT:   Well, I need to see that.

21           MR. DASH:   Judge, this is my only copy of what I

22   have.

23           THE COURT:   Well, whenever a witness is

24   cross-examined on the basis of a prior statement, Mr. Dash,

25   we must read the statement exactly as it's written and not

1    paraphrase it.

2              MR. DASH:  I understand.  But this --

3              THE COURT:  And I should have a copy if you're going

4    to use it for that purpose.

5              MR. DASH:  This is not cross-examination of a prior

6    statement at this point in time.  This is cross-examination

7    of what she actually said to investigators.  These are

8    investigative notes.

9              THE COURT:  Well, you're asking her what she said to

10   the investigator, and you're using the investigator's notes

11   for that purpose?

12             MR. DASH:  I am, Your Honor.

13             THE COURT:  All right.  Well, I think, number one,

14   we should know that; and number two, I should have a copy of

15   it.

16             MR. DASH:  If I could have a moment, Judge.

17             THE COURT:  Because we can't paraphrase what

18   somebody said in cross-examination.  That's the problem that

19   I frequently run into.

20             MR. DASH:  Judge, could I ask for a bench conference

21   on this?

22             THE COURT:  You may.

23             (Side-bar conference:)

24             MR. DASH:  Judge, I've never seen this happen where

25   an individual now all of a sudden --

1            THE COURT:  You know what?

2            MR. DASH:  I've never seen when an individual's

3    testifying and she has said something differently before.

4            THE COURT:  I can't hear you.

5            MR. DASH:  I don't want the jury to hear,

6    unfortunately.

7            THE COURT:  You're going to have to speak loud

8    enough so I can hear.

9            MR. DASH:  This witness was interviewed.

10           THE COURT:  Okay.

11           MR. DASH:  Okay.  At the time she provided a written

12   statement.

13           THE COURT:  Okay.

14           MR. DASH:  Okay.  But in the interview she told the

15   person one thing that is entirely different than what she has

16   testified to today.

17           THE COURT:  If you're going to cross-examine her on

18   the basis of what she told somebody else, all you're entitled

19   to do is ask her what she told him.  And then you can call a

20   witness to say if it's different than what she said.  You

21   can't read off somebody else's notes and use that for

22   cross-examination.

23           MR. DASH:  Judge --

24           THE COURT:  Don't tell me.  I'll tell you.

25           MR. DASH:  Okay.

1          THE COURT:  That is what you can do.  You understand

2     that?

3          MR. DASH:  I understand.

4          THE COURT:  If she said something to a particular

5     individual, you cannot paraphrase it.  You must ask by the

6     individual, and if her testimony is different, you can call

7     the individual to contradict her.  You cannot paraphrase.

8     Didn't you say something different?  Never said such a thing.

9     You cannot do that.  Now, let me see it.

10         MR. DASH:  Right here, Judge.

11         THE COURT:  All right.  You can say did you say to

12    so and so that he had a golf bag, beige in color.  That is

13    what you can say.

14         MR. DASH:  That is what I thought I asked, Judge.

15         THE COURT:  Not exactly.

16         MR. DASH:  Okay.

17         THE COURT:  That is what you can do.

18         MR. DASH:  Okay.  I will make copies.  Do you want

19    copies of all of my notes that I'm going to be using for

20    cross-examination?

21         THE COURT:  The problem is that people and -- I

22    don't mean to single you out, but I have brought it up to all

23    attorneys taking something like that and paraphrasing and

24    using that as the basis for questioning, which you cannot do.

25    You cannot take it and put it in your own words and use it as

1    your attempt to contradict the witness on a prior

2    inconsistent statement.  If you're going to have a prior

3    inconsistent statement, it must be read exactly as it's

4    given.

5              MR. DASH:  Yes, sir.

6              (End of side-bar conference.)

7    BY MR. DASH:

8    Q.  Mrs. Tyler, do you recall talking to Investigator Ivy on

9    the day of the robbery, November 7th, 2006, correct?

10   A.  Yes, sir.

11   Q.  And at that time you told Investigator Ivy, did you not,

12   that the suspect had a cloth bag, correct?

13   A.  I can't speak for my exact words.  I remember having a

14   conversation with him.  This was two years ago.  I'm pretty

15   sure that I said that it was a bag.

16   Q.  Do you recall telling Detective Ivy that the cloth bag

17   was beige in color?

18   A.  I don't know if I used the word "beige."  I used the word

19   "camouflage."  If Detective Ivy interpreted that as beige,

20   well, camouflage is green, beige.  It's got browns.  There

21   were all different colors in there.

22   Q.  Now, the firearm that you testified to earlier, you

23   testified that this was a silver gun, correct?

24   A.  That's correct.

25   Q.  This is a shiny silver or a dull silver?

1   A.   I have put that item out of my memory because that

2   brought threat to me.  So I cannot tell you at this time, I

3   cannot be sure, because I didn't want to remember the gun,

4   and I have a hard time remembering.

5   Q.   Okay.  But at the time of the incident, you were

6   certainly clear in what happened when you gave this

7   statement?

8   A.   No.  I was clear in what had happened.  As to details, I

9   gave them to the best of my ability.  But I was in shock.  I

10  was crying.  I was almost hyperventilating.  This man had

11  just threatened my life, and he had just tried to force me to

12  exit my bank, my safe zone where I'm supposed to be able to

13  go to work every day.  I felt violated in a way in which

14  nobody should have to feel.

15  Q.   Ma'am, at the time you told investigators that you

16  believe the individual who robbed the bank was a bi-racial,

17  light-skinned black male, correct?

18  A.   No, sir.  My exact words were that it was a bi-racial or

19  someone of olive color, olive skin tone.

20  Q.   Now, when you were interviewed, you also indicated, did

21  you not, that earlier that day that there had been somebody

22  in the bank that you believed was now responsible for the

23  robbery?

24  A.   We had several suspicious incidents that had happened

25  that day.  Didn't indicate whether I thought they were.  I

1   shared them in case they were of relevant nature to the
2   detective, things that at the time that they actually
3   happened, I didn't see it as being anything of great concern.
4   But after the robbery, it seemed a little particular.
5   Q.  In fact, you told -- and you put in your written
6   statement -- that you knew that this person that was in there
7   earlier, "I knew it was the same guy" --
8   A.  No, I did not.
9   Q.  -- "that had come in here"?
10  A.  No.  If I put that I knew, then that was my terminology
11  that I used at that time.  The individual that came in, I
12  made it clear to the Detective Ivy that I wasn't even sure if
13  it was related, that I had taken information -- with all due
14  respect, I don't even remember writing that statement
15  because, once again, I was under extreme distress.
16  Q.  You did provide a written statement that you signed that
17  particular day, correct?
18  A.  That is correct.  But I was in no shape to do so, and I
19  am sure that there are other individuals who were there that
20  could corroborate that.
21  Q.  So you don't recall telling the detectives and putting in
22  your statement that it was a light-skinned, black male?
23  A.  No.  I remember stating that that was a possibility, but
24  I also stated that the olive skin tone was what I was
25  positively sure of.  And I said that that could be a

1   bi-racial African American/white descent, or it could be

2   someone of Mexican or even Indian skin tone.  It was the skin

3   tone that I was positive about.

4   Q.  You didn't tell the investigators anything about a

5   Spanish accent at all during your interview with

6   investigators on the day that this robbery took place, did

7   you?

8   A.  Again, I cannot recall for you with 100 percent certainty

9   of my conversation with the investigator after the fact.  I

10  can tell you what my specific recollections are.

11          MR. DASH:  I don't have any further questions.

12          MR. HURT:  Nothing further, Your Honor.

13          THE COURT:  May this witness be excused?

14          MR. HURT:  Yes, sir.

15          THE COURT:  Mr. Dash, may this witness be excused?

16          MR. DASH:  Yes.  I'm sorry, Your Honor.  Yes.

17          THE COURT:  All right.  Ms. Tyler, you may be

18  excused as a witness with the understanding that you will not

19  discuss your testimony with any other witness in the case

20  until the case is concluded.

21          THE WITNESS:  Absolutely, Your Honor.  May I sit in

22  the courtroom?

23          THE COURT:  What's that?

24          THE WITNESS:  Absolutely, Your Honor.  I'm going to

25  sit in the courtroom.

1           THE COURT:  You may sit in the courtroom but you may

2    not discuss your testimony with anyone else.

3           THE WITNESS:  Absolutely.

4           (Witness excused.)

5           MR. HURT:  The next witness is Angel Wright.

6           ANGEL L. WRIGHT, called by the Government, having

7    been first duly sworn, was examined and testified as follows:

8                        DIRECT EXAMINATION

9    BY MR. HURT:

10   Q.  Good afternoon, Mrs. Wright.  Would you please state your

11   full name and spell it for the court reporter, please.

12   A.  Middle name, as well?

13   Q.  Yes, please.

14   A.  Angel Octavia Wright.  Angel, A-n-g-e-l, Octavia,

15   o-c-t-a-v-i-a, Wright, W-r-i-g-h-t.

16   Q.  And how are you employed, Mrs. Wright?

17   A.  Right now I work for Citizens & Farmers Bank.

18   Q.  And back in November of 2006, did you work at the BB&T

19   Bank?

20   A.  Yes.

21   Q.  Did you have a specific branch that you worked at?

22   A.  At the Lightfoot branch.

23   Q.  Is that on Mooretown Road?

24   A.  Yes.

25   Q.  Now, on the 7th day of November of 2006, were you

1    working -- actually scheduled and working that day?

2    A.   Yes.

3    Q.   And were you present when a man came into the bank

4    demanding money?

5    A.   Yes.

6    Q.   Now, where were you located in the bank at the time that

7    that man came in?

8    A.   I was on the front teller line.

9    Q.   I would like to show you, if you'd look at the monitor in

10   front of you, what's been previously admitted as Government's

11   Exhibit 1-B.  Do you recognize that layout?

12   A.   Yes.

13   Q.   And can you put a "T" on the teller line of that bank.

14   A.   Can I put a "T"?

15   Q.   Yes, ma'am.  The screen will register the touch that you

16   put there.

17   A.   About right there, the teller line (indicating).

18   Q.   And there appear to be four different stations.  What

19   station were you located at?

20   A.   If I'm not mistaken, it was the -- I have to think about

21   it because it has been two years.  If I'm not mistaken, it

22   was the third one from the teller door here, if I'm not

23   mistaken, either the second or the third.  I can't exactly

24   remember, but it was in front of this door so I'm thinking it

25   was the third one.  It was right in front of that vault door.

1   Q.  And when this person came into the bank, where was the

2   first location that you saw that person?

3   A.  When he first entered into the bank through the entrance

4   doors, he came directly in front of the relationship banker's

5   desk, which at the time it was right here in this area here

6   (indicating).

7   Q.  If you could -- I'm sorry to interrupt you, but if you

8   could put an "X" at that location to where the relationship

9   bank teller was.

10  A.  Right there (indicating).

11  Q.  Is that the first location you saw this individual at?

12  A.  When he first entered the door, he went directly in front

13  of that station.

14         MR. HURT:  Your Honor, at this time we would ask

15  that this photograph, this document be printed and introduced

16  as Government's Exhibit 1-F.

17         THE COURT:  All right.  That will be admitted.

18         (The document was received in evidence and marked as

19  Government's Exhibit No. 1-F.)

20  BY MR. HURT:

21  Q.  Now, Mrs. Wright, if you'll look at the monitor in front

22  of you, that has been marked and admitted as Government's

23  Exhibit 1-C.  Do you recognize that?

24  A.  Yes.

25  Q.  What is that?

1   A.   What, the whole picture?  Is that what you're asking me?

2   Q.   Yes.  What is that a picture of?

3   A.   That is a picture of the teller line.

4   Q.   Is that the way it looked in November of 2006?

5   A.   Yes.

6   Q.   Now, you stated that you first saw this person come into

7   the bank and go to the relationship banker table or desk.

8   What's the next thing that you saw?

9   A.   Well, as soon as he came in, and he went straight in

10  front of the relationship banker, right in front of her, I

11  remember Angie was her name at the time, I remember that she

12  was smiling, and she was -- at the time she was trying to

13  greet this person, and she was saying hello.

14          But then it seemed like she stopped in mid-sentence,

15  and we are trained to look at the door as soon as somebody

16  comes in.  So, of course, I looked up immediately.  But as

17  soon as -- she was just paused like this, and then all of a

18  sudden, he -- when he was in front of her like if he was

19  right in front of me, all of a sudden he made a move to her

20  left this way.  If he was right in front of her, this way,

21  and if I was her, he made a move.

22          As soon as he made a move to the side, I knew right

23  then that we were being robbed.

24  Q.   Why did you know that?

25  A.   Because it was a -- it was a move that no one person

1    that -- the way that I was trained to look at things, as soon

2    as he was standing right in front of her, as soon -- this is

3    a move right into her space almost, something that a normal

4    customer wouldn't have done.

5    Q.  Could you see the individual who was standing there

6    clearly?

7    A.  I saw him but I only saw the back of him at that time.

8    But, yes, I saw him plain as day.  There is nothing

9    obstructing as far as my view was concerned of him.  But when

10   he came in, he came directly in, stood in front of her.  So I

11   didn't see his face at the time or anything but the back of

12   him.

13          But as soon as she was paused like this, and then

14   all of a sudden he made a move to her side like this, I knew

15   immediately then that we were being robbed.

16   Q.  What happened next after this person moved to the side?

17   A.  Well, for me, I said, "Oh, my God, we're being robbed.

18   We're being robbed."  It was three of us in the bank at that

19   time.  It was the relationship banker who was sitting at that

20   particular spot, me who was sitting at the teller line, and

21   then the drive-through teller, which is on the side of me who

22   cannot see the entrance door when, you know, as soon as

23   somebody comes in because it's way down the bank.

24          So I said, "Oh, my God, we're being robbed.  We're

25   being robbed."  So just trying to take over that part of it,

1    I saw him as he moved around, like kind of snatch her out of

2    her seat or snatch her away from the desk.  I immediately put

3    my hands up.  That was just my reaction at that time.

4    Q.  And did he stay at that desk or did this person move?

5    A.  He moved.  After he snatched her up, he was trying to get

6    her to come up there behind -- you know, trying to get her --

7    he snatched her up out of her chair.  He made her get up.

8    And then he proceeded to make her walk forward.

9         But all this stuff was happening so fast, and by

10   that time he walked in front of her with the gun pointed, and

11   he was moving up towards the teller line.

12   Q.  Ma'am, if I could show you what's been marked as

13   Government's Exhibit 1-D.  Do you recognize that photograph?

14   A.  Yes.

15   Q.  And what is that a photograph of?

16   A.  It's a photograph of the robber coming up towards the

17   teller line.  He had came up -- by the time he had gotten to

18   this part, this is when he could see that there was the

19   drive-through, because, again, the drive-through teller can't

20   see the people coming in.  And the person who comes in, can't

21   see the full teller line until they come up and approach the

22   teller line.

23        Now, when he gets to this part (indicating), now he

24   is pointing towards the drive-through that way, and he sees,

25   I would imagine, Jenny in the drive-through at that time.  He

1    didn't approach me directly.  He came up, and then he started

2    for that teller line door.  That was on that side.

3    Q.  And as we're looking at this picture, which is 1-C on the

4    monitor, the teller line door is on the left side of the

5    picture; is that right?

6    A.  Yeah, on the left side of my picture here.

7              MR. HURT:  Your Honor, at this time we would ask

8    that the photograph of the witness, which is 1-D, be admitted

9    into evidence.

10             THE COURT:  All right.  Exhibit 1-D will be

11   admitted.

12             (The document was received in evidence and marked as

13   Government's Exhibit No. 1-D.)

14   BY MR. HURT:

15   Q.  Now, the person in this photograph, which is 1-D, has

16   their arm outstretched.  What was this person doing at that

17   time?

18   A.  This, the robber?

19   Q.  Yes.

20   A.  At the time he was pointing his gun through the

21   driver-through teller, who is Jenny over that side, because

22   remember, as I said, once you get into the teller area right

23   there where there is carpeting and tile floor, now you can

24   see the drive-through, and you can see that there is another

25   person there, because it was me at the teller line in the

1    front and then Jenny in the drive-through.

2              So at that particular time he was pointing the gun

3    at Jenny's direction.

4    Q.  So after this -- after the scene we see in this

5    photograph, what happened next?

6    A.  Okay.  He again immediately -- he didn't come straight at

7    me right here.  When he first came up, he had the gun, but

8    then as soon as he walked briskly to this area, again, he

9    pointed his gun down at Jenny.  He was making Angie walk up.

10             He approached the teller line door, and, you know,

11   you can -- the teller line door is like right here where

12   there is not a whole door, like a gate.  He proceeded then to

13   try to get in, and there is a trick to get into that gate

14   door.  It has a little knob on it, but it also has a button

15   underneath, and he was trying to get in, and he couldn't.  He

16   rattled the door.

17             And at that time I looked over at Jenny, and I

18   realized that she had pushed the silent alarm because when I

19   knew that we were being robbed, my hands went up.  By the

20   time I thought about hitting the alarm, it was too late

21   because he was on his way up with that gun, and I didn't want

22   to make any type of movement to think that, you know, I was

23   doing something wrong for him to, you know, draw his

24   attention to me.

25             But he was trying to get in that door, and then all

1    of a sudden he was, like, "Open this door.  Open this door."

2    And he was talking to Angie who was then following behind

3    him.  And she said, "Okay.  I'll get the door."  And so at

4    that time she opened the door and let him in.  And I

5    continued to have my hands up at that time.

6    Q.  Now, at this time did he come behind the teller line?

7    A.  Yes.

8    Q.  And did he say anything to you?

9    A.  Um, at the time, in order for me to stay calm, I tried

10   to, you know -- I see him, I see him coming in.  I looked at

11   him, but I didn't focus all my attention on him because I was

12   trying to stay and remain as calm as I could.  So I, you

13   know, had my hands up.  He brought -- once he opened the

14   door, he had Angie come through.  I remember that.

15        And they both were standing behind me at this time

16   because the vault door is right directly behind me.  And then

17   he says, "Open this door."  I knew he was talking to Angie

18   because she said, "I can't.  I don't have my keys.  And

19   besides that, I only have half the combo."  And that was what

20   was said at the time.

21   Q.  Now, after he -- after Angie responded that she couldn't

22   open the door, what did this person do next?

23   A.  At that particular time we had a person in the

24   drive-through who -- a customer who came up.  She had

25   something like a SUV, or what have you, and she was in the

1    drive-through, and if I'm not mistaken, I know she had

2    already put her work, or whatever she wanted done, her

3    transaction into the teller drawer.

4           By this time, I remember him saying that -- then all

5    of a sudden he says, "Oh, no, that's messed up."  And he

6    says, "She's calling the police."  He had seen the woman --

7    the woman in the drive-through, who had obviously seen what

8    was going on, and got her cellphone, and she was in the

9    drive-through calling the police because she saw the man in

10   there robbing us.

11          So he was, like, "Oh, man, that's messed up.  She's

12   calling the police."  And he said it a couple of times.  So

13   then -- oh, he did ask to open the door, right, the vault

14   door.  That is what he was trying to get into, and then he

15   was, like, "Oh, no, that's messed up.  She is calling the

16   police."

17          So then what he did, he proceeded -- because he was

18   pretty much like -- see, Angie was like directly behind me

19   but he was more to my right side where I can kind of see him

20   in the corner of my eyes, and then all of a sudden he decides

21   to put the gun on me.  Because he had it down.  He put the

22   gun on me.  He says, "Give me your money."  And he is like

23   right here.  There is this long desk right here, and he is

24   right there on the side of that (indicating), and he says,

25   "Give me your money."  And I said, "Okay.  Okay.  I'm getting

1  your money."

2  Q.  At the time he's standing there beside you, were you able

3  to get a good look at the gun?

4  A.  I did see the gun.  I can't say it was the best, you

5  know -- I didn't go right at it like that.  But I did

6  definitely see it on my side, you know, that he had that gun

7  pointed at me and that, you know, he was demanding money.

8  Q.  Can you remember any description of that gun?

9  A.  Well, the gun was shiny.  It was silver.  It was a short

10 gun.  I don't know -- I'm thinking it was a revolver.  I

11 don't really know my guns all that well, but it was shiny and

12 it was short.  It had a handle, and it was just really shiny,

13 silver, you know.  And he had it on me like this

14 (indicating).  And he said, you know, "Give me your money."

15 And then he had a camouflage bag in his other hand.

16 Q.  Once he said, "Give me your money," what did you do?

17 A.  I said, "Okay.  Okay."  Because I didn't want to make any

18 sudden moves.  And so then I reached down, and I unlocked my

19 drawer with my key, I opened it up, and I proceeded to gather

20 up the money.

21       And at that time he was like, "No dye packs.  No dye

22 packs," and I said, "I don't have any dye packs," and I

23 dumped the money into his bag and then I put my hands back

24 up.

25 Q.  Do you know approximately how much money you put into the

1   bag?

2   A.  I believe it was, like, $1600.

3   Q.  Now, you're fairly close to this person.  Were you able

4   to get a good look at the person who was demanding money from

5   you?

6   A.  I didn't get that good of a look because, first of all,

7   he was very covered up.  He had -- you know, his head was

8   covered up.  He had on a white turtle neck.  His skin was

9   covered up here.  He had this beard, fake mask on with beard

10  and stuff like that.  He did have gloves on, but I did get to

11  kind of see, like, this part of the wrist, but, I mean, not

12  enough to really see, you know.

13          I mean, I saw skin tone but I just couldn't get any

14  other description other than, you know, I see his build or

15  whatever.  But I did notice that, you know, when he talked to

16  me, he seemed to have an accent.

17  Q.  Do you know what kind of accent he had?

18  A.  Again, I'm not a person who is an expert on that, on

19  accent.  But just by him saying, you know, "Oh, that's messed

20  up.  That's messed up," I just -- I'm not exactly sure what

21  to say, but I do know that I decided in my report when I

22  listened to him that he wasn't black nor was he white, maybe

23  like, I don't know, Spanish, Hispanic.  I can't tell you

24  exactly how it is.  I really don't know that.

25  Q.  Now, when you saw the skin tone of the wrist, did you --

1    what did you see as far as the nature of the skin tone?

2    A.  I mean, to me it -- it wasn't fair skinned.  It was very,

3    very light.  It wasn't fair skinned but it wasn't dark

4    skinned.  Maybe -- I don't know, maybe a Spanish, Mexican.  I

5    don't know exactly the skin tone because I don't know skin

6    tones.  All I know is that with his accent, I didn't feel

7    like he was black or white, and his skin tone showed that to

8    me it wasn't that way either.

9    Q.  After you put the money in this camouflaged bag, what

10   happened next?

11   A.  He was still saying several things.  I mean, you know, he

12   kept saying, "That's messed up."  Because he said it like

13   four times, because one thing he saw after he said, "That's

14   messed up because she's calling the police," that's what he

15   said, then he said, "That's messed up.  She pushed the

16   button."

17           And what I imagine or assumed that he was talking

18   about was Jenny was in the drive-through, and we have a

19   heater, and in that heater -- the one with the driver-through

20   thing, it's a red button, like if you have a power strip, and

21   that red button lights up when you turn it on, that's the

22   only thing I can imagine him thinking about, you know, "Oh,

23   that's messed up.  She pushed the button."  But, of course,

24   he wouldn't have been able to know that part.

25           So then what happened, after I put the money in the

1   bag, he kept saying, "No dye pack, no dye pack," because at

2   this point now he's nervous because he knows that there is a

3   witness in the drive-through seeing him rob this bank.  And

4   then -- I'm sorry.  I lost track.  And then he says, um --

5   after he puts the money in the bag, he says, "No dye pack."

6   Then he says, "You're going with me."

7           Now, I knew that he was talking to me, but, again, I

8   would not focus my attention on him for him to -- I wasn't

9   going anywhere.  So I just, you know, act like I didn't hear

10  what he had said, but I heard what he had said, "You're going

11  with me."

12          And then he paused again, and then he said, um --

13  then he said it again, "You're going with me."  But this time

14  I knew he was talking to Angie because now Angie is flipping

15  out, but she didn't say nothing the first time.  And the

16  second time she said, "No.  No.  I can't go with you.  I got

17  babies.  I can't go with you."

18          And then my heart just sank because I just knew we

19  were not trying to go with him, and he, to me, was trying to

20  take a hostage because he knew that this woman had called the

21  police, and he was trying to make sure that he had a way of

22  escape by taking one of us.

23          And then he told me, "If you put a dye pack in this

24  bag, I'm going to blow her head off."  And I said, "We don't

25  have any dye packs, you know.  We don't have any dye packs."

1    And I was trying to reassure him because we definitely

2    didn't, you know.

3    Q.  So did he ultimately leave the bank?

4    A.  He did.  Eventually, you know, being that neither one of

5    us, I would imagine, budged.  I know that Angie said

6    something along the lines, "You better go," or something, but

7    I didn't hear it all clearly.  And he was running out of

8    time, because then eventually the lady -- at first she was in

9    the drive-through on her cellphone, and then eventually she

10   left, and then he started backing away out of the teller

11   line.

12        And then once he backed away out of the teller line,

13   he moved out of the teller line, and he walked out.  He

14   didn't run out.  He just walked, you know, nice and brisk but

15   not running out.  And he went on out the door.

16        And at that time Angie just broke down.  She was

17   already broke down because she thought he was really going to

18   take her out of there.  I said, "Angie, you're all right.  Go

19   get your keys and you go lock that door," and I then got on

20   the phone and called 911.

21        MR. HURT:  Thank you.  I have nothing further, Your

22   Honor.

23                      CROSS-EXAMINATION

24   BY MR. DASH:

25   Q.  Good afternoon, Ms. Wright.

1   A.   Hello.

2   Q.   Ms. Wright, the individual that robbed the bank that day

3   on November 7th, 2006, you had never seen that individual

4   before, to your knowledge?

5   A.   Not to my knowledge.

6   Q.   And you really had no idea who it was because of his --

7   what he was wearing and the beard and stuff on his face?

8   A.   That's absolutely correct.

9   Q.   And to this day you really don't know for sure -- you

10  could not pick out an individual in a line-up today that

11  robbed your bank, correct?

12  A.   That's true, because he was fully masked.

13  Q.   And I believe you said that he had an accent but the

14  accent wasn't a very heavy accent, was it?

15  A.   I can't -- it's been two years ago so I do know that he

16  did have an accent.  I can't tell you what's heavy and what's

17  not.

18  Q.   You recall talking to the police officers on November

19  7th, 2006, after this robbery, correct?

20  A.   Uh-huh.

21  Q.   And you recall telling them that it was not a real heavy

22  accent?

23  A.   I don't recall.  I just know that it's been awhile so --

24  Q.   And I believe you -- at the time you then said that you

25  couldn't tell if the individual was white or black?

1   A.  (Nods head.)

2   Q.  He was some other nationality, correct?

3   A.  And that's what I came to determine.

4   Q.  Now, you did say, though, I believe a few minutes ago,

5   and correct me if I'm wrong, that this gun that was used was

6   a shiny gun?

7   A.  To me, yes.

8   Q.  And when you say shiny, I mean, you just qualified it to

9   me, does that mean that it was kind of brilliant, light

10  reflected off it, things like that?

11  A.  It was silver.

12  Q.  But it wasn't a dull silver?  It was a shiny silver?

13  A.  To me it was -- I mean, yeah.  I don't know exactly what

14  lighting it was but I definitely know it was silver.

15  Q.  And you're sure it was a revolver?

16  A.  I think so.  I mean, again, I'm not an expert on guns.

17  Q.  Do you recall -- did you ever tell officers that the gun

18  looked like a toy?

19  A.  No.

20  Q.  During the course of this robbery, the firearm was never

21  discharged or anything like that, correct?

22  A.  Correct.  It was never discharged.

23  Q.  Did you see bullets in the gun, by any chance?

24  A.  No.  I don't know that.  I don't know what was in that

25  gun.  I know that I feared for my life because he had one.

1    Q.   And can you pull up 1-D for a minute, please.  Do you

2    have 1-D before you, ma'am?

3    A.   Yes.

4    Q.   Now, in this photograph it looks like an arm is

5    outstretched, correct?

6    A.   Uh-huh.

7    Q.   And it looks like there's the shadow of a person behind

8    the arm?

9    A.   Uh-huh.

10   Q.   Does that look like that's you also?

11   A.   Well, I know that's Angie right there.

12   Q.   That is Angie back there?

13   A.   Uh-huh.

14   Q.   Okay.  And where were you sitting in relation to this

15   particular --

16   A.   You see the computer monitor, I am to the left of that

17   computer monitor in that station.

18   Q.   Okay.  So the little, what appears to be like a red chair

19   or something like that in the very corner, that was the chair

20   you were in?

21   A.   Yes.  That's where I was.

22   Q.   Okay.  And where I believe you mentioned a Jenny was also

23   there, where is she in relation to you?

24   A.   Directly in front of that gun pointing that way.

25   Q.   So she's down around the -- like an L shape?

1    A.   Say, for example, I am -- the computer is sitting here

2    where that computer is, this is my station (indicating).

3    Okay.  And he is right there in directly in front of there

4    with his arm stretched out that way.  It is just as if the

5    drive-through window is like in an L like this (indicating).

6          The back of the teller station is this way, and I'm

7    sitting here, and then the back of the teller station goes

8    this way (indicating).  And when it goes this way, Jenny is

9    right there directly in front of where that gun is pointing

10   (indicating).

11   Q.   Okay.  Could you pull up 1-B for a second, please.  So

12   where you're talking about would be in this general area

13   that's the drive-through?

14   A.   Exactly.  That is where he was pointing, toward that

15   direction of the window.

16   Q.   And that's the area that I just circled in red?

17   A.   That is where Jenny is sitting, yeah, she's sitting in

18   that first area up there, the top of that circle.

19   Q.   And where you were at looks like there's four separate

20   stations?

21   A.   Uh-huh.

22   Q.   Were you coming from the bottom, first, second, third or

23   fourth one up?

24   A.   Third.  Right in front of the third.  Right directly in

25   front of that vault door.

1          MR. DASH:  Okay.  That is all the questions I have,

2    Your Honor.  I don't know if you need to print that since we

3    both have written on that.

4          THE COURT:  Well, that is up to you.

5          MR. DASH:  I don't need it, Judge.

6          THE COURT:  All right.

7          MR. DASH:  Thank you.

8          THE COURT:  May this witness be excused, counsel?

9          MR. HURT:  For the Government, yes, sir.

10         THE COURT:  Mr. Dash?

11         MR. DASH:  Yes, Your Honor.  I'm sorry.

12         THE COURT:  All right, Ms. Wright.  You may be

13   excused as a witness with the understanding that you will not

14   discuss your testimony with any other witness in the case

15   until the case is concluded.

16         THE WITNESS:  Yes, sir.

17         THE COURT:  You can step down.

18         THE WITNESS:  Thanks.

19         (Witness excused.)

20         THE COURT:  All right.  It's about time for our

21   afternoon recess.  We normally take a recess in the middle of

22   the afternoon, ladies and gentlemen.  So Mr. King will show

23   you to your room.

24         (Jury out at 3:30 p.m.)

25         THE COURT:  All right.  We'll be in recess for 15

1   minutes.

2              (Recess from 3:31 p.m. to 3:48 p.m.)

3              THE COURT:  All right, Mr. King.

4              (Jury in at 3:48 p.m.)

5              THE COURT:  All right, ladies and gentlemen.  We'll

6   continue with the presentation of the Government's case.

7              MR. HURT:  United States calls Jennifer Phinney.

8               JENNIFER PHINNEY, called by the Government, having

9   been first duly sworn, was examined and testified as follows:

10                        DIRECT EXAMINATION

11  BY MR. HURT:

12  Q.  Good afternoon, Mrs. Phinney.  Would you please state

13  your full name and spell it, please, for the court reporter.

14  A.  Yes.  It is Jennifer Lynn Phinney.  And the last name's

15  spelled P-h-i-n-n-e-y.

16  Q.  And, Mrs. Phinney, how are you employed?

17  A.  I am an office manager at an accounting firm.

18             THE COURT:  I'm sorry.  I couldn't hear you.

19             THE WITNESS:  I'm an office manager at an accounting

20  firm.

21  BY MR. HURT:

22  Q.  And before you did that job did you work for BB&T Bank?

23  A.  Yes, as a senior teller.

24  Q.  And taking you back to November of 2006, did you work for

25  BB&T then?

1    A.   Yes, I did.

2    Q.   Did you work at a particular branch?

3    A.   Yes.  I worked at the Lightfoot financial center.

4    Q.   Was that up in Williamsburg?

5    A.   Yes, it is.

6    Q.   Now, ma'am, I'm going to show you what's been marked as

7    and admitted as Government's Exhibit 1-B.  And specifically

8    on November 7th of 2006, were you working in the Lightfoot

9    branch on that date?

10   A.   Yes, I was.

11   Q.   And what was your job on that date?

12   A.   I was the drive-through teller.

13   Q.   And can you put a number 1 on the screen, touch the

14   screen, and it will leave a mark, a number 1 where you were

15   working on November 7th of 2006.

16   A.   (Witness complied.)

17   Q.   Is that the drive-through area?

18   A.   Yes, it is.

19   Q.   Now, were you present in the bank when a man came into

20   the bank and demanded money?

21   A.   Yes.

22   Q.   And from where you were located in the teller line, did

23   you ever have an opportunity to see this person?

24   A.   Yes, I did.

25   Q.   And can you describe the person you saw in the bank that

1    day?

2    A.   Yes.  He was wearing a disguise.  He was wearing -- he

3    was about medium build.  He was wearing a hat and gloves.  He

4    had long-sleeve shirt, pants, looked like boots.  He was

5    carrying a camouflaged bag, and he had a revolver.  He had

6    black gloves on and his -- on his face -- he had a mask on

7    his face that was covered in a fake beard.

8    Q.   And from where you were at the teller line, what was the

9    closest that this person ever came to you in November of

10   2006?

11   A.   It was -- can I touch?

12   Q.   If you would put an "X" where he --

13   A.   The closest?

14   Q.   Yes, please.

15   A.   About there (indicating).

16   Q.   Now, did you continue to work at the BB&T Bank after that

17   day when the man came in?

18   A.   Yes, I did.

19   Q.   And when, just for clarity, when did you ultimately leave

20   BB&T?

21   A.   October 16th of 2007.

22   Q.   Now, did you also work in the Lightfoot branch in

23   September, specifically on September 8th of 2007?

24   A.   Yes.  It was my birthday.  I was working there that day.

25   Q.   And where in the bank were you working on that date?

1   A.  On that day, because it was my birthday, I decided to

2   work on the front teller line.

3   Q.  And could you put a number 2 as close as you can to the

4   location on the teller line where you were working.

5   A.  (Witness complied.)

6   Q.  Now, did someone come into the bank that day for purposes

7   of robbing it?

8   A.  Yes.

9   Q.  And were you on the teller line when that person came in?

10  A.  Yes, I was.

11  Q.  Can you tell the jury what you saw when that person came

12  in.

13  A.  I was sitting on the teller line, and we do watch the

14  door, and I was prebalancing my drawer, and Linda was

15  actually beside me, and she was watching the door while I

16  looked in the drawer.  We take turns that way so someone

17  always had eyes on the door.  And I heard Linda say, "That

18  didn't look good."  And I looked up at her, I said, "What do

19  you mean?"  She said, "Somebody's in Mary Jo's office," and I

20  looked up just in time to see the bank robber to come out of

21  Mary Jo's office with Mary Jo.

22  Q.  If you could put the letter "M" where Mary Jo's office is

23  located.

24  A.  (Witness complied.)

25  Q.  Is it that office just, as you're looking at the

1    document, just to the right of the entryway?

2    A.  Yes.

3    Q.  And when you saw this person come out of Mary Jo's

4    office, was Mary Jo with this person?

5    A.  Yes.  He actually was escorting her.

6    Q.  And where did he escort her to?

7    A.  He actually -- would you like for me to draw on the map?

8    Q.  If you could just mark an "X" or, sorry, why don't you --

9    A.  He came up through the middle of the bank towards the

10   teller line, and there's a table.  You can see the little "X"

11   right there.  He came up, he advanced with Mary Jo.  Mary

12   Jo -- at that time he started quickly running towards the

13   teller line.  Mary Jo ducked in the office down below, and he

14   had, from that little table right there, he advanced quickly

15   to the teller line.

16        He leaped from the floor up onto my teller station

17   up onto the counter and stepped into my teller station with

18   me.

19        MR. HURT:  Your Honor, at this time we would ask

20   that Government's exhibit, which is on the screen, be printed

21   and be the next Government's exhibit which would be

22   Government's Exhibit 1-G.

23        THE COURT:  All right.  1-G will be admitted.

24        MR. HURT:  Thank you.

25        (The document was received in evidence and marked as

1    Government's Exhibit No. 1-G.)

2    BY MR. HURT:

3    Q.  Ma'am, I'm going to ask you to take a look at what has

4    been marked as Government's Exhibit 2-A.  Ma'am, do you have

5    before you Government's Exhibit 2-A?

6    A.  Yes, I do.

7    Q.  And do you recognize that?

8    A.  Yes.  That is the bank robber stepping on my teller

9    station countertop.

10         MR. HURT:  Your Honor, at this time we would move

11   the admission of Government's Exhibit 2-A.

12         THE COURT:  Exhibit 2-A will be admitted.

13         (The document was received in evidence and marked as

14   Government's Exhibit No. 2-A.)

15   BY MR. HURT:

16   Q.  Now, as we look at that picture, on the left of the

17   picture there's someone in yellow.  Who is that?

18   A.  That's Linda Reed.

19   Q.  And the station where the individual is actually

20   standing, is that your teller station?

21   A.  Yes.  I actually was on the floor because I was afraid he

22   was going to step on me.

23   Q.  Now, if you would take a look at Government's Exhibit

24   2-B, please.  Do you recognize that photograph?

25   A.  Yes.  You can actually see my head behind his arm where I

1    was hiding -- where I had ducked down on the floor.  You can

2    see where I was actually back behind him.  There was an

3    opening under my desk, and I was trying to be in there so --

4    I didn't want him to touch me.

5             MR. HURT:  Your Honor, at this time we would move

6    the introduction of Government's Exhibit 2-B.

7             THE COURT:  All right.  Exhibit 2-B will be

8    admitted.

9             (The photograph was received in evidence and marked

10   as Government's Exhibit No. 2-B.)

11   BY MR. HURT:

12   Q.  Now, Mrs. Phinney, when the individual came over your

13   teller station, what happened next?

14   A.  He actually, he stepped down -- he stepped down onto the

15   floor, and he went around to the drive-through teller first,

16   and demanded of her all -- he said, "Open all of the

17   registers," and demanded money from her first.

18             And then he turned around, and he came back to

19   Linda, and he demanded her money, and she gave him all of the

20   money out of her top drawer except for the dye pack, and he

21   said, "What is that?  What is that?"  She said, "That's your

22   dye pack.  You want it?"  And, of course, he said no.

23             And then he turned around to me, and he had taken

24   and fanned the money from the drive-through teller.  He had

25   waved it in the air like this to be sure there was not a dye

1    pack in it, and then he put it in the bag.  And then he took

2    Linda's money from her hand, and he fanned it, and he put it

3    in his bag.

4           While he was fanning the money, I watched what he

5    had done with the first one, and while he was fanning Linda's

6    money, I stacked the money that was in my drawer with the dye

7    pack in the middle of it, he turned around with the bag, and

8    I slam dunked it in the bag.  So I was able to deploy the dye

9    pack into his bag because at that point -- I was thinking

10   he's not going to dig through the bag.  I was praying and

11   hoping he wouldn't, because I wanted him to be caught because

12   it was the second time that I had been robbed.

13   Q.  Were you able to get a good look at this bag that you put

14   the money into?

15   A.  Yes, sir.

16   Q.  What kind of bag was it?

17   A.  It was a camouflage or khaki-colored knapsack, but it was

18   also -- there was, like, a black plastic type of lining in

19   it.  It was like a bag inside of a bag.

20   Q.  After you put the money into this bag, what happened

21   next?

22   A.  He climbed back up and went right back up over my teller

23   station counter.  Went right back out the way he came.

24   Q.  And did he leave the bank at that time?

25   A.  Yes, he did.  But he left, um, the nose piece of his

1    disguise was actually on my counter.

2    Q.  I'd like to have you look at what's been marked as

3    Government's Exhibit 2-C.  Do you recognize that photograph?

4    A.  Yeah.  That's my teller station with my birthday gift

5    sitting on the counter.

6    Q.  And was there anything that was left behind?

7    A.  Yeah.  In the middle of the counter is the rubber, like a

8    latex type of nose from the disguise.

9           MR. HURT:  Your Honor, at this time we'd move the

10   admission of Government's Exhibit 2-C.

11          THE COURT:  Exhibit 2-C will be admitted.

12          (The photograph was received in evidence and marked

13   as Government's Exhibit No. 2-C.)

14   BY MR. HURT:

15   Q.  And if you could draw a circle around where the item is,

16   the nose is?

17   A.  (Witness complied.)

18          THE COURT:  What did you say that item was?  I'm

19   sorry.

20          THE WITNESS:  It was a part of a mask.  It was like

21   a latex rubbery nose like would be part of a Halloween

22   costume.  It is -- it was pink, I guess, or peach color.

23   BY MS. HURT:

24   Q.  Now finally, Ms. Phinney, if you would look at what's

25   been marked as Government's Exhibit 2-D.  Do you recognize

1    that item?

2    A.   Yes.   That would be the nose.

3              MR. HURT:   Government moves the admission of 2-D.

4              THE COURT:   2-D will be admitted.

5              (The photograph was received in evidence and marked

6    as Government's Exhibit No. 2-D.)

7              THE WITNESS:   There is the note pad there, too,

8    where I had been doing my prebalance, you know, before he

9    came in where I had just started doing my prebalance.   You

10   can see my note on just one line.

11   BY MR. HURT:

12   Q.   Now, Mrs. Phinney, after the person climbed back over

13   your teller line and headed towards the door, what happened

14   in the bank next?

15   A.   I picked up the phone to call 911, and Mary Jo actually

16   locked the door.   We had a lock where she turned the lock on

17   the door, and then she also looked out the window and got the

18   license plate number from the vehicle, and by that time I was

19   on the phone with 911.   And as she was yelling the license

20   plate number, I was relaying that information to the operator

21   911.

22   Q.   Now, you've testified that you were present in the bank

23   in November of 2006 when it was robbed and now in September

24   of 2007.   Based on your observations were there any

25   similarities between the individual who robbed the bank in

1    November and the individual who robbed the bank in September?

2    A.   Yes.   The disguise was the same, the build was the same,

3    the camouflage bag that he carried the gun was the same.   The

4    gloves were the same.

5    Q.   Now, we haven't talked much about this gun.   Did you get

6    an opportunity to look at the gun on both occasions?

7    A.   Yes, I did.

8    Q.   And what type of gun was it?

9    A.   It was a silver revolver.

10   Q.   When the person who was in the bank on those two

11   occasions was making demands about the dye pack, did you make

12   any observations concerning how that person spoke?

13   A.   Yes.   It seemed to me the first time when he came in, it

14   was very broken speech.   Everything that he said, it didn't

15   seem to -- was like he was trying to put on an accent of some

16   sort.   It was here, there and everywhere, is the only way I

17   can describe it because he talked as if he was not an

18   educated type of individual, leaving off letters to words.

19   And the first robbery, it was actually the biggest thing that

20   he said was, "It's all messed up," is what he was declaring

21   that, "It was all messed up.   It's all messed up," like that.

22          And so he didn't use full sentences.   That is why I

23   said it sounded like he was uneducated.   It sounded, like I

24   said, not full sentences or full words -- I mean, pieces of

25   words, not sentences.

1    Q.  How about on the second occasion in September of 2007?

2    A.  The second occasion, I really don't recall at this time.

3    I don't remember.

4            MR. HURT:  Thank you, Mrs. Phinney.  I have no

5    further questions, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. DASH:

8    Q.  Good afternoon, ma'am.  Now, ma'am, on the first robbery

9    that took place on November 7th, 2006, I believe you

10   testified just a minute ago that the gun was the same on both

11   robberies?

12   A.  (Nods head.)

13   Q.  But do you recall telling the police officers on the

14   November 7th, '06 that the gun was not shiny and maybe black?

15   A.  I know that his gloves were black.  I do know that.  I

16   don't recall saying that his gun was black.

17   Q.  Now, you said that the disguise was the same for both

18   robberies.  When you're talking a disguise, you're basically

19   talking from the head up was similar, the facial disguise,

20   correct?

21   A.  The facial disguise was the same, as well as the black

22   gloves were the same, and, you know, he wore, you know, a

23   sweatshirt both times.

24   Q.  Okay.

25   A.  Of course, being that I was a bank teller, of course, you

1    don't really see much from the waist down because of the
2    counter being in the way.
3    Q.  But certainly the shirt was completely different in the
4    both bank robberies, correct?
5    A.  They were sweatshirts both times.
6    Q.  But that's what you mean by similar disguise?
7    A.  Yes, exactly.  That is why I said similar.
8    Q.  The first one was a white shirt, correct, and then the
9    second one was more dark colored shirt?
10   A.  I just know that it was a sweatshirt both times because
11   it was pulled down with the gloves so that no skin was
12   exposed that I could see from my vantage point.
13   Q.  Could you pull up 1-D, please.  This has already been
14   previously admitted as 1-D for a photo that was done on
15   November 7th of '06.  You recognize that photo, correct?
16   A.  Yes.  The gun is actually trained on me in that photo.
17   Q.  And that is a white shirt, correct?
18   A.  It is a sweatshirt, sir.
19   Q.  And 2-A, please.  Now, that particular shirt, you say
20   that that overcoat or whatever it is is a sweatshirt?
21   A.  Yes.
22   Q.  Just a dark colored sweatshirt?
23   A.  Yes.
24   Q.  Now, on the second -- on the first robbery, do you
25   recall -- well, you told police on the first robbery that you

1   thought it was an African American, light-skinned mixed race

2   individual, correct?

3   A.  Right.

4   Q.  Did you give the police any further description on the

5   second robbery that took place on September 8th?

6   A.  I do remember making the comment that I thought it was

7   the same individual because the body size was the same, the

8   disguise was the same.  It was -- it was all eerily the same.

9   Q.  Now, and these were almost a year apart, November of '06,

10  September of '07?

11  A.  Ten months.

12  Q.  I believe you testified that in the second robbery you

13  put a dye pack in the package?

14  A.  Yes, I did.

15  Q.  And you're somewhat familiar with how those dye packs

16  work and such like that, correct?

17  A.  Yes.  We are actually trained at how they work.

18  Q.  Okay.  And the dye packs, once they're in there, they are

19  set to go off in a very short period of time after,

20  hopefully, after the individual leaves the actual bank,

21  correct?

22  A.  Actually, the dye pack is actually -- has a battery in

23  it.  As long as it is in our drawer on its base, it is

24  completely de-activated.  When we lift it from that base, it

25  turns the dye pack on.  It wakes up.  It starts looking for

1    the signal.

2            As the dye pack passes through the magnetic field

3    out of the branch, that is when the countdown begins after it

4    leaves the branch, and there's a period of time there before

5    it actually goes off.

6    Q.  Now, during the second robbery, you didn't go out to look

7    to see if the dye pack had exploded, or anything like that,

8    in the car once the individual had left the bank, correct?

9    A.  We were trained to lock the doors and not to leave the

10   premises until the police arrived.

11   Q.  You didn't actually leave -- or you didn't lock the door

12   but somebody else did that?

13   A.  Right.  Mary Jo locked the door.

14   Q.  And this rubber nose that was left on the counter, did

15   that come off from his face or did it come out of the bag or

16   where did that come from?  Do you know?

17   A.  I don't know.  All I know is that it wasn't on my counter

18   before he came in.  It was there after he left.

19   Q.  And you didn't touch it or anything like that?

20   A.  No, sir.  I didn't touch it.  I didn't move it.  It is

21   exactly where it was left.

22           MR. DASH:  I don't have any further questions.

23   Thank you.

24           THE COURT:  May this witness be excused?

25           MR. HURT:  From the Government, yes, sir.

1              MR. DASH:  Yes, Your Honor.

2              THE COURT:  All right, Mrs. Phinney.  You're excused

3    as a witness with the understanding that you will not discuss

4    your testimony with any other witness in the case until the

5    case is concluded.  You can either leave and go about your

6    business, or if you wish you can remain in the courtroom.

7    You just can't talk to anybody about your testimony.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  All right.  You may step down.

10             (Witness excused.)

11             MR. HURT:  United States calls Mary Jo Lane.

12             MARY JO LANE, called by the Government, having been

13   first duly sworn, was examined and testified as follows:

14                       DIRECT EXAMINATION

15   BY MR. HURT:

16   Q.  Ma'am, good afternoon.  Would you state your full name

17   please?

18   A.  I'm Mary Jo Lane.

19   Q.  And Mrs. Lane, how are you employed?

20   A.  I'm employed at BB&T Bank.

21   Q.  And how long have you been employed there?

22   A.  At that location for over six years.

23   Q.  Which is that location?

24   A.  Um, in Williamsburg.

25   Q.  Is that the Lightfoot branch?

1    A.   It is.

2    Q.   And in September of 2007, what were your duties at that

3    bank?

4    A.   The relationship banker.  I sit at a desk, I greet

5    clients and open accounts, handle customer service.

6    Q.   And on September 8th of 2007 were you in the branch that

7    day?

8    A.   I was.

9    Q.   And I'd like to have you look at the monitor in front of

10   you of what has been previously admitted as Government's

11   Exhibit 1-B.  Do you recognize that, ma'am?

12   A.   Yes.  That's the floor plan of our branch.

13   Q.   And on September 8th of 2007, where would you have been

14   located in that branch?

15   A.   Right there (indicating).

16   Q.   You made a small "X" on an office by the entry to the

17   bank?

18   A.   Yes, sir.

19   Q.   Now, on that date in September of 2007, did a man come

20   into the bank demanding money?

21   A.   Yes, sir.

22   Q.   And can you tell the members of the jury your first

23   contact with that person.

24   A.   Gentleman came through the entryway, the foyer to my left

25   as I was sitting there.  When he came in, I looked up as I do

1   anytime the door opened, realized he was in disguise; mask,

2   sunglasses, gloves.  As quick as I realized that was not a

3   good thing, he had come through the second set of doors and

4   circled into my branch and was standing beside me at my desk.

5   Q.  And can you describe this person who was standing beside

6   you?

7   A.  He was medium build.  He had on bulky clothing.  I think

8   he had more clothing on that he needed.  He had on latex-type

9   mask on, fake black beard attached to that mask, a ball cap

10  pulled down, dark glasses that kind of wrapped around.  He

11  had on a heavy, either corduroy or flannel shirt that had a

12  lining that made it bulkier.  It was dark in color.  He had

13  on black gloves and blue jeans.  I don't recall the shoes.

14  Q.  Now, the September 8th of 2007 when you are sitting

15  there, did the person who came into your office have a

16  weapon?

17  A.  Yes.

18  Q.  What kind of weapon was that?

19  A.  It was a silver or chrome revolver.

20  Q.  Now, once this person came into your office, what did he

21  do?

22  A.  At first -- when I realized this was wrong, I had put my

23  hand up under my desk to press my alarm button.  The first

24  thing he said when he stopped beside me was, "Don't touch

25  it."  So I took my hand away.

1   Q.   Did you understand that to mean the button?

2   A.   Yes.  Yes.

3   Q.   What happened next?

4   A.   He said, "Did you touch it?"  And I didn't answer him

5   because although I had touched it, I don't know if I had

6   pushed it.  So I said nothing.

7   Q.   Did he do anything after you failed to respond?

8   A.   He asked if I could open the safe.

9   Q.   What was your response?

10  A.   No.

11  Q.   What happened next?

12  A.   Then he said, "Sorry about this."  And I kind of looked

13  up at him and realized he was moving his hand, and in his

14  right hand at his side he was just wiggling the gun.

15  Q.   What did he do after he said, "Sorry about this?"

16  A.   He said, "Let's go," and he kind of took a step back to

17  allow me to stand up and exit the office.

18  Q.   Where did you go?

19  A.   I headed out the doorway of my office.  Do you want me

20  to --

21  Q.   If you could make --

22  A.   When I got to the door of my office, he said, "Don't say

23  anything."  And I just walked out to the left up through the

24  lobby toward the teller line.

25  Q.   Did you make it all the way to the teller line?

1    A.   No.  Um, right there is a ticket counter, and just before

2    we got to that counter, he kind of stopped and just took

3    about two steps, and he jumped the counter.

4    Q.   And who was behind the counter at that time?

5    A.   At that time there were three tellers.

6    Q.   Do you remember who they were?

7    A.   Uh-huh.

8    Q.   Who was that?

9    A.   It was Jennifer Phinney and Linda Reed and Carol Seawell.

10   Q.   Now, after this man jumped the teller counter, what did

11   you do?

12   A.   I looked to my left where my supervisor was sitting in

13   that office right there, and she just signaled me to come

14   into that office.  So I just walked into that office and sat

15   down in one of the chairs and just was still and quiet.

16   Q.   How long did you remain in that office?

17   A.   Until my supervisor said, "He's left," and meaning --

18   Q.   What did you do?

19   A.   At that point I jumped up to go back to my office to grab

20   my keys so I could lock the door behind him, which is

21   procedure if a robber leaves the building, lock the door

22   behind him quickly.

23   Q.   Did you go into the vestibule?

24   A.   No, I did not, because at the time when I reached for my

25   keys, I looked out the window in the office, and I saw him

1    getting into a vehicle.

2    Q.   Can you describe that vehicle?

3    A.   It was an older vehicle.  I don't know the make or model.

4    But it was kind of a silvery gray, kind of faded silver, gray

5    vehicle.

6    Q.   I'm going to ask you to take a look at what's been marked

7    as Government's Exhibit 2-E, if you would, please.

8    A.   It looked like that.

9         MR. HURT:  Your Honor, at this time the Government

10   would move the admission of Government's Exhibit 2-E.

11        THE COURT:  2, what's the letter?

12        MR. HURT:  2-E, Your Honor.

13        THE COURT:  All right.  Exhibit 2-E will be

14   admitted.

15        (The photograph was received in evidence and marked

16   as Government's Exhibit No. 2-E.)

17   BY MR. HURT:

18   Q.   And from your office, which you earlier indicated, you

19   could see into the parking lot?

20   A.   Yes.

21   Q.   And how far away was that car from where you were in your

22   office?

23   A.   It was just across the concrete, the little covered

24   porch, directly outside my office.

25   Q.   And did you see the person get into that vehicle?

1   A.  I did.

2   Q.  And did they drive away?

3   A.  Yes.

4   Q.  Now, at the time that you saw this vehicle, were you able

5   to see a license plate?

6   A.  I did.

7   Q.  And do you recall that license plate?

8   A.  It was Virginia license KEB-5751.

9   Q.  I'm going to show you an actual item.  Do you recognize

10  that license plate, ma'am?

11  A.  Yes, sir.

12  Q.  Is that the license plate that you saw that day?

13  A.  Same number, yes, sir.

14          MR. HURT:  Your Honor, we move the admission of

15  Government's Exhibit 3-B.

16          MR. DASH:  Judge, we don't object to that one at

17  this point.  This witness just says it's the same number.  We

18  don't know where this license plate came from or anything

19  like that so.

20          THE COURT:  Well, she identified it as Virginia

21  license with that number so I'll admit it.

22          (The photograph was received in evidence and marked

23  as Government's Exhibit No. 3-B.)

24          THE COURT:  What is that exhibit number?  That is

25  3-B?

1            MR. HURT:  Yes, sir.

2            THE COURT:  All right.  Exhibit 3-B will be

3     admitted.

4            MR. HURT:  Thank you, Your Honor.

5     BY MR. HURT:

6     Q.  Did you ultimately end up locking the doors?

7     A.  Yes, sir.

8     Q.  Now, were you again in the bank on Lightfoot, at the

9     Lightfoot branch of BB&T on November 10th of 2007?

10    A.  Yes, sir.

11    Q.  And --

12           THE COURT:  What was that date?

13           MR. HURT:  November 10th of 2007, Your Honor.

14           THE COURT:  November 10th of 2007.  All right.

15    BY MR. HURT:

16    Q.  And what were your duties in the bank on that occasion?

17    A.  The same.  Relationship banker.

18    Q.  Did you have the same office?

19    A.  I did.

20    Q.  At some point during that day did you have occasion to

21    see a car pull into the parking lot that attracted your

22    attention?

23    A.  I did, because the car actually backed into the parking

24    space.

25    Q.  And how close to where your office was located did this

1    car park?

2    A.   The same exact spot as the previous time.

3    Q.   I'd like to have you look at Government's Exhibit 3-A

4    which -- do you recognize that car, ma'am?

5    A.   That looks like the same one.

6    Q.   When you say the same one, the same car that pulled --

7    A.   No, not the same one as the September incident, the same

8    one pulled in in November.

9           MR. HURT:  Your Honor, at this time the Government

10   would move the admission of Government's Exhibit 3-A.

11          THE COURT:  Exhibit 3-A will be admitted.

12          (The photograph was received in evidence and marked

13   as Government's Exhibit No. 3-A.)

14   BY MR. HURT:

15   Q.   You say a car which looked much like this backed in near

16   your office?

17   A.   Yes.

18   Q.   Was there anything about this car that attracted your

19   attention?

20   A.   Had that license tag on it.

21   Q.   When you say that license tag?

22   A.   KEB-5751.

23   Q.   That's been admitted as Government's Exhibit 3-B.  When

24   you saw this car back up with that license plate on it, what

25   occurred to you?

1    A.   Hit my alarm button.

2    Q.   Did you do that?

3    A.   I did.

4    Q.   What did you do after you hit your alarm button?

5    A.   I started to stand up to go into the lobby to alert the

6    other employees when, again, the robber came in through the

7    vestibule and was in there very quickly.

8    Q.   Now, as -- so where were you actually in the bank when

9    the robber came in?

10   A.   I was at my desk, but instead of sitting in my chair, I

11   was standing with my hand on the alarm button.

12   Q.   And after the bank robber came into the bank, where did

13   he go?

14   A.   He came into my office and said, "Here we go again."

15   Q.   And what happened?

16   A.   He just said, "Let's go."  And he took my arm, took a

17   hold of my left arm, and just kind of led me out into the

18   lobby.  We walked up through the lobby, past the ticket

19   counter where we'd stopped before, and at that point he said,

20   "Open the door before she gets hurt."

21   Q.   Now, Mrs. Lane, between the time of the September 2007

22   bank robbery and the November 2007 bank robbery, were there

23   changes made to the teller line?

24   A.   There were.

25   Q.   I'd like to have you look at the monitor, if you would,

1    please, at Government's Exhibit 1-C which has been previously

2    admitted.  Is that the way the teller line looked in

3    September of 2007?

4    A.  Yes.

5    Q.  And what additions were made to it between then and

6    November of 2007?

7    A.  Bullet resistant glass was put on from the top of the

8    teller line to the ceiling and down the side with a locked

9    door so that the teller line was totally sealed from the

10   lobby.

11   Q.  So there's no way to get from the lobby across the teller

12   line unless you go through a door?

13   A.  You have to go through the door.

14   Q.  Now, ma'am, if you would take a moment and look at

15   Government's Exhibit 3-C.

16           THE COURT:  3 what?

17           MR. HURT:  3-C.

18   BY MR. HURT:

19   Q.  Do you recognize that photograph, ma'am?

20   A.  Yes.

21   Q.  And what is that?

22   A.  That is him holding my arm, and it looks like it's right

23   about the time he was telling them to open the door before I

24   got hurt.

25           MR. HURT:  Your Honor, we would move for the

 1   admission of Government's Exhibit 3-C.

 2           THE COURT:  Exhibit 3-C will be admitted.

 3           (The photograph was received in evidence and marked

 4   as Government's Exhibit No. 3-C.)

 5   BY MR. HURT:

 6   Q.  And Mrs. Lane, you can see kind of the reflection of that

 7   bulletproof glass in that picture; is that right?

 8   A.  Yes.

 9   Q.  Now, the gentleman at that point where he's standing

10   beside you, did he have a weapon?

11   A.  He did.

12   Q.  And what sort of weapon did he have?

13   A.  It looked to me like the same gun that I saw in

14   September.  It was a chrome, silver revolver.

15   Q.  And you've previously described this outfit he's wearing.

16   You said it was bulky?

17   A.  Yeah, like a bulky, like a flannel shirt with a fleece

18   lining, only in November it wasn't the same one.  It had kind

19   of a plaid pattern on it.

20   Q.  And what did he have on his face?

21   A.  It looked like the same exact latex mask with the fake

22   beard and wrap-around sunglasses.  The ball cap was a

23   different one.  It was lighter in color than the one in

24   September.  And again he had the dark gloves on also.

25   Q.  After he took you to that position in front of the teller

1  line, what happened next?

2  A.   When they did open the door to allow him access, he just

3  kept holding me and pulled me back behind the teller line and

4  kind of pushed me to a stop right in front of a doorway

5  behind the teller line.

6  Q.   Now, at this point in time who was behind the teller

7  line?

8  A.   The tellers.  It was Linda Reed, Cheryl Wheeler and Carol

9  Seawell.

10  Q.   And how long was this bank robber back there?  Let me ask

11  it a different way.  Did the bank robber actually get money

12  from behind the teller line?

13  A.   He did.

14  Q.   Who put money in his -- gave money to him?

15  A.   He took money from Cheryl Wheeler and from Linda Reed.

16  At one point I know Carol started walking toward us from the

17  drive-through area, and at that point he put his gun out and

18  aimed it at her and said, "Don't move," and kind of swung the

19  gun to me like, you either.  He didn't say that out loud,

20  though.

21  Q.   Now, was the money put into any specific container?

22  A.   He had a bag.  It was camouflage exterior, dark interior.

23  Q.   And after the money was in the bag, what happened next?

24  A.   Well, we actually heard a short burst of a police siren,

25  and the sound came in through the drive-through.  We don't

1   know how far they were, but at that point he kind of did a

2   little three-step like he didn't know which way he was going

3   to turn but at that point he left.

4   Q.   Did he leave the bank entirely?

5   A.   Yes.

6   Q.   And what did you do?

7   A.   Followed him toward the door and locked it behind him.

8   Q.   And did you see him get into the vehicle that you

9   previously described?

10  A.   I did not that time because two others also followed him

11  to the door.

12          MR. HURT:   Thank you.   No further questions, Your

13  Honor.

14                        CROSS-EXAMINATION

15  BY MR. DASH:

16  Q.   Good afternoon, ma'am.   Ma'am, you were shown a couple of

17  photographs of vehicles.   Now, those photographs were not

18  taken at your bank, correct?

19  A.   No.   Uh-uh.

20  Q.   And those are just photographs of vehicles?

21  A.   Of vehicles.

22  Q.   That are similar in what you saw on those two occasions?

23  A.   Yes, sir.

24  Q.   You can't say for sure today that those are the two

25  vehicles that were --

1   A.  No, sir.

2   Q.  -- in your lot?

3   A.  No, sir.

4   Q.  Now, the first robbery that took place on September 8th,

5   what time of day was that, ma'am?

6   A.  It was about 12:01.  We were just -- I was just getting

7   ready to lock the door.

8   Q.  So that was a Saturday?

9   A.  It was a Saturday.  We closed at noon.

10  Q.  And on that particular occasion, you were aware that dye

11  packs were placed into some of the money that was taken from

12  the bank, correct?

13  A.  At that time?  I was not aware, no, sir.

14  Q.  But you are now aware that dye packs --

15  A.  Right.

16  Q.  And how about on the November 10th, 2007?  Were dye packs

17  also placed?

18  A.  To my knowledge, they were not.

19  Q.  Now, on September 8th of '07, I believe you said that you

20  locked the doors behind you after he left, correct?

21  A.  (Nods head.)

22  Q.  Did you see any dye pack explosion --

23  A.  No, sir.

24  Q.  -- or anything like that?  And did you actually watch the

25  vehicle as it left the parking lot long enough to see which

1    direction it was headed --

2    A.  No, sir, I didn't.

3    Q.  -- anything like that?  So you just locked the door?

4    A.  I locked the door and went in to get our robbery kit to

5    proceed with what we needed to do.

6    Q.  But you did see the car long enough where you're sure of

7    the license plate?

8    A.  Oh, absolutely.

9    Q.  And on November 10th, '07, how much time elapsed between

10   the time that you saw the car in the parking lot and the time

11   when this individual came into the bank?

12   A.  Seconds.

13   Q.  So you didn't have enough time to get up and actually

14   lock the bank?

15   A.  No, sir.

16   Q.  Just enough time to know what was going on basically?

17   A.  Yes, sir.

18   Q.  You don't know for sure on each of those days whether the

19   gun that was displayed was a real gun or if it was a replica

20   gun or anything like that?

21   A.  No, sir.

22   Q.  Certainly, the firearm was never discharged, you never

23   heard a shot or anything like that?

24   A.  No.

25   Q.  Did you have a close enough view of the gun to see

1    whether or not there were any bullets in it or anything like

2    that?

3    A.   No, sir.

4    Q.   Did you get a close enough look at the individual to

5    determine whether what race the individual was?

6    A.   On the November one, I think so, yes.

7    Q.   Okay.  But you don't know for sure on the September 8th

8    one?

9    A.   From voice pattern, sound, I had a pretty good idea.

10   Q.   It sounded like the first -- it sounded like the one,

11   same individual?

12   A.   Oh, yes.  Oh, yeah.  I'm certain it was the same

13   individual both times.

14   Q.   But did you see any skin color or anything like that?

15   A.   I did in November.

16   Q.   November?

17   A.   Behind the line, I was kind of behind him to his left,

18   and I did make a point of looking.

19   Q.   And how long have you worked at the bank?

20   A.   I been with BB&T almost 13 years.

21   Q.   And as a relationship banker were you the supervisor on

22   duty that -- on each of those days, or the more senior

23   person?

24   A.   I would say the senior person, yes, sir.

25   Q.   And you have experience with -- I mean, you go through

1    training in case there's robberies and things like that?

2    A.   Yes, sir.

3    Q.   So you know what you're supposed to be looking for so you

4    can then later describe it to the police officer?

5    A.   Yes, sir.

6    Q.   And after each of the robberies, you knew -- on September

7    8th you knew that there had been a prior robbery at the bank?

8    A.   Yes, sir.

9    Q.   And that information was readily disseminated amongst

10   individuals in the bank?

11   A.   After the prior one the year before?

12   Q.   After the first one?

13   A.   Yes.

14   Q.   And it's a fairly small bank.  I mean, there aren't that

15   many employees that work at that particular branch, correct?

16   A.   Right.  Correct.

17   Q.   So everybody kind of knew what had happened in the first

18   one almost a year prior to in November of '06, correct?

19   A.   I wasn't there, and it wasn't -- details were not widely

20   discussed, no.

21   Q.   And certainly -- there was a supervisor, I believe, is it

22   Ms. McDede, is it, that is the supervisor?

23   A.   She's the branch manager.

24   Q.   Branch manager.  Okay.  And she kind of knew and kept

25   everybody in the loop of what was going on with these

1    different robberies, correct?

2    A.   I'm not sure I know what you mean.

3    Q.   That's fine.  As we sit here today -- well, let me back

4    up.  If we had done a line-up, say, two weeks ago, three

5    weeks ago, you wouldn't have been able to identify the

6    individual that robbed that bank, correct, if you'd have seen

7    the face?  For instance, if I was in the line-up, you

8    wouldn't have known who it was that robbed the bank, correct?

9    A.   From, say, the people sitting here today?

10   Q.   Yes.

11   A.   Oh, I think, yeah, I think I could.

12   Q.   Only because --

13   A.   -- because I saw the skin color and the back of his neck

14   and --

15   Q.   But you didn't see enough facial features?

16   A.   I did not.  Well, he was masked.  He was fully masked.

17          MR. DASH:  I don't have any further questions.

18   Thank you.

19          MR. HURT:  No additional questions, Your Honor.

20          THE COURT:  May this witness be excused, then,

21   counsel?

22          MR. HURT:  Yes, sir.

23          MR. DASH:  Yes, sir.

24          THE COURT:  All right.  Mrs. Lane, you're excused as

25   a witness with the understanding that you will not discuss

1    your testimony with any other witness until the testimony in

2    the case is concluded.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  You may step down at this time.  If you

5    wish, you can either remain in the courtroom or you can go

6    about your business.

7              (Witness excused.)

8              MR. HURT:  United States calls Linda Reed.

9               LINDA REED, called by the Government, having been

10   first duly sworn, was examined and testified as follows:

11                        DIRECT EXAMINATION

12   BY MR. HURT:

13   Q.  Good afternoon, Mrs. Reed.  Would you please state your

14   full name for the record, please.

15   A.   Linda Reed.

16   Q.  And is your last named spelled R-e-e-d?

17   A.   Yes.

18   Q.  And how are you employed, Mrs. Reed?

19   A.   A teller at BB&T Bank.

20   Q.  Are you assigned to a specific BB&T branch?

21   A.   Yes.  The Lightfoot branch.

22   Q.  Is that in Williamsburg?

23   A.   Yes, it is.

24   Q.  And going back to September of 2007, were you at that

25   branch on that date?

1   A.   Yes, sir.

2   Q.   And do you specifically remember September 8th of 2007?

3   A.   Yes, sir.

4   Q.   And why do you remember that date?

5   A.   Because we were robbed.

6   Q.   And do you recall where in the bank you were working at

7   that time?

8   A.   I'm sorry.  I didn't hear you.

9   Q.   Do you recall where in the bank you were working?

10  A.   I was at my teller station.

11  Q.   So you were on the teller line?

12  A.   Yes.

13  Q.   On that date in September, what is the first thing you

14  recall seeing that gave you the impression there was a

15  problem in the bank?

16  A.   I saw, like, a streak of lightning come through the front

17  door and go into Mary Jo's office.  And I told Jenny that I

18  thought we were going to be robbed.

19  Q.   What's the next thing you saw after that?

20  A.   Mary Jo coming out of the office with the robber behind

21  her.

22  Q.   What did that robber do after he came out of Mary Jo's

23  office?

24  A.   Um, he made her come up to the teller line and told us

25  that if I didn't open the door, somebody would get hurt.

1    Q.  Was that in September?

2    A.  Oh, no.  I'm sorry.  That was -- that was the third

3    robbery.  No, that's when he jumped over the counter.

4    Q.  And do you remember at whose station he jumped over?

5    A.  Jenny's, right next to me.

6    Q.  Ma'am, if you would please take a look at the monitor,

7    I'm going to ask that you look at what's been previously

8    admitted as Government's Exhibit 2-A.

9    A.  Okay.  Yes.

10   Q.  Do you recognize that?

11   A.  That's it, yes.

12   Q.  Are you in that picture?

13   A.  Yes.  I'm on the left there.

14   Q.  In the yellow top?

15   A.  Yes.

16   Q.  Now, the person who's coming over the teller line, is

17   that the person you saw go into Mary Jo's office?

18   A.  Yes.

19   Q.  And he appears to have something in his right hand.  Do

20   you know what that is?

21   A.  A gun.

22   Q.  There appears to be something in his left hand.  Do you

23   know what that is?

24   A.  A bag.  I think it is a camouflage bag.

25   Q.  Now, after this person came over the teller line, what

1   happened next?

2   A.  He jumped down and almost landed on Jenny.  Then he told

3   us to give him our money, give him all the money and no dye

4   pack.

5   Q.  Did you do that?

6   A.  Yes.

7   Q.  Now, do you know how much money he got from you?

8   A.  11 or $1200, I believe.

9   Q.  As he was talking to you, did you make any observations

10  about the nature of his speech?

11  A.  Yes.  It was Spanish.  I could understand that.

12  Q.  After he got money from you, did he get money from anyone

13  else behind the teller line?

14  A.  Yes.  He went -- after me he went through the

15  drive-through teller and got money from her.  And then he

16  came back and got money from Jenny.

17  Q.  After he got money from each of you behind the teller

18  line, what did he do next?

19  A.  He jumped back over the teller line and proceeded to

20  leave.

21  Q.  When he left the bank, what did you do?

22  A.  Well, Mary Jo followed him out, and we just proceeded to

23  lock everything up and called the police and get our robbery

24  kit out and write down description.

25  Q.  That was in September.  Were you again in the bank in

```
 1   November of --
 2   A.  Yes.
 3   Q.  -- 2007?
 4   A.  Yes.
 5   Q.  And specifically on November 10th, did anything unusual
 6   happen?
 7   A.  We were robbed again.
 8   Q.  And where were you when that occurred?
 9   A.  Um, I was at my teller station.  But I was at a different
10   one.
11   Q.  I'd ask you to -- well, describe for us what happened
12   that you could see from the teller line.
13   A.  Um, let's see, that was about quarter to 10 in the
14   morning when he came in.  And I believe he went to Mary Jo's
15   office and got Mary Jo and drug her back.  That we had the
16   glass around the teller line.  And he told me if I didn't
17   want her to get hurt, I better open the door.  And so I did
18   open the door.
19   Q.  Now, did you hear Mary Jo say anything prior to him
20   coming up to the teller line or coming into the bank?
21   A.  No, I don't believe so.
22   Q.  Now, when he came up to the glass, was anyone with him?
23   A.  Mary Jo.
24   Q.  I'd like you to, if you would, take a look at the monitor
25   again and going to show you what's been admitted as
```

1    Government's Exhibit 3-C.  Do you recognize that?

2    A.   Yeah.   That was it.   He was dragging her back to the

3    side.

4    Q.   And at that point could you see him --

5    A.   Yes.

6    Q.   -- from where you were?

7    A.   Yes.   Uh-huh.

8    Q.   What do you recall him wearing?

9    A.   He had the dark hat, the beard, and he had, like, a blue,

10   dark flannel quilted shirt and dark pants, gloves, gun.

11   Q.   After you opened the door to let him into the back of the

12   teller line, what happened next?

13   A.   He asked us for all of our money, no dye pack, and he

14   wanted the money out of the second drawer, too.

15   Q.   And did you comply?  Did you give him those items?

16   A.   Yes, I did.

17   Q.   Now, at this point did you feel that you recognized the

18   person in November?

19   A.   Oh, yeah.   It was the same guy.

20   Q.   Why do you say that?

21   A.   His features, his mannerism, everything was the same,

22   almost the same outfit except this time he wore a -- he lost

23   his nose on the other one.   He put a dark Band-Aid on his

24   nose at this time.

25   Q.   So you -- I'm sorry.   I couldn't hear what you said it

1   was on his nose?

2   A.  A band-aid, a wide band-aid on the top of his nose.

3   Q.  Now, as he's behind the teller line getting this money,

4   did he get more money than from just you?

5   A.  Yes.

6   Q.  Who else did he get money from?

7   A.  Cheryl Wheeler.

8   Q.  And after the money was taken out of your drawer, was it

9   put into anything in particular?

10  A.  Another camouflage bag.  He opened it and put his stuff

11  in there.

12  Q.  Did you do that?

13  A.  Yes.

14  Q.  And did Cheryl do that?

15  A.  Yes.

16  Q.  And what happened after you put the money into this

17  camouflage bag?

18  A.  He was getting ready to -- I don't know -- go to another

19  teller when we heard the siren coming.  And he kind of

20  fidgeted back and forth and decided to go out the door and

21  leave, and I followed behind him.

22  Q.  I'd like to show you what's been marked as Government's

23  Exhibit 3-D.  Do you recognize that, ma'am?

24  A.  Yep.  That was him.

25  Q.  And is that photograph from November 2007?

1    A.   Uh-huh.

2    Q.   If you could answer yes or no?

3    A.   I'm sorry, yes.

4    Q.   And where is that picture taken?

5    A.   That is going out the door.

6          MR. HURT:   Your Honor, at this time we move the

7    admission of Government's Exhibit 3-D.

8          THE COURT:   Exhibit 3-D will be admitted.

9          (The photograph was received in evidence and marked

10   as Government's Exhibit No. 3-D.)

11   BY MR. HURT:

12   Q.   Now, was that the -- what is that in his left hand?

13   A.   That's the bag, the tote bag with the money in it.  Yeah,

14   that's it.

15   Q.   Now, when you followed him to the door, did you see

16   anything in the parking lot?  Did you see what --

17   A.   He had backed the car in, and I saw his license plate,

18   KEB-5751.

19   Q.   How about the type of car?

20   A.   It was a dark blue but not like a Navy blue.  It was that

21   new shiny, real clean blue.

22   Q.   And was it a -- can you be more specific?

23   A.   I think it was a Chevrolet.

24   Q.   I'd like you to take a look at the monitor, Government's

25   Exhibit previously introduced and admitted as 3-A.

1    A.   Yes.   That looks like it, four door.

2    Q.   And after you locked the doors, what did you do next?

3    A.   We ran back in, and, of course, we called the police.   We

4    got our robbery pack out, and we all started writing down

5    everything we remembered and so that we would have it ready

6    for the police officers.

7             MR. HURT:   Thank you.   I have no further questions.

8             MR. DASH:   I don't have any questions, Your Honor.

9             THE COURT:   All right.   You ready with your next

10   witness?

11            MR. HURT:   Judge, we got finished faster than I

12   thought we would.   I do not have an additional witness.

13            THE COURT:   Well, ladies and gentlemen, I guess that

14   means that's all we can do today.   I don't think it's

15   necessary for me to emphasize any further what I said earlier

16   about not discussing the case or allowing anybody to discuss

17   it with you.

18            If your friends and family think that you're being

19   too stiff-necked about it, you can just blame it on me.   But

20   just don't let it happen.

21            We'll resume tomorrow morning at 10:00.   I'll ask

22   you to please return directly to the jury room and hopefully

23   we'll be able to begin promptly at that time.   We're

24   adjourned for the day here.

25            All right.   This witness may be excused, I assume,

1   counsel?

2           MR. HURT:  Yes, sir.

3           MR. DASH:  Yes, sir.

4           THE COURT:  All right.  Mrs. Reed, you're excused

5   with the understanding you won't discuss your testimony with

6   any other witness in the case until the case is concluded.

7           THE WITNESS:  Yes, sir.  Thank you.

8           (Witness excused.)

9           (Jury out at 4:50 p.m.)

10          THE COURT:  All right.  We'll be adjourned until

11  10:00 tomorrow morning.

12          (Hearing adjourned at 4:50 p.m.)

13                          CERTIFICATION

14

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18      X_____x

19                  Jody A. Stewart

20              X_____x

21                      Date

22

23

24

25

JODY A. STEWART, Official Court Reporter