```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Newport News Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                      )
 5  UNITED STATES OF AMERICA,         )
                                      )
 6          Plaintiff                 )   CRIMINAL ACTION NO.
                                      )    4:08cr35
 7  v.                                )
                                      )
 8  HECTOR JAVIER CARABELLO,          )
                                      )
 9          Defendant.                )
    - - - - - - - - - - - - - - - - - -

10

11

12                  TRANSCRIPT OF PROCEEDINGS

                              DAY 2
13
                      Newport News, Virginia
14
                       December 11, 2008
15

16

    BEFORE:   THE HONORABLE HENRY C. MORGAN, JR.
17            United States District Judge

18

19  APPEARANCES:

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Eric Hurt
21                 Katherine Martin
                   Assistant United States Attorney
22                 Counsel for the United States

23            FEDERAL PUBLIC DEFENDER'S OFFICE
              By:  Larry Dash
24                 Assistant Federal Public Defender
                   Counsel for the Defendant

25
```

1                                **I N D E X**

2     GOVERNMENT'S
      WITNESSES                                                    PAGE
3

4      SANDRA GIMBERT
            Direct Examination by Ms. Martin                       182
            Cross-Examination by Mr. Dash                          188
5      JENNIFER SLUDER
            Direct Examination by Ms. Martin                       190
6           Cross-Examination by Mr. Dash                          193
            Redirect Examination by Ms. Martin                     195
7      AMANDA G. HORSLEY
            Direct Examination by Ms. Martin                       196
8           Cross-Examination by Mr. Dash                          202
            Redirect Examination by Ms. Martin                     204
9      KAREN MARTIN
            Direct Examination by Mr. Hurt                         206
10          Cross-Examination by Mr. Dash                          218
            Redirect Examination by Mr. Hurt                       219
11     VICKI SHARP
            Direct Examination by Mr. Hurt                         219
12     CHARLOTTE THORNTON
            Direct Examination by Ms. Martin                       227
13     PAULA TILLER
            Direct Examination by Ms Martin                        239
14          Cross-Examination by Mr. Dash                          248
       HOLLIS ROCCA
15          Direct Examination by Ms Martin                        249
            Cross-Examination by Mr. Dash                          255
16     BARBARA TRIVELLI
            Direct Examination by Mr. Hurt                         256
17     JIM NICOL
            Direct Examination by Mr. Hurt                         261
18          Cross-Examination by Mr. Dash                          268
       LILLIAN VEGA-CARABALLO
19          Direct Examination by Ms. Martin                       272
            Cross-Examination by Mr. Dash                          280
20          Redirect Examination by Ms. Martin                     283
       VICTOR GARCIA
21          Direct Examination by Ms. Martin                       287
            Cross-Examination by Mr. Dash                          290
22     SCOTT BABER
            Direct Examination by Mr. Hurt                         292
23          Cross-Examination by Mr. Dash                          306
            Redirect Examination by Mr. Hurt                       312
24          Recross-Examination by Mr. Dash                        314
       MARK MARSHALL
25          Direct Examination by Mr. Hurt                         315
            Cross-Examination by Mr. Dash                          317

179

 1

 2     JENNIFER COLLINS
            Direct Examination by Ms. Martin              318
 3     GREGORY F. FEDERICO
            Direct Examination by Ms. Martin              329
            Cross-Examination by Mr. Dash                 334
 4

 5     DEFENDANT'S
       WITNESSES                                          PAGE
 6
       NONE
 7

 8

 9

10                        E X H I B I T S

11     GOVERNMENT'S
       NO.            DESCRIPTION                         PAGE
12
       4-A            Photograph                          183
13     4-B            Floor plan                          184
       4-E            Floor plan                          188
14     4-C            Photograph                          197
       4-D            Photograph                          201
15     5-A            Photograph                          208
       5-B            Photograph                          215
16     6-A            Photograph                          221
       6-B            Photograph                          223
17     7-A            Photograph                          229
       7-B            Floor plan                          230
18     7-C            Photograph                          233
       7-D            Photograph                          236
19     8-A            Photograph                          243
       8-B            Photograph                          245
20     8-C            Photograph                          247
       9-A            Photograph                          257
21     9-B            Photograph                          258
       9-C            Photograph                          260
22     10-A           Photograph                          264
       11-A           Photograph                          278
23     11-B           Photograph                          280
       13             Photograph                          295
24     12             Firearm                             301
       27             Currency                            304
25     12-A &         Photographs                         305
       27-A

180

|    |    |    |
|----|----|----|
| 33 & 33-A | Drug paraphernalia and photograph | 306 |
| 14 & 14-A | Tub and photograph | 320 |
| 15 & 15-A | Wig and photograph | 321 |
| 16 & 16-A | Fake beard and photograph | 322 |
| 17 & 17-A | Ball cap and photograph | 322 |
| 18 & 18-A | Cap and photograph | 323 |
| 19 & 19-A | Gloves and photograph | 323 |
| 20 & 20-A | Shoes and photograph | 324 |
| 22 & 22-A | Shirt and photograph | 324 |
| 23 & 23-A | Pants and photograph | 325 |
| 24 & 24-A | Screwdriver and photograph | 325 |
| 28 & 28-A | Tint film and photograph | 326 |
| 30 & 30-A | Bag and photograph | 326 |
| 25 & 25-A | Jacket and photograph | 328 |
| 26-A | Photograph | 329 |
| 21 & 21-A | Nose and photograph | 331 |
| 29-A | Photograph | 332 |
| 31-A | Photograph | 333 |
| 32 & 32-A | Make-up and photograph | 334 |

DEFENDANT'S
NO.            DESCRIPTION                          PAGE

NONE

1          THE CLERK:  United States of America versus Hector
2     Javier Caraballo, criminal number 4:08cr35.
3          Government ready, Mr. Hurt?
4          MR. HURT:  The Government is ready.  Good morning,
5     Judge.
6          THE CLERK:  Defense ready, Mr. Dash?
7          MR. DASH:  Yes, we are.  Good morning, sir.
8          THE COURT:  All right.  We ready for the jury,
9     counsel?
10          MR. DASH:  Yes, sir.
11          THE COURT:  All right, Mr. King.
12          (Jury in at 10:11 a.m.)
13          THE COURT:  Good morning, ladies and gentlemen.
14     It's a nice day to be inside.
15          Would you call the roll of the jury, Elva.
16          THE CLERK:  Yes, sir.
17          (Roll call of jury.)
18          THE CLERK:  They are all present, Judge.
19          THE COURT:  All right.  We'll continue with the
20     presentation of the evidence in behalf of the United States.
21          You ready for your next witness?
22          MS. MARTIN:  Yes, Your Honor.  The United States
23     calls Sandra Gimbert.
24           SANDRA GIMBERT, called by the Government, having
25     been first duly sworn, was examined and testified as follows:

```
 1                      DIRECT EXAMINATION
 2   BY MS. MARTIN:
 3   Q.  Good morning, Ms. Gimbert.
 4   A.  Good morning.
 5   Q.  Could you please state your full name and spell your last
 6   name for the court reporter.
 7   A.  Yes.  It's Sandra L. Gimbert.  Last name spelling is
 8   G-i-m-b-e-r-t.
 9   Q.  Mrs. Gimbert, where do you work?
10   A.  I work for Citizens & Farmers Bank.
11   Q.  Do you work at a specific branch?
12   A.  Yes.  I work at the Sandston branch.
13   Q.  And is that on Williamsburg Road in Sandston?
14   A.  Yes, it is.
15   Q.  How long have you worked there?
16   A.  Be seven years in April.
17   Q.  And what's your position at the bank?
18   A.  Customer service representative.
19   Q.  As a customer service representative, can you tell me
20   whether Citizens & Farmers is insured by the Federal Deposit
21   Insurance Corporation or FDIC?
22   A.  Yes, we are.
23   Q.  Ms. Gimbert, I'm going to pass up some exhibits for you
24   to look at.  First, if you'd take a look at what's been
25   marked for identification as Government Exhibit 4-A.  Do you
```

1  recognize Government Exhibit 4-A?

2  A.  Yes.  That's the branch that I work at in Sandston.

3         MS. MARTIN:  Your Honor, the Government offers

4  Exhibit 4-A into evidence and ask that it be published to the

5  jury.

6         THE COURT:  All right.  Exhibit 4-A will be

7  admitted.

8         (The photograph was received in evidence and marked

9  as Government's Exhibit No. 4-A.)

10 BY MS. MARTIN:

11 Q.  Ms. Gimbert, were you working at the branch on March 5th,

12 2007?

13 A.  I was.

14 Q.  And did anything unusual happen that day?

15 A.  There was a bank robbery that afternoon.

16 Q.  That afternoon.  What approximately was the time?

17 A.  At close time, just before closing time, a few minutes

18 before 5.

19 Q.  A few minutes before 5.  And where were you sitting when

20 you first -- or standing when you first realized that the

21 bank was --

22 A.  My office is directly across from the front door, just

23 opposite the front door, across the lobby.

24 Q.  Ms. Gimbert, I'd like to show you what's been marked for

25 identification as Government Exhibit 4-B.  Do you recognize

1   that?

2   A.   Yes.

3   Q.   And does that exhibit fairly and accurately depict the

4   floor plan of the bank as it was on March 5th, 2007?

5   A.   It does.

6          MS. MARTIN:  Your Honor, the Government offers

7   Exhibit 4-B into evidence and ask that it be published.

8          THE COURT:  All right.  Exhibit 4-B will be

9   admitted.

10          (The floor plan was received in evidence and marked

11   as Government's Exhibit No. 4-B.)

12   BY MS. MARTIN:

13   Q.   Ms. Gimbert, if you touch the screen in front of you, you

14   can mark that exhibit.  So, if you could, would you mark an

15   "X" where your desk is located.

16   A.   With my hand?

17   Q.   Just with your hand on the screen.

18   A.   Want me to do that a little bit better?

19   Q.   No.  That is perfect.  So you were sitting at your desk.

20   What happened?  When did you first see the bank robber?

21   A.   My desk, the way it's situated, this part here is where

22   my computer was (indicating).  So I was turned looking at my

23   computer.  Out of the corner of my eye, I saw the door open,

24   and turned, but by then he was in my office crouched down

25   beside my chair.

1   Q.  And did he say anything to you once he crouched down next

2   to you?

3   A.  Yes, he did.  He said he was there to make a withdraw.

4   Q.  Did you reply?

5   A.  I told him that I understood.

6   Q.  What did you mean by that?

7   A.  He was disguised, and I knew that he was there to rob the

8   bank.  So I let him know that I understood and that I was

9   going to do what he told me.

10  Q.  You mentioned that he was disguised.  What was he

11  wearing?

12  A.  He had a fake beard, um, and he had a bandage over his

13  nose, a large bandage over his nose, thick hair, big bulky

14  coat, gloves, and he was -- most everything was covered.

15  Q.  You said he was wearing a big, bulky coat.  Do you

16  remember anything else about --

17  A.  It was plaid, kind of like the ones like hunters might

18  wear, you know.

19  Q.  Now, after he knelt down by your desk and said that he

20  wanted to make a withdraw, what happened after that?

21  A.  He asked me where the money was, and I turned to tell

22  him -- I turned, and my chair swivels, and I turned to tell

23  him to nod at the teller line, and he told me not to look at

24  him.  So I turned back around and just looked straight down.

25  Q.  And did you go -- what happened after that?

1    A.   He wanted to know where the big money was.  I told him

2    without moving my head, told him the vault.  But in the

3    meantime, one of our tellers had crossed the lobby to check

4    on me, and he said, "We're going now."  So I stood up and

5    walked with him to the teller line.

6    Q.   And on the screen can you circle where the teller line

7    was located.

8    A.   (Witness complied.)

9    Q.   And after you walked over to the teller line, what did

10   you do once you got there?

11   A.   He asked me who had the money, and I had to tell him

12   which tellers had the money out.

13   Q.   And who did you tell him?

14   A.   That the drive-through tellers did, Allison and Jennifer,

15   and then Amanda worked at the lobby and that she had still

16   had her money in there.

17   Q.   And so what did he do after you told him who had the

18   money?

19   A.   He went to each one of them --

20          THE COURT:  I'm sorry.  Can you speak a little

21   louder, ma'am.

22          THE WITNESS:  He went to each one of the tellers

23   that I'd indicated had the money and they put money into the

24   bag.

25   BY MS. MARTIN:

1  Q.  Where were you standing while that was happening?

2  A.  He'd gotten us all together in the little area by the

3  first teller, the little corner by the door.  It goes behind

4  the teller line.  We were all kind of bunched there together,

5  except Amanda, who was at her station and the drive-through

6  tellers.

7  Q.  So where you marked there on the screen, that's where he

8  had gathered everyone?

9  A.  Yes.

10  Q.  Okay.  Ms. Gimbert, did you notice that the bank robber

11  was carrying a gun?

12  A.  Yes, I did.

13  Q.  Can you describe it?

14  A.  It looked like it was short and silver, but I think that

15  it had, like, some silver tape on it on the end of it.

16  Q.  Okay.  And was he carrying anything else?

17  A.  A camouflage bag, like a -- it wasn't floppy like a

18  duffel bag, but it was a camouflaged fabric.

19  Q.  And was there anything that you remember that was

20  distinguishing about the way he spoke?

21  A.  He had, I felt, like a Hispanic accent.

22  Q.  And after he went to each of the tellers, what did he do

23  after that?

24  A.  He asked us if there was any -- and I can't remember if

25  he said bait money or funny money or whatever, but if there

1   was any money in there like that, that he was taking one of

2   us with him.  And we said that there was none in there.  And

3   he turned and left, headed towards the door, and he said,

4   "Thank you."

5   Q.  After he left, what did you do?

6   A.  We secured the area that was -- that he had been in.

7   According to our robbery kit, each one of us had certain jobs

8   that we had to do.

9        MS. MARTIN:  All right.  Thank you, Ms. Gimbert.  No

10  further questions.  Oh, I'm sorry.  Your Honor, the

11  Government asks that this floor plan be printed and marked as

12  Government Exhibit 4-E.

13       THE COURT:  All right.  4-E will be admitted.

14       (The document was received in evidence and marked as

15  Government's Exhibit No. 4-E.)

16                       CROSS-EXAMINATION

17  BY MR. DASH:

18  Q.  Good morning, Ms. Gimbert.  Ma'am, you indicated that the

19  gun that you saw, looked like it had tape on the end of it.

20  Was that tape across the barrel end or the butt end or do you

21  recall which?

22  A.  I don't.  He had it kind of palming it, so some of it was

23  covered, and just when I looked at it at first, it looked

24  like there was tape on it.

25  Q.  So the whole time that you saw it, it was pretty much in

1    the palm of his hand?

2    A.   Yes.

3    Q.   It wasn't out, you know, pointing at anybody or anything

4    like that?

5    A.   When he was palming it behind the teller line, he had it

6    there because he had the bag also.  But when he was at my

7    desk, he had it pointed to me.

8    Q.   Okay.  And when you saw this gun, you didn't see any

9    bullets or anything like that?

10   A.   No.

11   Q.   And the firearm was never discharged or anything?

12   A.   No.

13   Q.   And I believe that you said that when he left that this

14   individual actually said, "Thank you" as he was walking out

15   the door?

16   A.   He did.

17   Q.   And you said that you secured or you helped secure the

18   bank and employ your robbery checklist, I guess, correct?

19   A.   Yes.

20   Q.   What exactly did you do?  Did you lock the front doors or

21   did you have some other chore, some other duty and

22   responsibility?

23   A.   No, I didn't lock the front door.  I went to the -- I

24   can't even remember now, to tell you the truth.  I didn't

25   make the 911 call.  I remember securing the area that he was

1   at, like turning chairs over towards the teller line so that

2   nobody would walk up there to the teller line.

3   Q.  And you didn't actually see a vehicle or how he actually

4   departed once -- other than walking out the front door?

5   A.  I did not.

6           MR. DASH:  I don't have any further questions.

7   Thank you.

8           MS. MARTIN:  Nothing further from the Government,

9   Your Honor.

10          THE COURT:  May this witness be excused, counsel?

11          MR. DASH:  Yes, Your Honor.

12          MS. MARTIN:  Yes, Your Honor.

13          THE COURT:  All right, Ms. Gimbert.  You are excused

14  as a witness with the understanding that you will not discuss

15  your testimony with any other witness in the case until the

16  case is concluded.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  You may step down.

19          (Witness excused.)

20          MS. MARTIN:  United States calls Jennifer Sluder.

21           JENNIFER SLUDER, called by the Government, having

22  been first duly sworn, was examined and testified as follows:

23                       DIRECT EXAMINATION

24  BY MS. MARTIN:

25  Q.  Good morning, Ms. Sluder.  Will you state your full name

1  and spell your last name, please, for the record.

2  A.   Jennifer Dale Sluder, S-l-u-d-e-r.

3  Q.   Ms. Sluder, where do you work?

4  A.   At Citizens & Farmers Bank.

5  Q.   Do you work at a specific branch?

6  A.   I work at the Sandston branch.

7  Q.   And how long have you worked there?

8  A.   I been there two and a half years.

9  Q.   What do you do there?

10  A.   I'm the head teller.

11  Q.   Ms. Sluder, were you working at the branch on March 5th,

12  2007?

13  A.   Yes.

14  Q.   And did something unusual happen that day?

15  A.   We were robbed.

16  Q.   Do you -- where were you working when the bank was

17  robbed?

18  A.   In the drive-through window.

19  Q.   Ms. Sluder, I am going to show you what's been previously

20  admitted as Government Exhibit 4-B, going to come up on your

21  screen.  You touch the screen, you can mark it.  So if you

22  would, will you show us with an "X" where the teller window,

23  the drive-through is.

24  A.   (Witness complied.)

25  Q.   And tell us when you first realized that you were being

1    robbed.

2    A.   Um, I turned around to go to the front teller line, and I

3    saw him standing there, and he had the other tellers lined up

4    in a row.

5    Q.   And did he notice you?

6    A.   Yes.

7    Q.   And what happened after he noticed you?

8    A.   He told me to stand by them and look my head down, don't

9    look at him.

10   Q.   Don't look at him.  And what did he do after that?

11   A.   Um, he proceeded to get the money from the first teller,

12   and then he asked who was in the drive-through, and there

13   were two of us back there, and both of us started to walk

14   back at the same time, and he grabbed the other teller by the

15   arm and put the gun to her arm and made me get my money and

16   then made her get hers out.

17   Q.   Do you remember how much, approximately, he got from you?

18   A.   I don't.

19   Q.   So after he took money from you, then he went to the

20   second teller?

21   A.   Yes.

22   Q.   After that what happened?

23   A.   Um, he stood at the door to go back to the teller line,

24   and he said, "If there's anything in this bag, I'm coming

25   back and taking one of you with me."  And then he said thank

1    you and walked out.

2    Q.  You said if there is anything in the bag.  Do you

3    remember what the bag looked like?

4    A.  It was like a tan or a green.

5    Q.  And do you remember what the bank robber was wearing,

6    what he looked like?

7    A.  He was completely in disguise.  We could not tell who he

8    was.  He had on a flannel shirt, and he had his face

9    completely covered, and he had a band-aid on his nose.

10   Q.  Was there anything that you remember about how he spoke?

11   A.  He had an accent.

12   Q.  And do you remember what the gun looked like?

13   A.  It was silver.  It looked like it could have been a

14   revolver.  It was some type of handgun.

15   Q.  After the bank robber left, what did you do?

16   A.  Locked the door.

17   Q.  Do you remember anything about the general build of the

18   bank robber?

19   A.  Um, he was about my height, maybe a little bit shorter.

20   Not really big, not real small, about average build, but he

21   was short.

22          MS. MARTIN:  I have no further questions.

23                        CROSS-EXAMINATION

24   BY MR. DASH:

25   Q.  Good morning, Ms. Sluder.

1  A.  Good morning.

2  Q.  Ma'am, when this incident took place, you indicated that

3  the individual that robbed the bank had an accent?

4  A.  Yes.

5  Q.  Do you recall what kind of accent that was?

6  A.  At first when I heard it, I thought it was Middle

7  Eastern, but then when he was leaving, it sounded more

8  Hispanic.

9  Q.  Okay.  But in your notes that you provided to the police,

10  Henrico police, you put very Indian accent, correct?

11  A.  Uh-huh.

12  Q.  In fact, you underlined the "very" a couple of times,

13  correct?

14  A.  Uh-huh.  That was very strong at first, yes.

15  Q.  And when you described the individual, did you happen to

16  see the color of his skin or anything like that?

17  A.  No, I did not.

18  Q.  And the gun that you saw, you described it as a silver

19  revolver type of gun, correct?

20  A.  Yes.

21  Q.  And do you recall -- you actually at one time thought

22  that this gun was a fake gun, correct?

23  A.  Uh-huh.

24  Q.  And that's what you told the police, was that you thought

25  the gun was fake?

```
 1  A.   Uh-huh.
 2            MR. DASH:  I don't have any further questions.
 3  Thank you.
 4                      REDIRECT EXAMINATION
 5  BY MS. MARTIN:
 6  Q.  Ms. Sluder, do you recall that when you described the gun
 7  to the police that you described it as fake or that it was
 8  really new?
 9  A.  It could have been either.  I just wasn't sure.  I was
10  very confused because I thought that it was a mock robbery
11  the whole time so --
12            MS. MARTIN:  Thank you, Ms. Sluder.
13            THE COURT:  May this witness be excused?
14            MS. MARTIN:  Yes, Your Honor.
15            MR. DASH:  Yes, Your Honor.
16            THE COURT:  All right, Ms. Sluder.  You're excused
17  as a witness with the understanding that you will not discuss
18  your testimony with any other witness in the case until the
19  case is concluded.
20            THE WITNESS:  Okay.
21            THE COURT:  You may step down at this time.
22            (Witness excused.)
23            MS. MARTIN:  The United States calls Amanda Horsley.
24            AMANDA G. HORSLEY, called by the Government, having
25  been first duly sworn, was examined and testified as follows:
```

```
 1                          DIRECT EXAMINATION
 2   BY MS. MARTIN:
 3   Q.  Good morning, Ms. Horsley.  Can you state your full name
 4   and spell your last name for the court reporter.
 5   A.  It's Amanda Jean Gillenwalters Horsley.  Gillenwalters is
 6   G-i-l-l-e-n-w-a-l-t-e-r-s and Horsley is H-o-r-s-l-e-y.
 7   Q.  Ms. Horsley, did you work at the Citizens & Farmers Bank
 8   in Sandston?
 9   A.  Yes, ma'am.
10   Q.  Do you work there any longer?
11   A.  No, ma'am.
12   Q.  How long did you work there?
13   A.  I was there two years.
14   Q.  What did you do?  What was your position?
15   A.  I was a bank teller.
16   Q.  And when did you leave Citizens & Farmers?
17   A.  March 23rd, 2007.
18   Q.  Ms. Horsley, were you working at the bank on March 25th,
19   2007?
20   A.  Yes, ma'am.
21   Q.  And do you remember what happened that day?
22   A.  Yes, ma'am.  I'd worked that day, and at the closing of
23   the day, I balanced out my drawer, and somebody had come in.
24   I had said hello to them, and they had walked straight to
25   Sandra's desk, and had knelt down beside her, and I didn't
```

1   see them, and I got really nervous.

2         I was sitting at my desk at the time that this had

3   happened, and another teller -- or my head teller, Angel, she

4   had come up beside me and said something to me, and he come

5   around with Sandra with a gun and was holding her, making

6   her, um, come behind the teller line, and he proceeded to rob

7   me and two other tellers.

8   Q.  Okay.  Ms. Horsley, I'm going to pass up some exhibits

9   for you to look at.  I'd like you to first take a look at

10  what's been marked for identification as Government's Exhibit

11  4-C.  Do you recognize that?

12  A.  Yes, ma'am.

13  Q.  What is it?

14  A.  It's the lobby of the Sandston branch that I used to work

15  at.

16         MS. MARTIN:  Your Honor, the Government offers

17  Exhibit 4-C into evidence and ask that it be published.

18         THE COURT:  All right.  Exhibit 4-C will be

19  admitted.

20         (The photograph was received in evidence and marked

21  as Government's Exhibit No. 4-C.)

22  BY MS. MARTIN:

23  Q.  Now, Ms. Horsley, you were just mentioning that you were

24  at your desk when you saw somebody cross the lobby and you

25  said hello to them.  Where exactly on this picture?

1  A.  I was right here (indicating).

2  Q.  Right there.  Can you mark an "X" on it, if you would?

3  A.  (Witness complied.)

4  Q.  And that was your teller station?

5  A.  Yes, ma'am.

6  Q.  Okay.  And because it was close to closing time, what

7  were you doing?

8  A.  I had just finished counting down my drawer and getting

9  ready to close for the day to go home, put my stuff away, and

10 go home, when somebody had walked into the lobby, and I

11 stayed there because I assumed that it was a customer.  And

12 they had walked over to Sandra's desk, and like I said, he

13 come around with Sandra and proceeded to rob us.

14 Q.  Could you see what he was wearing?

15 A.  Yes, ma'am.  He had a flannel jacket on, blue and red and

16 tan, jeans, a black hat, a black mask, like a beard or

17 something.

18 Q.  Once he got behind the teller line, where did he go

19 first?

20 A.  He went to my station.  He held a gun up to my side, my

21 stomach area, and put his bag, his duffel bag on the table

22 and proceeded to tell me to stay still, to stop moving, and

23 to put money in the bag.

24 Q.  Now, you said that he held the gun up to your stomach.

25 Did you -- could you see the gun?

1   A.  Yes, ma'am.

2   Q.  Can you describe it?

3   A.  I couldn't tell you.  I'm not real familiar with guns.

4   It was just a handgun almost, or a smaller gun, not a rifle

5   or anything, just a smaller gun.

6   Q.  Do you remember the color?

7   A.  It was gray, silverish color.

8   Q.  Did you see -- could you tell if it was loaded or not?

9   A.  No, ma'am.

10  Q.  You said that he put a bag up on --

11  A.  Yes, ma'am.  It was a duffel bag.  It was a green camo

12  duffel bag or smaller bag.  It's no bigger than that

13  (indicating).

14  Q.  And do you remember approximately how much money he took

15  from you?

16  A.  Um, about $20,000.

17  Q.  And after he got the money from your drawer -- now, was

18  that both drawers?

19  A.  Yes, from my top drawer, yes, ma'am, and from my -- the

20  second drawer.

21  Q.  And explain to the jury about the top drawer and the

22  bottom drawer.

23  A.  The top drawer has a limited amount in it.  It also has

24  the dye pack, as well as the bait money in it, and then the

25  second drawer has what's our extra money, our bundled money,

1    which would be wrapped of hundreds or in a certain amount,

2    like ours would be in 50s or a hundred dollar bundles, so on

3    and so on as far as, like, 20s and 10s and 5s.

4            And that particular day I had to open that Tuesday,

5    or the next day, and I had to have plenty of money for the

6    next teller that was opening with me because she wasn't

7    there -- she's not there in the afternoons.

8    Q.   Okay.  So after you gave the bank robber your top drawer,

9    did he ask to get the second drawer?

10   A.   Yes, ma'am.  He did ask to get the second drawer, and I

11   had -- I didn't give him the dye pack and the bait money the

12   first time, and he said, "What's that?"  And I just threw it

13   in his bag as well.

14   Q.   What did you throw in his bag?

15   A.   I threw his dye pack and the bait money in his bag.

16   Q.   And so after he took money from you at your teller

17   station, where did he go after that?

18   A.   He went behind what we would consider the drive-through,

19   and he proceeded to rob the first teller, or the first window

20   teller in the drive-through and then proceeded to go for the

21   second teller in the drive-through.

22   Q.   Where were you standing?

23   A.   I was standing right here when it happened or -- and I

24   was moving closer to the wall when it happened, when he was

25   proceeding to rob the other two girls in the drive-through.

1  Q.  And who else was standing there with you?

2  A.  Angel, Allison, Jennifer -- well, Jennifer and Allison

3  were the two ladies in the back.  Alice, Sandra and Angel

4  were all standing there with me while he was robbing her.

5  Q.  Now, after he had taken the money from the drive-through,

6  where did he go?

7  A.  He stood there for a minute and told us that if we had a

8  dye pack in the bag, that he was going to take one of us with

9  him.  And then he proceeded to leave.

10  Q.  All right.  I'm going to show you what's been marked as

11  Government's Exhibit 4-D.  Do you recognize that?

12  A.  Yes, ma'am.

13  Q.  Can you tell us what it is?

14  A.  That is the Sandston lobby after he was leaving.

15          MS. MARTIN:  Your Honor, Government offers Exhibit

16  4-D into evidence and ask that it be published.

17          THE COURT:  All right.  Exhibit 4-D will be

18  admitted.

19          (The photograph was received in evidence and marked

20  as Government's Exhibit No. 4-D.)

21  BY MS. MARTIN:

22  Q.  And so the back there, you can see some people in the

23  back.  Do you recognize who those are?

24  A.  I know it's Alice and Angel, as well as myself, and

25  Jennifer and Allison are all standing back there huddled

1  together because he huddled us together after he had gotten

2  all the money from us.

3  Q.  All right.  And what did you do after he left?

4  A.  I stood there after he left.  Angel and Allison went to

5  close and lock the doors and to grab the paperwork for the --

6  or a robbery kit which had paperwork in it saying what type

7  of gun and basic police report type things.

8  Q.  Why did you leave the bank a couple weeks later?

9  A.  I wasn't.  I was let go.

10            MS. MARTIN:  Thank you.

11            THE WITNESS:  Thanks.

12            MS. MARTIN:  No further questions, Your Honor.

13                         CROSS-EXAMINATION

14  BY MR. DASH:

15  Q.  Good morning, ma'am.

16  A.  Good morning.

17  Q.  Ma'am, I just want to clarify, and it might have just

18  been misspoken by the prosecutor, but this robbery took place

19  March 5th, not the March 25th, correct?

20  A.  Yes, March 5th.

21  Q.  So there wasn't another one on March 25th that you were

22  involved in?

23  A.  No.

24  Q.  Okay.  Now, when you were interviewed -- I mean, as part

25  of the robbery did you provide statements and fill out forms

1   and things like that, correct?

2   A.  Yes, sir.

3   Q.  And you testified that you saw this silver handgun.  Do

4   you recall telling the police officers anything else about

5   the handgun?

6   A.  Not at this time, I don't remember.

7   Q.  Do you recall telling them that it looked like it was

8   plastic?

9   A.  It almost had like a plastic look to it at one point that

10  it wasn't -- it seemed -- I guess it was -- at the time it

11  didn't seem as if it was all real.

12  Q.  Now, additionally, when you were -- the individual that

13  robbed this bank, I believe you gave a little bit of a

14  description.  Do you recall giving a description as to his

15  voice or anything like that?

16  A.  His voice, it sounded foreign.  The one thing that I do

17  remember, um, like on his face, was that he had a mark such

18  as a mole on his face or his neck area.  But he wasn't

19  from -- it sounded almost as if he wasn't from this country

20  or he had somewhat of a foreign accent.

21  Q.  In fact, you told the police that you thought it was

22  Indian or Middle Eastern, correct?

23  A.  Yes.

24  Q.  Now, ma'am, I believe you said that you had actually put

25  a dye pack into the bag, correct?

1    A.  Yes, sir.

2    Q.  Did you happen to look out the window or anything like

3    that to see if this dye pack had gone off afterwards?

4    A.  No, sir.  I stayed -- right where you see all the tellers

5    huddled at, I stayed there until after everybody had said

6    that the doors were locked and it was okay.

7    Q.  So you didn't -- you don't know where he went --

8    A.  No.

9    Q.  -- how he left or anything like that?

10   A.  No.

11          MR. DASH:  I don't have any further questions.

12   Thank you.

13                    REDIRECT EXAMINATION

14   BY MS. MARTIN:

15   Q.  Mrs. Gillenwalters Horsley, did you make a written

16   statement?  Defense counsel asked you if you'd made a written

17   statement following the robbery?

18   A.  Yes.  I did with the police officer.

19   Q.  Do you remember on what day you made that statement?

20   A.  It was March 5th, and then I know I made another one with

21   the FBI agent or with you all's office.

22   Q.  And if I showed you that written statement, would it

23   refresh your recollection about exactly what you thought the

24   gun looked like?

25   A.  Yes, ma'am.

1          MS. MARTIN:  Your Honor, I'd like to pass up what's

2     been marked as --

3     BY MS. MARTIN:

4     Q.  Mrs. Gillenwalters, I'll give you a moment to read that,

5     if you would.

6     A.  Okay.

7     Q.  If you'd give that back to the court security officer.

8     Do you remember now what exactly you wrote down?

9     A.  Yes, ma'am.  It was -- I wrote down that it was -- it

10    looked almost plastic, and it looked as if it had bullets in

11    it in the gun.  I wasn't sure -- since then it's been awhile

12    since I -- trying to forget about the robbery and everything.

13    Q.  But at the time you noticed that there were bullets in

14    the gun?

15    A.  Yes, ma'am.

16          MS. MARTIN:  Thank you, Ms. Gillenwalters.  No

17    further questions.

18          THE COURT:  May this witness be excused, counsel?

19          MR. DASH:  Yes, sir.

20          (Witness excused.)

21          THE COURT:  All right, Ms. Horsley.  You're excused

22    as a witness with the understanding that you won't discuss

23    your testimony with any other witness in the case until the

24    case is concluded.

25          THE WITNESS:  Yes, sir.

1              THE COURT:  You may step down.

2              THE WITNESS:  Thank you.

3              (Witness excused.)

4         MR. HURT:  The United States calls Karen Martin.

5              KAREN MARTIN, called by the Government, having been

6    first duly sworn, was examined and testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. HURT:

9    Q.  Good morning, Mrs. Martin.

10   A.  Hello.

11   Q.  Would you please state your full name and spell your last

12   name for the court reporter.

13   A.  Karen Marie Martin, M-a-r-t-i-n.

14   Q.  And, Mrs. Martin, how are you employed?

15   A.  Through -- it is now Village Bank but it was River City

16   Bank.

17   Q.  And what do you do for what used to be River City Bank?

18   A.  Assistant branch manager.

19   Q.  Where is that branch located?

20   A.  Highland Springs, Virginia.

21              THE COURT:  Where is that?

22              THE WITNESS:  Highland Springs, Virginia.

23   BY MR. HURT:

24   Q.  Is that just outside of Richmond?

25   A.  Yes, sir.

1    Q.  Ma'am, how long have you been with what used to be River

2    City Bank?

3    A.  Since June of 2006.

4    Q.  And on June 30th of 2007, were you in the branch that

5    day?

6    A.  Yes, sir.

7    Q.  And do you recall that day specifically?

8    A.  Yes, sir.

9    Q.  Was there anyone else working with you that day?

10   A.  Yes, sir.

11   Q.  And who was that?

12   A.  My teller, Monte Mitchell, and that we were the only two

13   working that day.  It was on a Saturday.

14   Q.  And on this Saturday, did someone come in to rob the

15   bank?

16   A.  Yes, sir.

17   Q.  Do you recall what time that was?

18   A.  Right at 12.

19   Q.  Being a Saturday, how late were you going to be open?

20   A.  Till 12.

21   Q.  Now, ma'am, I'd like to show you some exhibits, if I

22   might.  If you would take a look at that first exhibit on

23   top, which is Exhibit 5-A, do you recognize that building,

24   ma'am?

25   A.  Yes, sir.  That's my branch.

1   Q.   That's the one located in Highland Springs?

2   A.   Yes, sir.

3            MR. HURT:   Your Honor, at this time we would move

4   the introduction of Government's Exhibit 5-A.

5            THE COURT:   Exhibit 5-A will be admitted.

6            (The photograph was received in evidence and marked

7   as Government's Exhibit No. 5-A.)

8   BY MR. HURT:

9   Q.   Now, on the date in June, June 30th, is that the way the

10  building looked?

11  A.   Yes, sir.

12  Q.   Had you locked the doors when this bank robbery occurred?

13  A.   We were getting ready to.

14  Q.   Were there any customers in the building?

15  A.   Yes, sir.  One.

16  Q.   Do you recall who that was?

17  A.   Mr. Gooding, the business next door to us.

18  Q.   So when you're getting ready to close, where were you

19  located when this person came in to rob the bank?

20  A.   I was standing with Monte behind his teller line at his

21  station.

22  Q.   And what were you doing?

23  A.   My computer had messed up at my desk so I went around,

24  and Monte's was still up, so Mr. Gooding was on the other

25  side of the teller line of me and Monte, and I was trying to

1   help him using his computer.

2   Q.  When did you first notice that someone had come into the

3   bank to rob it?

4   A.  As soon as they came in the front door.

5   Q.  And why did you know that?

6   A.  The way they were dressed.

7   Q.  The person came in, as we are looking at the photograph

8   which has been admitted as 5-A, is that the front door to

9   your bank?

10  A.  That's the front door but then they have to come through

11  another set of doors.

12  Q.  And once the bank robber came into your bank, where did

13  he go first?

14  A.  He came straight -- walked straight towards us at the

15  teller line.

16  Q.  And you and, you said, Monte were behind the teller line?

17  A.  Yes, sir.

18  Q.  And where was Mr. Gooding at this point?

19  A.  In front of -- in front of Monte's station, so right in

20  front of us.

21  Q.  So is it fair to say the three of you were pretty close

22  together?

23  A.  Yes, sir.

24  Q.  And where did this bank robber come as far as the teller

25  line was concerned?

1   A.  Um, we were at the first station.  As soon as he came, he

2   hopped over the second station and was right next to Monte.

3   Q.  Where were you in relation to this person who just hopped

4   over the teller line?

5   A.  Monte was here (indicating) and I was behind Monte.

6   Q.  Okay.  You indicated with your hand Monte was on your

7   right?

8   A.  Yeah.

9   Q.  You were just behind?

10  A.  Yes.  The robber was here, Monte was here (indicating),

11  and I was standing behind Monte.

12  Q.  Monte is between you and the robber?

13  A.  Yes, sir.

14  Q.  Did the robber say anything at this point?

15  A.  He said something.  When he came in, I knew exactly what

16  was happening just by the way he was dressed.  So the only

17  thing I could think was to say, "Sir, you need to remove your

18  mask."  He said something I didn't understand, and the next

19  thing I know, he had hopped over the counter.

20  Q.  So before he hops the counter, you had said, "You need to

21  remove your mask"?

22  A.  Yes, sir.

23  Q.  When he got behind the counter, did he say anything to

24  you?

25  A.  Um, he had just said, "Give me all the money," and he

1   didn't want any dye pack or bait or anything like that.

2   Q.   Did he have something to put this money in?

3   A.   He had a camouflage-like duffel bag.

4   Q.   And did either you or Monte put money in that bag?

5   A.   As I can -- as I can remember, um, Monte pulled his

6   drawer out and gave him -- I believe he let the robber take

7   everything, but Monte told him not to touch -- he was going

8   for the dye pack, and Monte was like, no, no, don't touch

9   that because that is what it was.

10  Q.   So on this occasion no dye packs were put into that bag

11  that you know of?

12  A.   Correct.

13  Q.   Now, do you know how much money Monte ended up putting in

14  the bag?

15  A.   No, sir, I don't.  I know our limits were, I believe at

16  that time $8,000.  So I'm pretty sure it was under that.

17  Q.   Once Monte put the money in this camouflage bag, what

18  happened next?

19  A.   Um, we were directed to go to the vault, walk towards the

20  vault to go open the vault to get more money.

21  Q.   Did the person who was robbing the bank, did he threaten

22  you in any way?

23  A.   Not me, and not at that point, but Monte at some point,

24  yes.

25  Q.   Did you see any weapons on this bank robber?

1   A.  Yes, sir.  As soon as he had hopped over, I saw a gun.

2   Q.  Okay.  Can you describe this gun?

3   A.  Um, I want to say it was all black because I remember

4   thinking, well, it looked like a toy gun.

5   Q.  Now, once the bank robber asked you to go or told you to

6   go to the vault, did you do that?

7   A.  We all walked.  Mr. Gooding stayed around about where he

8   was, and Monte, myself and the robber went towards the vault.

9   Q.  Did you actually go to get to the vault or did you

10  just --

11  A.  We were like -- it is under dual control.  We didn't have

12  the halves to get in there.  Nobody had sole control of the

13  vault.

14  Q.  Now when you say something is under dual control, what

15  does that mean?

16  A.  You need two people, like we have a combo.  One person

17  would have one half, the other person would have the second

18  half.  We didn't have the right combos to get in there to

19  open it.

20  Q.  And did you tell the bank robber this?

21  A.  Yes.

22  Q.  And what was his response?

23  A.  Um, we just -- after that happened, we showed him, you

24  know, there was some lockers back there.  We opened them.  We

25  showed him there was nothing.  We told him it's under dual

1    control.  There is nothing we can do.  He brought us back

2    out.  I do remember him going back towards the counter and

3    saying that I want $10,000 in this bag right now.

4    Q.  What was your response to that?

5    A.  I'm, like, we can't do it.  We don't have the combos to

6    get in.  If you want me, I'll call somebody, but I can't get

7    in.

8    Q.  Now, as this bank robber is talking to you, did you

9    notice anything about his voice or how he spoke?

10   A.  Um, he had a accent, Hispanic, of that kind of descent,

11   yes.

12   Q.  And when you told him that you couldn't get him the

13   $10,000, what was his response?

14   A.  He had taken us back, and he didn't really -- he really

15   didn't talk that much.  We went back to the teller line so he

16   could look through the other drawers because he thought maybe

17   some more money was there.  Then he brought us back out, and

18   before we stepped out into the lobby area, he says, "If I

19   shoot him, will you remember?"  And I told him if I could, I

20   would, but I can't.

21   Q.  When he said remember, what did you take that to mean?

22   A.  Remember the combo to go get into the main vault.

23   Q.  But I guess, based on your prior testimony, it wasn't a

24   question of remembering, you just didn't have it?

25   A.  Right.

1    Q.  And when the bank robber said "shoot him," who was he

2    referring to?

3    A.  Monte.

4    Q.  After you told him that you couldn't do it, what did the

5    bank robber do next?

6    A.  Um, we all -- well, me, myself, Monte and him went to the

7    vault again, and we went in there.  Mr. Gooding was still

8    standing over towards the teller line area.  We walked into

9    the safe deposit box area because you have to go there before

10   you can get into the vault area.  And there was a laptop on

11   the floor, and he asked what that was.  I told him it was a

12   laptop, and he didn't worry about that.  And he put his hands

13   on the safe deposit box, but other than that, it was about

14   it.

15   Q.  And so did he ultimately leave the bank?

16   A.  Yes, sir.

17   Q.  Did you see him leave?

18   A.  Yes, sir.

19   Q.  Did you follow him out?

20   A.  No, sir.

21   Q.  Why not?

22   A.  Because I was scared.

23   Q.  Where did you stay?

24   A.  We stayed in the vault safe deposit box area until

25   probably he'd gotten through the second set of doors, which

1   are the doors you see, and, um, we went and locked those.  So

2   probably about another ten seconds after he left.

3   Q.  Now, ma'am, if you would take a look, there is another

4   Government's Exhibit which has been marked as 5-B.  Do you

5   recognize that scene?

6   A.  Yes, sir.

7   Q.  And what is that?

8   A.  That's that day.  That is the first time we went to the

9   vault.

10          MR. HURT:  Your Honor, at this time the Government

11  would move into evidence Exhibit 5-B.

12          THE COURT:  All right.  Exhibit 5-B will be

13  admitted.

14          (The photograph was received in evidence and marked

15  as Government's Exhibit No. 5-B.)

16  BY MR. HURT:

17  Q.  Now, the picture's a little blurry, Mrs. Martin, but can

18  you point out what -- let's start from the left of that

19  picture.  There is a woman in an orange colored top.

20  A.  That's me.

21  Q.  And then there is a gentleman on the far right with --

22  A.  That's Monte.

23  Q.  And that figure has, it appears white, a white shirt

24  coming out from under his jacket?

25  A.  Yes.

1   Q.   What is he wearing?

2   A.   That's Monte's white River City Bank shirt that we wore,

3   that he wore on Saturdays.

4   Q.   The person in-between, do you recall, it appears to be

5   dark clothing.  Do you recall what the bank robber was

6   wearing?

7   A.   It was all black from head to toe.

8   Q.   And when you mentioned earlier in your testimony a

9   disguise or a mask, can you describe that mask?

10  A.   The only part I saw was the cheek area and the nose area.

11  Everything else was covered up.

12  Q.   Did the person have on a hat of any sort?

13  A.   Like the -- I don't know what they're called, but I want

14  to say the old fishing hats that have the strings on them.

15  Q.   And how about the hair of this bank robber?

16  A.   It was dreads, but you could tell it was fake.  When you

17  got close enough, you could tell it was really fake.

18  Q.   Did the bank robber have anything on his hands?

19  A.   Gloves.

20  Q.   Do you know what color they were?

21  A.   Black.

22  Q.   And how about shoes?

23  A.   They were the black, like, throw-away shoes.  You can get

24  them at Wal-Mart for, like, 5 bucks.  They're -- I remember

25  they were all black, and they had the rubber around the soles

1   of them.

2   Q.  Now, the picture here, that person in the middle, if you

3   look at the foot, it appears that there is some white.  Is

4   that what you're referring to when you say rubber soles?

5   A.  Yes, sir.

6   Q.  Now, did these shoes have shoe laces or shoe strings?

7   A.  No.  They were just like slip-on shoes.

8   Q.  Were you able to see any parts of the skin of this bank

9   robber?

10  A.  Yes, sir.

11  Q.  And what could you see?

12  A.  Um, when I could see his hair, I could see just, like,

13  right around his neck area, and I saw on his face, I saw he

14  had freckles.

15  Q.  And could you tell his skin tone?  Was this person --

16  A.  Like a tannish, Hispanic color.

17  Q.  Now, as part of your job as assistant manager of the --

18  what used to be the River City Bank, are you -- do you know

19  whether or not your bank was insured by FDIC?

20  A.  Yes, sir.

21  Q.  And does it continue to be?

22  A.  Yes, sir.

23          MR. HURT:  Thank you, Mrs. Martin.  I have no

24  further questions.

25          THE WITNESS:  Thank you.

```
 1                        CROSS-EXAMINATION
 2   BY MR. DASH:
 3   Q.  Good morning, ma'am.
 4   A.  Hi.
 5   Q.  Ma'am, could you just go into a little more detail.  You
 6   described this hat as like an old fishing hat.  What do you
 7   mean by that?
 8   A.  Um, they had -- they hang -- they are on your hat, and
 9   they have the brim all the way around and the little string
10   like you can pull up the little notch.
11   Q.  So it wasn't like a baseball style?
12   A.  Oh, no, sir, uh-uh.
13   Q.  You recall what color that hat was?
14   A.  Black.
15   Q.  And I believe you testified that the gun looked like a
16   toy gun?
17   A.  I remember when I looked at it that's what came into my
18   mind.
19   Q.  You didn't see any bullets or anything like that?
20   A.  No, sir.
21   Q.  Nobody -- this individual didn't discharge the firearm or
22   anything?
23   A.  No, sir.
24   Q.  And you didn't actually see how this individual left
25   other than walking out the door?  You didn't see him get in
```

```
 1   the car or anything like that, did you?
 2   A.  Correct.
 3           MR. DASH:  I don't have any further questions.
 4                       REDIRECT EXAMINATION
 5   BY MR. HURT:
 6   Q.  Mrs. Martin, you stated earlier that you were scared and
 7   stayed in the vault.  Did the firearm have anything to do
 8   with your fear in this case?
 9   A.  Yes, sir.
10           MR. HURT:  Thank you.
11           THE COURT:  May this witness be excused?
12           MR. HURT:  From the Government, yes, sir.
13           MR. DASH:  Yes, Your Honor.
14           THE COURT:  All right, Mrs. Martin.  You're excused
15   as a witness with the understanding that you will not discuss
16   your testimony with any other witness in the case until the
17   case is concluded.  You may step down at this time.
18           (Witness excused.)
19           MR. HURT:  United States calls Vicki Sharp.
20           VICKI SHARP, called by the Government, having been
21   first duly sworn, was examined and testified as follows:
22                       DIRECT EXAMINATION
23   BY MR. HURT:
24   Q.  Good morning, Mrs. Sharp.  Would you please state your
25   full name and spell your last name for the court reporter.
```

1   A.  Vicki Nackmany Sharp, S-h-a-r-p.

2   Q.  Ma'am, how are you employed?

3   A.  I'm employed at Franklin Federal Savings & Loan as a

4   savings officer.

5   Q.  How long have you been with Franklin Federal?

6   A.  Four years.

7   Q.  And taking you back, were you present in the bank on the

8   day in which it was robbed?

9   A.  Yes, sir.

10  Q.  Do you recall that date?

11  A.  It was in August.  I'm not sure of the exact date.

12  Q.  If I told you it was August 24th, would that sound right

13  to you?

14  A.  Yes, sir.

15  Q.  And on that date on August 24th of 2007, what were you

16  doing in the branch?

17  A.  I was working as a teller.

18  Q.  Now, that branch is located where specifically?

19  A.  5100 Nine Mile Road, Richmond, Virginia.

20  Q.  Do you recall what time the branch was -- somebody came

21  in to rob the branch?

22  A.  Yes, sir.  It was exactly 4:21 because we open at 4:00 on

23  Friday afternoons, and I remember we had not been there that

24  long.

25  Q.  Now, before we go any further, as an employee of that

1    bank, are you familiar with whether or not your institution

2    is insured by the Federal Deposit Insurance Corporation or

3    FDIC?

4    A.  Yes, sir.

5    Q.  And so you are?

6    A.  Yes, sir.

7    Q.  And on that day in August of 2007, were you behind the

8    teller line when the person came in to rob the bank?

9    A.  Yes, sir.

10   Q.  Ma'am, I'm going to show you a couple of exhibits, if you

11   would take a look at these.  First, I'd ask you to look at

12   6-A.  Do you recognize that, ma'am?

13   A.  Yes, sir.

14   Q.  What is that?

15   A.  That's the branch that is my place of employment.

16   Q.  That's your bank?

17   A.  Yes, sir.

18          MR. HURT:  Your Honor, at this time we would move

19   the introduction of Government's Exhibit 6-A.

20          THE COURT:  All right.  Exhibit 6-A will be

21   admitted.

22          (The photograph was received in evidence and marked

23   as Government's Exhibit No. 6-A.)

24   BY MR. HURT:

25   Q.  Is that the way it looked on the day in August last year

1   when it was robbed?

2   A.  Yes, sir.

3   Q.  As you're behind the teller line, was there anyone back

4   there with you?

5   A.  Yes.  There was one other teller.

6   Q.  Who was that?

7   A.  Sue King.

8   Q.  Was there anybody else in the branch at that time?

9   A.  No, sir.

10  Q.  What was the first thing that you saw that alerted you

11  that somebody was trying to rob your bank?

12  A.  Well, he entered the bank with a gun with his hand

13  outstretched towards us.

14  Q.  When you say outstretched toward you, you mean --

15  A.  Like this (indicating).

16  Q.  You're holding your hand as if you have a gun in it?

17  A.  Correct.

18  Q.  Did you see a gun?

19  A.  Yes, sir.

20  Q.  Can you describe that gun?

21  A.  Um, it was like a revolver, metallic, silver looking,

22  gray.

23  Q.  And did he come to your window?

24  A.  He went to Sue's window and then came to, you know, my

25  window.  He was more or less stood between the two of us just

1    waving the gun.

2    Q.  Ma'am, if you would take a look at that next exhibit

3    there in front of you which has been marked as Government's

4    Exhibit 6-B.  I'm sorry, it's -- there you go.  Do you

5    recognize that, ma'am?

6    A.  Yes, I do.

7    Q.  And how is it that you recognize that?

8    A.  Not something you forget.

9    Q.  What is that?

10   A.  It's the person that came in our bank.

11          MR. HURT:  Your Honor, the Government moves the

12   introduction of Exhibit 6-B.

13          THE COURT:  All right.  Exhibit 6-B will be

14   admitted.

15          (The photograph was received in evidence and marked

16   as Government's Exhibit No. 6-B.)

17   BY MR. HURT:

18   Q.  Now, at the time this picture is taken, do you know, is

19   he standing kind of in-between you or is that your teller

20   station right there?

21   A.  I believe that is my teller station.

22   Q.  Now, there appears to be -- the light seems to be

23   reflecting off of something.  What is that that we see the

24   light reflecting off around the teller station?

25   A.  I don't understand.

1   Q.   That is a bad question.  My apologies, ma'am.  Is there

2   glass between you and the lobby?

3   A.   Oh, yes.

4   Q.   And what kind of glass is that?

5   A.   I understand bulletproof.  I don't know what kind.

6   Supposedly bulletproof.

7   Q.   And so the people in the lobby, is it fair to say, cannot

8   get into the teller line unless you allow them to?

9   A.   Correct.

10  Q.   When this person came up to the window, you said he was

11  pointing something which you thought to be a gun.  In that

12  photograph, is that what you saw to be him pointing at you?

13  A.   Yes, sir.

14  Q.   Did he say anything?

15  A.   He first told us to step back, step back.

16  Q.   Did you?

17  A.   Yes, sir.

18  Q.   And what happened next?

19  A.   He kept telling us that he wanted me to open the teller

20  door, "Open the door.  Open the door."

21  Q.   Did you?

22  A.   No, sir.

23  Q.   Why not?  That is a stupid question but --

24  A.   I wasn't about -- there were no customers in the bank

25  so --

1   Q.   Now, were you fearful at this point?

2   A.   Yes, sir.

3   Q.   Why is that?

4   A.   Well, the glass is supposedly bulletproof, but I didn't

5   want to be the one it was tested on.   Sorry.

6   Q.   Now, after you refused to open the door, did this person

7   in the picture, which is Government 6-B, did he say anything

8   or do anything?

9   A.   He was kicking on the teller door and banging on the door

10  and the glass, you know, from the teller stations, and at one

11  point he tried to put his gun through my teller tray.

12  Q.   At the bottom of that picture you can see what appears to

13  be kind of a metal tray inset into the teller station.   Is

14  that what you're referring to?

15  A.   Yes, sir.

16  Q.   Was he able to get the gun up under there?

17  A.   No.   But he certainly was trying.

18  Q.   What happened next?

19  A.   Um, I think he got frustrated and left after that.

20  Q.   Now, is this person that's telling you to step back or to

21  open the door, did you notice anything about his speech or

22  how he spoke?

23  A.   He had an accent.   It was like, "Open ze door.   Open ze

24  door."

25  Q.   And when he is standing there, were you able to get a

1   good look at how he was dressed or what he was wearing?

2   A.  Yes, sir.  He had a -- it was August, and the first thing

3   that you would notice is unusual was he was dressed as if it

4   was winter, including gloves.

5   Q.  Now, there appears -- it is hard to see in this picture

6   but there appears to be some white on the face of this

7   person?

8   A.  Yes.  He had something across his nose, duct tape or some

9   type of tape, and he had a beard that looked to me was fake,

10  and he had a hat on.

11  Q.  And is that the hat that we see in that picture?

12  A.  Yes, sir.

13  Q.  Now, there appears to be on the left side or in his left

14  hand, there appears to be something in his hand.  Were you

15  able to see what that was?

16  A.  It was a camouflage bag.

17  Q.  It's hard to tell from this picture, but do you know how

18  tall -- could you tell how tall this person was?

19  A.  5'6", 5'8".  I'm not --

20  Q.  After he became frustrated with you not opening the door,

21  what happened next?

22  A.  He turned and left the building.

23  Q.  And what did you do?

24  A.  We were pushing our security button kind of buttons.

25  Q.  Did you follow him out or did you see --

1   A.   No, sir.

2   Q.   Did you just wait for the police?

3   A.   Yes, sir.

4   Q.   How long did all this take?

5   A.   It seemed like forever, but I'm sure it was only a matter

6   of minutes that he was -- not really sure exactly how many

7   minutes he was in there.

8            MR. HURT:   Thank you, Mrs. Sharp.   I have no further

9   questions.

10           MR. DASH:   No questions, Your Honor.

11           THE COURT:   All right, Mrs. Sharp.   You're excused

12  as a witness with the understanding that you won't discuss

13  your testimony with any other witness in the case until the

14  case is concluded.   You may step down at this time.

15           THE WITNESS:   Thank you.

16           (Witness excused.)

17           MS. MARTIN:   The United States calls Charlotte

18  Thornton.

19           CHARLOTTE THORNTON, called by the Government,

20  having been first duly sworn, was examined and testified as

21  follows:

22                          DIRECT EXAMINATION

23  BY MS. MARTIN:

24  Q.   Good morning, Mrs. Thornton.   Can you state your full

25  name and spell your last name, please, for the record.

1   A.  My name is Charlotte Ann Thornton, T-h-o-r-n-t-o-n.

2   Q.  Mrs. Thornton, where do you work?

3   A.  Citizens & Farmers Bank.

4   Q.  And at which branch do you work?

5   A.  The Verona.

6   Q.  And is Verona, is that the branch on New Market Road?

7   A.  It is.

8   Q.  How long have you worked there?

9   A.  I've been there over five years now.

10  Q.  And what do you do there?

11  A.  I'm a customer service representative.

12  Q.  And in that capacity, are you familiar with whether the

13  bank is insured by FDIC?

14  A.  We are.

15  Q.  Okay.  I'm going to pass up a couple of exhibits for you

16  to take a look at.  Mrs. Thornton, that first exhibit, it's

17  marked for identification as Government Exhibit 7-A, do you

18  recognize that?

19  A.  I do.  That's our branch.

20  Q.  And besides the decorations, does that accurately depict

21  the exterior of the bank as it was on September 29th?

22  A.  It does except, of course, that was morning.

23        MS. MARTIN:  Of course.  Your Honor, the Government

24  offers Exhibit 7-A into evidence and ask that it be

25  published.

```
 1              THE COURT:  Exhibit 7-A will be admitted.
 2              (The photograph was received in evidence and marked
 3    as Government's Exhibit No. 7-A.)
 4    BY MS. MARTIN:
 5    Q.  Mrs. Thornton, were you working at the bank on September
 6    29th?
 7    A.  I was.
 8    Q.  Do you remember what happened that day?
 9    A.  I do.
10    Q.  Can you tell us about what time was it when the bank was
11    robbed?
12    A.  It was approximately three minutes till 12 when we
13    first -- I noticed the car back in.  And it was right about
14    closing time.
15    Q.  So what day of the week was it?
16    A.  It was a Saturday morning.
17    Q.  So on Saturday do you close at noon?
18    A.  We do.  We close at 12 o'clock.
19    Q.  And you mentioned that you saw a car back in?
20    A.  He backed in right in front of where my desk is.
21    Q.  Okay.  So looking at this picture, the exterior of the
22    bank, where would that be?
23    A.  I said if you look at the door, I'm to the left, that
24    window that's right there, my desk was right in front of us.
25    Q.  So you noticed a car backing in from the window?
```

1  A.  I did.

2  Q.  If you would, take a look at Government Exhibit 7-B.  Do

3  you recognize that exhibit?

4  A.  That's the layout of our branch.

5          MS. MARTIN:  Your Honor, the government offers

6  Exhibit 7-B and ask that it be published.

7          THE COURT:  All right.  Exhibit 7-B will be

8  admitted.

9          (The floor plan was received in evidence and marked

10  as Government's Exhibit No. 7-B.)

11  BY MS. MARTIN:

12  Q.  And, Mrs. Thornton, if you touch this screen, you can

13  mark it.  So I ask that you could put an "X" where you

14  were -- where you said your office was.

15  A.  Uh-huh.  (Witness complied.)

16  Q.  You were sitting at your desk.  What were you doing?

17  A.  Um, like I said, we were getting ready to close.  In

18  fact, I had the branch keys in my hand.  So just sitting

19  there getting ready to go through closing procedures.

20  Q.  Were you about to go lock the door?

21  A.  I was.

22  Q.  And you said you saw the car backing into the parking

23  space.  Do you remember what the car looked like?

24  A.  It was a small, like a dull grayish car.

25  Q.  Um, and what did -- what did you see after the person

1   backed into --

2   A.  They backed in, and through bank training, with the fact

3   that the car was backing in, um, and at Verona we probably

4   know 95 percent of our customers, so I got to feeling that it

5   might be a potential robber.  So I went ahead at that time

6   and wrote down the license tag, and I got up to lock the

7   door, and we even made a comment about locking the door that

8   that -- since we didn't at that time close till a couple

9   minutes after that, really we shouldn't.  So then I sat back

10  down.

11  Q.  So you were -- you got up to lock the door?

12  A.  I did.  I did.

13  Q.  And but decided to sit back down?

14  A.  Right.

15  Q.  And then did you see anyone get out of the car?

16  A.  I did.  I saw him -- the person exit the car.  And you

17  could tell it was a fake looking beard, dark hair, and at

18  that time I told -- made the comment to the tellers, I said,

19  you know, "Everybody stay calm.  I believe we are getting

20  ready to get robbed."

21  Q.  You made a comment to the tellers.  Who else was in the

22  bank with you at the time?

23  A.  Angela Key, our assistant branch manager was in an office

24  behind me, and then we had two tellers in the teller section,

25  which is right in front of me where I sat.

 1   Q.  Could you circle on this floor plan where the teller
 2   station is.
 3   A.  There was one here and one at the drive-through
 4   (indicating).
 5   Q.  So there were two tellers behind the teller line?
 6   A.  Uh-huh.
 7   Q.  And Angela was in her office?
 8   A.  Right behind me.
 9   Q.  Could you put an "A" where Angela was.
10   A.  Okay.  (Witness complied.)
11   Q.  And was there anyone else in the branch?
12   A.  No.
13   Q.  Okay.  And so you saw the bank robber get out of the car?
14   A.  (Nods head.)
15   Q.  And you noticed that he was wearing a disguise?
16   A.  I did.
17   Q.  Can you tell us what you saw him wearing.
18   A.  Um, it was a real fakey looking beard, dark hair down to
19   here (indicating).  He had -- it was still very warm, but he
20   had on, like, Dickie long-sleeve shirt, the Dickie looking
21   pants, and then a hat over his head.
22   Q.  When you say Dickie?
23   A.  The Dickie work uniform, that type of a look.
24   Q.  And was he wearing anything --
25   A.  Gloves.

Thornton, C. - Direct                                            233

1   Q.   And do you remember what color the gloves were?

2   A.   Dark.  I would say they were black.

3   Q.   I'm going to show you now what has been marked as

4   Government's Exhibit 7-C, if you would take a look at that.

5   It should be up there.  Do you recognize Government's Exhibit

6   7-C?

7   A.   I do.  That's our branch lobby.

8           MS. MARTIN:  Your Honor, the Government moves into

9   evidence Exhibit 7-C and ask that it be published.

10          THE COURT:  Exhibit 7-C will be admitted.

11          (The photograph was received in evidence and marked

12   as Government's Exhibit No. 7-C.)

13   BY MS. MARTIN:

14   Q.   And those chairs in the picture right there, what are

15   they doing there?  Are they normally there?

16   A.   I had put them there after the robbery because that's

17   where he went over.

18   Q.   All right.  So you placed those chairs there to I

19   guess --

20   A.   We were told to protect it, right.

21   Q.   And so you're saying that teller window, one, two, three

22   from the left, you said --

23   A.   -- that's where the person jumped over.

24   Q.   So he jumped over the counter?

25   A.   He did.

1   Q.  All right.  Let's back up a little bit.  After he got out

2   of the car, you saw him approaching, what happened once he

3   entered the bank?

4   A.  When you come into our front, we've got, like, a

5   vestibule-type area between two doors, and once he came in

6   the front door, it seemed like everything speeded up.  He had

7   a bag which he pulled the gun out of, came through the front

8   door, and then started yelling at us, you know, not to move,

9   not to call, and then he scaled and went over the teller

10  station.

11  Q.  You said he was carrying a bag.  Do you remember what it

12  looked like?

13  A.  It was a dark bag, and it was like he had something

14  camouflage inside of it or -- like a bag in a bag or

15  something.  I just don't remember.  I'm sorry.

16  Q.  No.  That's fine.  Now, you mentioned he was also

17  carrying a gun?

18  A.  Uh-huh.

19  Q.  Can you describe the gun?

20  A.  Um, it was dull looking, color silver, short nose.

21  Q.  All right.  Now, once he came in and jumped the teller

22  counter, what happened after that?

23  A.  I still had the keys in my hand, and he had Alice, the

24  teller, behind with the gun, and I was reaching under trying

25  to hide the keys.  And he turned around, pointed the gun at

1   me, and he said something.  I don't know.  But I immediately

2   stopped and put my hands up, and then he told Alice to open

3   the doors.  He then turned to Katherine, the other girl, and

4   also had her empty her drawers.  You want me to keep going?

5   Q.  You're doing great.

6   A.  Then he questioned about us going in the vault, and we

7   told him that with the staff we had we weren't able to.

8   Q.  So he -- you mentioned that you were trying to hide your

9   keys.  Why were you trying to hide your keys?

10  A.  Bank training, I guess, just trying to protect my bank.

11  Q.  Okay.  And first he -- when he hopped over the counter,

12  Alice was the teller working at that station?

13  A.  Uh-huh.

14  Q.  And did you see him take -- did you see money taken out

15  of her drawer?

16  A.  I did.  I did.

17  Q.  And then after that, he went to the drive-through teller?

18  A.  He went to the drive-through teller.

19  Q.  And did he get money from that teller?

20  A.  I couldn't see but he was telling her to give him the

21  money.  Then he had Cat with the gun, and they went through

22  the kitchen out the side door and then back into the lobby

23  right at the check writing station that you see.

24  Q.  I'm going to show you lastly what's been marked as

25  Government's Exhibit 7-D, if you'll look at that.

1    Mrs. Thornton, do you recognize that?

2    A.  I do.  That's the picture I pulled for the police of the

3    robber as he was scaling the stand there at Alice.

4            MS. MARTIN:  Your Honor, Government offers Exhibit

5    7-D into evidence.

6            THE COURT:  Exhibit 7-D will be admitted.

7            (The photograph was received in evidence and marked

8    as Government's Exhibit No. 7-D.)

9    BY MS. MARTIN:

10   Q.  And so, Mrs. Thornton, over, I guess, on the right corner

11   there, is that your desk back there that we see in the

12   background?

13   A.  That is my desk.

14   Q.  And that is where you were standing when he jumped over

15   the counter?

16   A.  Sitting, yes, ma'am.

17   Q.  Sitting?

18   A.  Uh-huh.

19   Q.  And the head we see here in the foreground, who is that?

20   A.  That's Alice.

21   Q.  All right.  Now, after he asked you -- what did he say to

22   you about the bank vault?

23   A.  It was more to Alice, that he was saying that he wanted

24   to go in the vault, and I was really frightened for her.  She

25   was trying to tell him that she couldn't get in, and so I was

1    just repeating and telling him that there was no way that we

2    could get in the vault, so I thought that maybe with two of

3    us that he would believe us.

4    Q.  And did he respond to that?

5    A.  No.  No.  He was very adamant about dye packs.  The whole

6    time through the robbery, he kept saying there better not be

7    any dye packs in anything.

8    Q.  When he was speaking, did you notice anything about the

9    way he spoke?

10   A.  It was an accent.  I thought -- I don't know.  I mean, I

11   could tell that it wasn't a local accent.

12   Q.  Okay.  So after he came from behind the teller line,

13   where did he come through?

14   A.  He came back to the check writing station, and he stood

15   there for quite some time going through the bag, looking at

16   the money, and he kept saying that there better not be dye

17   packs.

18   Q.  Is that the check writing station in the background

19   there?

20   A.  It is.

21   Q.  That picture?  And so he stood there for how long, do you

22   think?

23   A.  It probably wasn't, I don't know, 30 seconds, but it

24   seemed like 10 hours.

25   Q.  Did he say anything more after that?

1   A.   As he left he told us all to have a good day.

2   Q.   And what did you do after he left?

3   A.   Collapsed, cried.  We immediately started trying to do

4   what the bank had taught us as far as locking the branch,

5   securing it, making sure that the proper management was

6   called.

7   Q.   Did you lock the front door?

8   A.   No.  Katherine did.  I can't remember if it was Katherine

9   or Angela.  I think it must have been Katherine because she

10  was there at the table with him with the gun.

11  Q.   Did you see him drive away?

12  A.   I did not.

13          MS. MARTIN:  I have no further questions.  Thank

14  you, Mrs. Thornton.

15          THE COURT:  Wait a minute, Mrs. Thornton.  The other

16  attorney may have some questions for you.

17          MR. DASH:  Actually, Judge, I don't have any

18  questions.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right, Mrs. Thornton.  You may be

21  excused as a witness, but I'll ask you not to discuss your

22  testimony with any other witness in the case until the case

23  is concluded.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may step down, ma'am.

1              (Witness excused.)

2              THE COURT:  All right, ladies and gentlemen.  Think

3    it's about time to take our mid-morning recess so I'll ask

4    you to step into the jury room for about 15 minutes.

5              (Jury out at 11:30 a.m.)

6              THE COURT:  All right.  We will take a 15-minute

7    recess.

8              (Recess from 11:30 a.m. to 11:47 a.m.)

9              THE COURT:  All right, Mr. King.

10             (Jury in at 11:47 a.m.)

11             THE COURT:  All right.  The Government ready with

12   its next witness?

13             MS. MARTIN:  Yes, Your Honor.  The United States

14   calls Paula Tiller.

15             PAULA TILLER, called by the Government, having been

16   first duly sworn, was examined and testified as follows:

17                         DIRECT EXAMINATION

18   BY MS. MARTIN:

19   Q.  Good morning, Ms. Tiller.  Will you please state your

20   full name and spell your last name for the court reporter.

21   A.  Paula Tiller, T-i-l-l-e-r.

22   Q.  Ms. Tiller, where do you work?

23   A.  Citizens & Farmers Bank in Richmond.

24   Q.  Do you work at a specific branch?

25   A.  The Verona branch on Route 5.

1   Q.   How long have you worked there?

2   A.   Thirteen years.

3   Q.   And what is your position at the bank?

4   A.   I'm the branch operations manager.

5   Q.   Ms. Tiller, were you working at the bank on December

6   21st, 2007?

7   A.   Yes.

8   Q.   And did anything unusual happen that day?

9   A.   Yes.

10  Q.   Do you remember what?  Can you tell us what happened?

11  A.   Um, it was about right at 6:00, maybe a minute before,

12  and we had a customer in late, but we were beginning to

13  take -- you know, turn the Christmas tree off, turn the

14  lights off, and we were waiting for that customer to leave.

15  That customer left.

16       At that time we had to go -- I was standing at the

17  check writing counter in the center of the lobby and went to

18  the front door.  At that time we had a Christmas wreath on

19  the door so I had to physically open the door and go out,

20  take the wreath off the door and key lock the front door.

21       At that point a dark car came from around the side

22  of the building, and a man jumped out in a mask with a silver

23  gun in his hand.

24  Q.   Now, when the car came around, you said the side of the

25  building?

1   A.   Right.  Like to my right.

2   Q.   Did -- where did he park?

3   A.   Kind of came in a semi-circle, like didn't pull in a

4   parking spot, came in a semi-circle at the front of the

5   building.

6   Q.   Ms. Tiller, I'm going to show you what's previously been

7   admitted as Government Exhibit 7-B.  Do you recognize that?

8   A.   Yes.

9   Q.   Now, you mentioned that the -- Mrs. Tiller, if you touch

10  the screen, you can mark it.

11  A.   Okay.

12  Q.   So if you might, can you show us maybe outside where he

13  might have parked --

14  A.   Um, like --

15  Q.   -- with an "X".

16  A.   That way.

17  Q.   Okay.  And where were you standing with an "X"?

18  A.   At the front door.

19  Q.   Okay.  You said the car was dark.  Do you remember what

20  color it was?

21  A.   Navy blue, the dark gray.

22  Q.   Okay.  Once you saw the car, did you see -- you saw

23  somebody get out?

24  A.   Yes.  And I recognized him immediately.

25  Q.   Why did you recognize him?

1    A.   Because I'm the one who had pulled pictures from a

2    robbery September 29th at our branch and at our Sandston

3    branch March 5th; it was the same mask, the same hair, the

4    same nose and the same gun, and I saw the gun.

5    Q.   So you saw the gun?  What did the gun look like?

6    A.   It was silver.

7    Q.   What did you do once you recognized the man getting out

8    of the car?

9    A.   I slammed the door, put the dead bolt on the door.  There

10   is a foyer that's all glass.  I ran back through the foyer.

11   There's another door.  I slammed that door.  And I yelled to

12   the tellers, "It's him.  He's back.  Call 911."  And then I

13   ran towards the kitchen and told all of them to get in the

14   kitchen with me.

15   Q.   Can you mark on this floor plan where the kitchen is with

16   a "K."

17   A.   (Witness complied.)

18   Q.   So who else gathered with you in the kitchen?

19   A.   All but two that were there -- I'm sorry, all but three.

20   Two girls ran the other way, and one girl who had actually

21   been there September 29th, one of my part-time tellers, she

22   actually ran out the back door.

23   Q.   Where did the other one go?

24   A.   One went into an office on the other side of the room,

25   the building, and one ran upstairs and locked herself in an

1  office upstairs.

2  Q.  So how many people, then, were in the kitchen?

3  A.  Hold on.  Four.

4  Q.  What happened once you got in the kitchen?

5  A.  Well, I heard glass break.  So I assumed that the front

6  door -- you know, there are panes in the door, so I assume

7  that he had broken a pane in the door and was going to have

8  to come in.  But then very quickly, he was in the kitchen

9  with us.  So I knew he had not had time to go all the way

10  through that foyer and through two doors.

11  Q.  Ms. Tiller, I'd like you to look at what's been marked as

12  Government's Exhibit 8-A in the front of you.  She should

13  have it.  I'm sorry.  I didn't pass it up.  I got it in my

14  hand.  Show you a couple of exhibits.

15  A.  Yes.  Okay.

16  Q.  Do you recognize Government Exhibit 8-A?

17  A.  Yes.  This is the window in front of one of my CSR's desk

18  that was -- that's where he made entry, busted through the

19  window.

20       MS. MARTIN:  Your Honor, the Government offers

21  Exhibit 8-A into evidence and ask that it be published.

22       THE COURT:  All right.  Exhibit 8-A will be

23  admitted.

24       (The photograph was received in evidence and marked

25  as Government's Exhibit No. 8-A.)

Tiller, P. - Direct                                                          244

1   BY MS. MARTIN:

2   Q.  And now describe for us, I guess, where this picture --

3   where this front window is.

4   A.  It would be to -- if you're standing looking at my

5   building, it would be to the left of the front door.

6   Q.  Okay.

7   A.  The first window to the left of the door.

8   Q.  You testified that the bank robber then pushed his way

9   into the kitchen.  Did you not -- you didn't lock the door in

10  the kitchen or --

11  A.  At the time, no.  There was no -- well, he was behind the

12  teller line by then, so, no, there's no lock, because it's

13  behind the teller line.

14  Q.  Okay.  So how did he get behind the teller line?

15  A.  He jumped the teller line.

16  Q.  If you could look at Government's Exhibit 8-B.  Do you

17  recognize that?

18  A.  Yes.  That would be teller window three, and that's the

19  picture I pulled after it was over.  So that's definitely

20  teller window three, that he obviously jumped teller window

21  three to get back to the kitchen door.

22          MS. MARTIN:  Your Honor, the Government offers

23  Government's Exhibit 8-B and ask that it be published.

24          THE COURT:  Exhibit 8-B will be admitted.

25          (The photograph was received in evidence and marked

Tiller, P. - Direct                                                245

1   as Government's Exhibit No. 8-B.)

2   BY MS. MARTIN:

3   Q.  Now, Ms. Tiller, looking at the photograph and from your

4   memory of the experience, can you -- can you describe what

5   you remember him wearing?

6   A.  Him wearing?  Like a blue -- blue and white or off-white

7   plaid, like thick quilted jacket, gloves, a baseball hat,

8   what appeared to be fake hair here and here (indicating), and

9   either a band-aid or some sort of rubber down the front of

10  his nose.

11  Q.  And in this picture, in his right hand, I guess in his

12  left hand, can you tell what he's carrying?

13  A.  A bag.

14  Q.  Did you remember that bag?  Did you see the bag during

15  the robbery?

16  A.  During, I did.

17  Q.  Do you remember what it looked like?

18  A.  I don't.

19  Q.  After he pushed his way into the kitchen, what happened

20  then?

21  A.  He said, "Get out here.  Give me the money," and kind of

22  corralled us all back behind the teller line and went from

23  teller to teller.

24  Q.  How many tellers were working?

25  A.  There were four, but as I said, one of them had gone out

1    the back door and gotten into a car with a customer.

2    Q.   Which teller did he go to first?

3    A.   I don't know.  I think drive-through, lane one drive.

4    Q.   And did you see him take money from --

5    A.   Yes.

6    Q.   -- the teller at the drive-through?

7    A.   Yes.

8    Q.   And so did he -- how many tellers were with you in the

9    kitchen?

10   A.   Three.

11   Q.   Three.  And so then did each of them open their drawers?

12   A.   Yes.

13   Q.   After he had taken money from those tellers, what did he

14   do?

15   A.   Then he -- the teller that had gone out the back door and

16   gotten in the car with the customer, her drawer -- it was 6

17   o'clock.  We were settling out.  And her second drawer was

18   unlocked, and it appeared that he, like, looked at her

19   computer screen, and then went to her drawer and pulled her

20   second drawer and took a brick of money from her second

21   drawer.  But she was not there.

22   Q.   So what do you mean by looked at her computer screen?

23   A.   I don't know.  He just seemed to look like someone was

24   working there.  I mean, if someone's working that station,

25   the teller system is up.

1  Q.  And that drawer then was unlocked?

2  A.  Yes.

3  Q.  After that, what did he do?

4  A.  Um, he -- then he hit the other two tellers, got them and

5  then told me to let him back out.

6  Q.  And so --

7  A.  -- he went back through the kitchen and back out that

8  door and through the lobby, and he just kept saying, "Let me

9  out."

10  Q.  I'd like you to look then lastly at Government's Exhibit

11  8-C.  Do you recognize that?

12  A.  Yes.  That's him and I going back in the foyer.

13        MS. MARTIN:  Your Honor, Government offers

14  Government's Exhibit 8-C into evidence and ask that it be

15  published.

16        THE COURT:  Exhibit 8-C will be admitted.

17        (The photograph was received in evidence and marked

18  as Government's Exhibit No. 8-C.)

19  BY MS. MARTIN:

20  Q.  Now, what we can see, is there an interior door and an

21  exterior door?

22  A.  Yes.  There are two doors.  It's the front door, the

23  foyer and then another door that's just like that that you

24  have to go through.  So I had put dead bolts on both of those

25  doors.

1  Q.  You locked both of those doors when you were coming back

2  in?

3  A.  Right.

4  Q.  And so when he brought you back around --

5  A.  -- he made me unlock the dead bolts, go back through the

6  foyer and unlock that dead bolt, and he went out the front

7  door.

8  Q.  And in the picture here, is that -- it's a little

9  difficult to see, but what's he doing with his arm there?

10  A.  Um, well, I'm on the other side of him.  He's just

11  like pushing -- once I put the dead bolt, I mean, he still

12  has the gun in his hand, and he's, um, pushing the door open.

13  Q.  Okay.  Now, after he left, what did you do?

14  A.  I put the dead bolt back on the doors again, ran back in

15  there.  I mean, we had -- people were already on the phone

16  with 911, you know.  I'm doing our normal robbery stuff,

17  blocking stuff off.  They are on the phone with 911.  I'm

18  telling them, telling them to get here early, quick, we have

19  a big hole in the window because I was afraid he would come

20  back in the window.

21         MS. MARTIN:  Thank you, Mrs. Tiller.

22                     CROSS-EXAMINATION

23  BY MR. DASH:

24  Q.  Good morning, Ms. Tiller.  Ma'am, the dark car that you

25  saw, you didn't get a license plate number or anything like

Rocca, H. - Direct                                                         249

```
1    that on the car, did you?
2    A.  No, sir.  Because of the way it was parked.  I was
3    looking at the side of the car.
4    Q.  And when you were locking the bank back up after he left,
5    did this car leave the parking lot or did you see it leave or
6    did you not see anything that was going on outside?
7    A.  No.  Once he got out the door, I went back in.
8              MR. DASH:  I don't have any further questions.
9              THE COURT:  All right.  I assume she can be
10   released?
11             MS. MARTIN:  From the Government, yes, Your Honor.
12             MR. DASH:  Yes, sir.
13             THE COURT:  Mrs. Tiller, you're excused as a witness
14   with the understanding you won't discuss your testimony with
15   any other witness in the case until the case is concluded.
16   You may step down.
17             (Witness excused.)
18             MS. MARTIN:  The United States calls Hollis Rocca.
19              HOLLIS ROCCA, called by the Government, having been
20   first duly sworn, was examined and testified as follows:
21                        DIRECT EXAMINATION
22   BY MS. MARTIN:
23   Q.  Good morning, Ms. Rocca.  Would you state your full name
24   and spell your last name for the court reporter.
25   A.  Hollis Ann Rocca, R-o-c-c-a.
```

1   Q.   Mrs. Rocca, where do you work?

2   A.   Citizens & Farmers Bank in Verona.

3   Q.   How long have you worked there?

4   A.   Seven years.

5   Q.   And what's your position at the bank?

6   A.   I'm the head teller.

7   Q.   Were you working at the bank on December 21st, 2007?

8   A.   Yes, ma'am.

9   Q.   Do you recall what happened that day?

10  A.   We were robbed.

11  Q.   And around what time of day was it?

12  A.   Um, it was at night, right at closing, which was 6:00

13  p.m.

14  Q.   And where were you working?

15  A.   I was in lane one of the drive-through.

16  Q.   Mrs. Rocca, I'm going to show you what's been previously

17  admitted as Government Exhibit 7-B.  Now, you can -- if you

18  touch the screen, you can mark this diagram.  If you would,

19  cold you mark an "X" where you were stationed that day.

20  A.   (Witness complied.)

21  Q.   So you were working -- and you were working the

22  drive-through?

23  A.   Yes, ma'am.

24  Q.   And when did you first realize that the bank was being

25  robbed?

1  A.  Um, I was waiting on a customer, and Paula, my manager,

2  came -- I heard her screaming, and I turned around and looked

3  at her screaming, "He's back.  He's back.  Everybody get

4  down."

5  Q.  So you were -- you had a customer in the drive-through at

6  the time?

7  A.  Yes.  I was issuing a gift card.

8  Q.  And what did you do once you heard Paula yelling?

9  A.  Um, I dropped down.  I grabbed a phone.  There is a phone

10  right there next to me.  And I dialed 911.  And I looked at

11  my customer and just was screaming just, "Get out.  Get out.

12  Go."  And they took off.

13          I then noticed at that time that there was a

14  customer in lane 2.  So I stood up and yelled into the

15  microphone for her to leave.  She needed to get out now.

16  Q.  And so were you -- you said you were crouching down?

17  A.  Yes.

18  Q.  Okay.  And where did you go -- where did you go after

19  that?

20  A.  I ran into the kitchen.

21  Q.  You just mark that with a "K" where the kitchen.

22  A.  (Witness complied.)

23  Q.  And who else was in the kitchen with you?

24  A.  Rachel, Paula and Gwen.

25  Q.  And what happened once you were in the kitchen?

1   A.  We were standing there, um -- Rachel was at one point and

2   Paula was leaning against the door.  Gwen was behind me, and

3   we were trying to figure out what to do, and then the door

4   opens, and in comes the gun, and then the robber stepped in

5   and told us to "Get out here and give me the money."

6   Q.  Did you hear anything before he pushed his way into the

7   kitchen?

8   A.  Um, there was a loud crash.  I didn't know where it came

9   from, but there was a loud crash, and then it just felt like

10  seconds later he was there.

11  Q.  You said Paula was up against the door.  Was anyone --

12  what was she doing against the door?

13  A.  Like, she was trying to hold the door, like brace the

14  door.

15  Q.  And once he pushed his way in, what did you see first?

16  A.  I saw the gun.

17  Q.  And can you describe the gun for us.

18  A.  Snubbed-nose revolver, silver.

19  Q.  Do you recall what he was wearing?

20  A.  Dark clothes, but it was a dark, um -- looked like a fake

21  beard, completely covered.  All I could see was his eyes, had

22  a hat on.

23  Q.  What did he say to you once he'd broken into the kitchen?

24  A.  "Get out here and give me the money."

25  Q.  And what did everyone do?

1    A.  Um, we walked out and walked back to the teller line.

2    Rachel went to where her station was.  Gwen went to hers, and

3    I went back to lane one of the drive-through.

4    Q.  Where did he go first?

5    A.  I don't remember where he went.  I just remember we were

6    back there, and then he was there.

7    Q.  Okay.  And did he take money from your teller station?

8    A.  Um, I actually took it out my drawer myself because the

9    robber was at Rachel's station, and I grabbed all the money

10   out of my top drawer, and I turned around, and I was staring

11   at his back.

12          And I watched him, and he checked her drawers to

13   make sure, and so I turned back around and grabbed the rest

14   of my money, and then turned back around and waited for him

15   to come to me.

16   Q.  So you said that he checked her drawers to make sure.

17   What do you mean by that?

18   A.  He pulled the drawer open to make sure there was no money

19   left.

20   Q.  And so when he turned around to you, did he say anything?

21   A.  Um, he asked me if that was all of it, and that there

22   were no dye packs, no bait, and I told him yes.  And he

23   looked at my drawers to make sure because my drawers were

24   still sitting open, to make sure there was nothing left.

25   Q.  And you said drawers pleural, so was that your top and

1   bottom drawer?

2   A.  Yes, ma'am.

3   Q.  Do you know approximately how much money he took from

4   you?

5   A.  $3,911 even.

6   Q.  Seem to be pretty certain about that?

7   A.  Yes, ma'am.

8   Q.  Okay.  After he got the money from your drawer, where did

9   he go after that?

10  A.  He started walking past the counter as if he was heading

11  back towards the kitchen.  He stopped, and he pulled back,

12  and the lane next to me, which was lane two, which where

13  Katherine had been working, he reached over and he pulled the

14  drawer out.  And her drawer had been unlocked, and reached in

15  and took all the money out of that bottom drawer.

16  Q.  Did he leave after taking Katherine's money from her

17  drawer?

18  A.  He had Paula with him and made Paula walk him to the

19  front door.

20  Q.  What did you do after he left?

21  A.  I picked the phone back up because when I had dialed 911,

22  when I ran to the kitchen, I just -- I didn't hang the phone

23  up.  I just dropped it on the counter.  I picked the phone

24  back up, and the 911 operator was there telling me that the

25  police were on their way and just to stay on the phone with

1   them.

2   Q.  So the 911 operator was still on the line?

3   A.  Yes, ma'am.

4   Q.  How long do you think that the whole thing lasted?

5   A.  It felt like forever, but I was one of the ones who

6   helped organize the picture to turn into Henrico, so I know

7   on the time clock it was only about a minute and 11 seconds.

8            MS. MARTIN:  Thank you.

9            THE WITNESS:  Thank you.

10                        CROSS-EXAMINATION

11  BY MR. DASH:

12  Q.  So, ma'am, this robber told you no dye packs.  Do you

13  know were any dye packs put in the bag or the packages that

14  were given to the individual?

15  A.  Not in our branch because we do not have dye packs at our

16  branch.

17  Q.  So your branch doesn't have them, never has?

18  A.  No, sir.

19            MR. DASH:  No further questions.  Thank you.

20            THE COURT:  All right.  May this witness be excused?

21            MS. MARTIN:  From the Government, yes, Your Honor.

22            THE COURT:  All right, Mrs. Rocca.  You may be

23  excused as a witness with the understanding that you will not

24  discuss your testimony with any other witness in the case

25  until the case is concluded.

```
 1              THE WITNESS:  Yes, sir.
 2              (Witness excused.)
 3              MR. HURT:  The United States calls Barbara Trivelli.
 4              BARBARA TRIVELLI, called by the Government, having
 5    been first duly sworn, was examined and testified as follows:
 6                          DIRECT EXAMINATION
 7    BY MR. HURT:
 8    Q.  Good afternoon, Mrs. Trivelli.
 9    A.  Good afternoon.
10    Q.  Would you please state your full name and spell your last
11    name, please.
12    A.  Barbara Trivelli, T-r-i-v-e-l-l-i.
13    Q.  And, Mrs. Trivelli, how are you employed?
14    A.  I'm a teller at the bank of McKenney in Prince George,
15    Virginia.
16    Q.  And how long have you worked there?
17    A.  Just over a year.
18    Q.  Ma'am, I'd like to show you, the gentleman will hand you
19    what has been marked as Government's Exhibit 9-A.  Would you
20    take a look at that?
21    A.  Okay.
22    Q.  Do you recognize that photograph, ma'am?
23    A.  That's the branch of our bank.
24              MR. HURT:  At this time the Government moves into
25    admission Government's Exhibit 9-A.
```

1              THE COURT:  Exhibit 9-A will be admitted.

2              (The photograph was received in evidence and marked

3     as Government's Exhibit No. 9-A.)

4     BY MR. HURT:

5     Q.  And where is that branch located, ma'am?

6     A.  On the corner of Owens Way and Jefferson Park Road.

7     Q.  What city is that?

8     A.  Prince George.

9     Q.  Is that near Hopewell?

10    A.  Yes.  It adjoins Hopewell.

11    Q.  On the 25th of February of this year, were you working in

12    the branch that day?

13    A.  Yes, I was.

14    Q.  And did anything unusual catch your attention around

15    closing time?

16    A.  Yes.  A gentleman approached our door, came through the

17    first door, because we keep that open for the Coin Star, came

18    in and tried the second door, and it was locked.

19    Q.  Now, if you would take a moment -- well, first of all,

20    before I ask you that, where were you standing when that

21    occurred?

22    A.  I was standing at my teller station with my back to the

23    front door.

24    Q.  And how did you know to turn around and look?

25    A.  Because the teller that I was speaking with was facing

1    the front door, and she said to me, "What is on that guy's

2    face?"

3    Q.  And so when you turned around, could you see the front

4    door from where you were?

5    A.  Yes, I could.

6    Q.  If you would take a look at what you have in your hand as

7    Government's Exhibit B.

8    A.  Yes.

9    Q.  9-B, excuse me.  Do you recognize that photograph?

10   A.  Yes, I do.

11   Q.  What is that a photograph of?

12   A.  It's the person that came through and tried to get into

13   the second door.

14          MR. HURT:  Your Honor, we would ask that

15   Government's Exhibit 9-B be admitted into evidence.

16          THE COURT:  All right.  Exhibit 9-B will be

17   admitted.

18          (The photograph was received in evidence and marked

19   as Government's Exhibit No. 9-B.)

20   BY MR. HURT:

21   Q.  Is that the front door to your bank?

22   A.  Yes, it is.

23   Q.  And is that an accurate depiction of the person you saw

24   come up to the door?

25   A.  Yes, it is.

1  Q.  What could you see -- when you say what your co-workers

2  said, "What does that person have on their face?" what did

3  you see about the face?

4  A.  Well, it was dark and, you know, she says, "Like, is it a

5  beard or what?"  So with that, I left my station, because he

6  had turned to walk away, and went around to the front door to

7  see whatever I could see of this person.

8  Q.  Can you describe -- the picture's a little fuzzy.  Can

9  you describe what you saw as this person wearing?

10 A.  He had a gray and black plaid shirt on, like a jacket,

11 ball cap, the black, what we thought was a beard, and then

12 there was like something white.

13 Q.  And when you went to the front door, could you see a

14 vehicle?

15 A.  Yes.

16 Q.  And what did you see?

17 A.  It looked like a little Honda Civic, grayish color.

18 Q.  And if you would take a look at what has been marked as

19 Government's Exhibit 9-C in front of you, do you recognize

20 that?

21 A.  That's the vehicle that he drove away in.

22         MR. HURT:  Your Honor, at this time the Government

23 moves the admission of Government's Exhibit 9-C.

24         THE COURT:  Exhibit 9-C will be admitted.

25         (The photograph was received in evidence and marked

1    as Government's Exhibit No. 9-C.)

2    BY MR. HURT:

3    Q.  And is that the vehicle as it is driving away?

4    A.  Yes.

5    Q.  Now, what did you do after you went to the front door and

6    looked out?

7    A.  Well, before he backed out, I could see his front license

8    plate.  And when I had gone to the front door, Debbie, the

9    other teller, had gone back to the IT office.  I was calling

10   out the numbers that I saw on the front plate.  She was

11   calling out the numbers that she was seeing on the back plate

12   as he passed those windows.  And our IT guy said, "These are

13   not the same numbers."

14   Q.  So the car drove off?

15   A.  Yes.

16   Q.  And what happened after the car drove off?  What did you

17   do?

18   A.  Debbie and I went back to -- I went back to the room

19   where Debbie and Jim were, and that's when they were saying,

20   you know, something's wrong here.

21   Q.  Did you call the police?

22   A.  Debbie called the police.

23   Q.  Now, as part of your employment with the Bank of

24   McKenney, do you know whether or not your bank is insured by

25   the Federal Deposit Insurance Corporation?

1    A.  Yes, it is.

2           MR. HURT:  Thank you, Judge.  I have no further

3    questions.

4           MR. DASH:  No questions, Your Honor.

5           THE COURT:  All right.  Ms. Trivelli, you have --

6    you may be excused at this time with the understanding that

7    you will not discuss your testimony with any other witness in

8    the case until the case is concluded.

9           THE WITNESS:  Yes.  I understand.

10          THE COURT:  You may stand down.

11          THE WITNESS:  Thank you.

12          (Witness excused.)

13          MR. HURT:  United States calls Jim Nicol.

14           JIM NICOL, called by the Government, having been

15   first duly sworn, was examined and testified as follows:

16                      DIRECT EXAMINATION

17   BY MR. HURT:

18   Q.  Good afternoon, Mr. Nicol.  Could you please state your

19   full name and spell your last name for the court reporter.

20   A.  James Warren Nicol.  Last name spelled N-i-c-o-l.

21   Q.  How are you employed, Mr. Nicol?

22   A.  I'm employed by the Bank of McKenney.

23   Q.  What is your position with that bank?

24   A.  I'm a vice-president network administrator.

25   Q.  And do you have a specific office that you spend most of

1   your time in in that place?

2   A.   Yes.  My home office is in Prince George.  Our office in

3   Prince George is at 4700 Owens Way.

4   Q.   And if you would take a look at this screen which is

5   Government's Exhibit, previously introduced as 9-A, is that

6   the location of your office?

7   A.   Yes, that's correct.

8   Q.   And were you in that location on February 25th of this

9   year?

10  A.   Yes.

11  Q.   What were you doing?  What is your duty when you're in

12  your office?  What do you do?

13  A.   Make it sound simply, I'm the computer guy.  More

14  involved, I monitor the network for traffic and monitor the

15  firewalls and the PCs and the servers, and at that point I

16  was monitoring the network, sitting at a work station.

17  Q.   So you don't have a customer -- you don't deal with

18  customers?

19  A.   No.  I do not meet with customers.

20  Q.   Now, on February 25th did you become aware that something

21  was going on around closing time which was unusual?

22  A.   Yes.  A little bit after 4, Debra Smith, one of the

23  tellers, asked to come in my office to look out the window,

24  and didn't think anything of it.  Then I heard another teller

25  in the office, Barbara Trivelli call out, "I think he's

1    wearing, got a beard."  And I thought that was kind of odd,

2    so I stood up from the desk and looked out the window and

3    noticed a compact, silver car leaving the bank parking lot.

4    Q.  If you would take a look at the monitor at Government's

5    Exhibit 9-C, is that the type of compact car you noticed when

6    you looked out your window?

7    A.  Yes.

8    Q.  So as a result of seeing this and the commotion that

9    surrounded it, what did you do?

10   A.  Well, I paid attention to the car and heard the tellers

11   calling off license plate numbers, and I was trying to pay

12   attention to the plate on the car.  And I noticed that both

13   Barbara and Debra were calling out different plates.  And at

14   that point I realized that something had gone wrong in the

15   branch and heard somebody say something about calling the

16   police.

17          And because the car at this point was at the traffic

18   light preparing to turn, I called to them and told them that

19   to tell the police it was -- look like a small Honda and that

20   the plates on the front and rear don't match.

21   Q.  So what did you do after you gave them this information?

22   A.  As I was calling it out, I went out the rear of the bank,

23   got in my company car and attempted to follow this silver

24   car.  I had lost sight of the car, and but I'd noticed that

25   it had turned right onto Jefferson Park so I turned right

1   also.

2   Q.  Did you see the car again?

3   A.  Um, I'd lost sight of the car and had basically thought,

4   well, it's gone.  I'm not going to be able to get a better

5   identification of the car, and had pulled over into a parking

6   lot close to a major intersection not a half mile from where

7   our branch.

8          And as I was turning around in the parking lot to

9   avoid the traffic intersection, I looked across the street

10  and noticed the same car traveling around BB&T branch.

11  Q.  Now, sir, you have before you what has been marked as

12  Government's Exhibit 10-A.  Do you recognize that -- do you

13  recognize what's depicted in that photograph?

14  A.  Yes.

15  Q.  What is that?

16  A.  That's the branch bank.  That is the BB&T branch.

17  Q.  Is that where you saw the car?

18  A.  Yes, it is.

19         MR. HURT:  Your Honor, at this time the government

20  moves the admission of Government's 10-A.

21         THE COURT:  Exhibit 10-A will be admitted.

22         (The photograph was received in evidence and marked

23  as Government's Exhibit No. 10-A.)

24  BY MR. HURT:

25  Q.  Now, does this photograph have -- can you see where the

1   car was from this photograph?

2   A.  I -- there is a car, appears to be like a small SUV that

3   is dark in color, maybe black.  That's where I parked my car,

4   and to the left of me, where it appears to be something blue

5   maybe, that was where the silver car parked.

6   Q.  So you -- you were across the street when you first saw

7   the car?

8   A.  Yes.

9   Q.  And was there anybody in the car that you could tell?

10  A.  Well, as the car traveling around the branch, I crossed

11  over the street and pulled into the branch lot and noticed

12  that the driver got out of the car and went to the branch

13  door and attempted the door but the door was locked, returned

14  to the car, and as he was returning to the car, I parked next

15  to it.

16  Q.  Now, the door that you're talking about that was tried by

17  this person, is that the door we see in the photograph?

18  A.  Yes.

19  Q.  So you pulled up, and the car you saw was on your left;

20  is that right?

21  A.  That's correct.

22  Q.  What did you do after you pulled in beside it?

23  A.  Rolled down the window on the driver's side, my side of

24  the car, and attempted to look inside this silver car.

25  Q.  Were you able to do that?

1   A.  No.  The window was tinted with like a purplish film that

2   was really dirty.  At that point I needed a little more info.

3   So I got out of my car and walked around the back of the car,

4   and that is when I realized I -- I told the tellers I thought

5   it was a Honda.  But that's when I realized it was Corolla

6   written on the back of the car, which made it a Toyota.

7   Q.  Sir, I'd like you to take a look at the monitor which is

8   going to display Government's Exhibit 2-E.  Does that appear

9   to be similar to the vehicle you saw that day?

10  A.  Yes.

11  Q.  And is there anything particular about this Toyota

12  Corolla that stands out in your mind as being similar to the

13  one you saw in the BB&T parking lot that day?

14  A.  Well, yes.  It's an older model, and I guess I'm showing

15  my age, but it happens to be a two-door model of a Corolla,

16  which you don't see much, and has flip-up headlights.  So

17  those two are really odd from the standpoint of Corollas.

18  Q.  Was there anything about the wheels?

19  A.  Yeah.  What I noticed about the car is that it had little

20  hub caps, not wheel covers.  There were small hub caps on the

21  car.

22  Q.  Once you walked around behind the car, what did you do?

23  A.  I proceeded to the driver's side of the car, and that

24  window was also tinted, and I attempted to peer in and

25  couldn't see well.  So I moved over a bit, and at that point

1    the silver car was backing up.  And as it was backing up,

2    there was another vehicle, a pick-up truck I recall also

3    trying to leave the parking lot parked opposite of us.  And

4    it was backing up at the same time blocking the silver car

5    from being able to move.  And that's when I looked in -- I

6    was able to see through the windshield and see that the

7    driver had on a fake beard and ball cap.

8    Q.  Now, again, if you would look at the monitor, I'm going

9    to show you what has been introduced as Government's Exhibit

10   9-B.  The person that you were able to see through the

11   windshield, were they similar in appearance to what's

12   depicted in Government's Exhibit 9-B?

13   A.  Yes.

14   Q.  Were you able to see what sort of clothing the person was

15   wearing on their torso?

16   A.  I described the outer garment as what I call like a work

17   shirt, a heavy shirt that could be worn as outer garment.  It

18   was kind of leather green plaid and underneath was like a

19   hoodie, gray hoodie.  Also noticed that when the car was

20   paused waiting to leave the parking lot, that the driver had

21   on gloves, and that it was -- the beard was fake.

22        The beard was easily observed as fake, and there was

23   some kind of fabric covering the nose, a flesh colored fabric

24   covering the bridge of the nose.  Ball cap was pulled down,

25   low over the brow.

1    Q.  After you were able to make this observation through the

2    windshield, what happened next?

3    A.  Well, the pick-up truck blocking the silver car moved out

4    of the way, and the silver car left the parking lot.  Got

5    back in my car and followed the silver car through an

6    intersection and down the highway and traveled as far as it

7    seemed to be safe.  The car traveled in down Route 36.  I

8    can't remember what they're going to call that street but

9    Route 36 into Hopewell, turning left on National Lane, and I

10   followed and headed back out of town towards Fort Lee, and at

11   that point the car cut across three lanes of traffic and

12   headed northbound on 295, and at that point it didn't seem

13   reasonable to continue.

14   Q.  Just to be clear, that BB&T that you ultimately spent

15   time in the parking lot, which is Government's 10-A, that

16   was, I believe you said, about a half a mile from your

17   branch?

18   A.  Approximately, yes.

19   Q.  Now, is that in the City of Hopewell as opposed to Prince

20   George County?

21   A.  It is right at the county line.  The county line actually

22   runs maybe through their parking lot.

23          MR. HURT:  Thank you.  I have no further questions.

24                       CROSS-EXAMINATION

25   BY MR. DASH:

1    Q.   Sir, good afternoon.  So the first time that you saw this

2    individual was when you got out of the car and walked around

3    the car, and you could see through the windshield; is that

4    correct?

5    A.   I -- there was someone driving the car as it drove out of

6    the bank parking lot, my branch bank parking lot.  There was

7    someone driving the car then, and then it turned right onto

8    Jefferson Park.  I next saw the person, who was the driver of

9    the car, when they exited the silver car, parked in the BB&T

10   branch bank walking to the branch door, attempted to open the

11   door and then returned to the car.

12   Q.   Okay.  How far away were you when you saw that?

13   A.   I was across the parking lot.  I'd say that that distance

14   would be 30, 40 yards when I was pulling into the parking

15   lot.

16   Q.   And to do that did you have to cross a major road or did

17   you -- was --

18   A.   When?

19   Q.   To get to the BB&T spot where you parked?

20   A.   To get to the parking lot, yes, I did have to cross a

21   road.  But when I saw the driver get out of the car and

22   attempt the door, I was in the -- I guess you'd call it the

23   entrance to the branch.

24   Q.   And you didn't -- you couldn't tell what that person was

25   wearing at that time, correct?  When you saw this person get

1    out and try the door, you didn't know -- you couldn't tell

2    what he was wearing, all you could tell is it was a person

3    trying the door?

4    A.  No.  I could see the same thing I saw with the driver

5    sitting in the car.

6    Q.  I guess I was --

7    A.  Plaid shirt.

8    Q.  -- a little confused because you indicated that you

9    didn't see him until you actually walked around the car, in

10   your direct testimony.

11   A.  When I was peering in the window, the side window of the

12   car, I could not see in to get a good identification, that's

13   correct.  The window was tinted with the film.

14   Q.  And the only time you could get a good identification was

15   when you walked in front and you could see through the

16   windshield?

17   A.  That's correct.

18   Q.  Did you ever get the plate number that was on this

19   vehicle in the back when you were following the vehicle?

20   A.  I attempted to.  Tried to commit it to memory, and when I

21   returned to my branch, I was reciting it, and the officer who

22   met me as I left my car, because I had -- I think by that

23   point the police had been notified that there was a problem,

24   he was more interested in finding out who I was.  I was

25   trying to recite the plate and had, and I will tell you that

1    I could not recall the plate.

2    Q.  You didn't have a cellphone with you so you could call it

3    in?

4    A.  Unfortunately, I did not.

5    Q.  And you indicated that you had lost sight of this vehicle

6    for some time when you first pulled out and left your branch.

7    How long before you saw this vehicle again?  I know you've

8    described the distance but how long did that take?

9    A.  Just a few -- just maybe a minute.  I'd have to time it

10   to give you an exact, but I would say it wouldn't take long

11   to travel that half mile.

12   Q.  Now, when you saw this individual get out of the vehicle

13   at the BB&T Bank and go up to the door, you were approaching

14   the parking lot, if I get this correct?

15   A.  Approaching the parking lot, that's correct.

16   Q.  And the individual went up, tried the door, went

17   immediately back and got in the car?

18   A.  That's correct.

19   Q.  And then apparently sat there for a long enough time for

20   you to pull in to the parking spot beside him, get out and

21   walk all the way around the vehicle?

22   A.  That would be a matter of seconds, but, yes, that's

23   correct.

24           MR. DASH:  I don't have any further questions.

25           MR. HURT:  Nothing further, Your Honor.

1           THE COURT:  All right, Mr. Nicol.  You're excused as

2   a witness with the understanding that you will not discuss

3   your testimony with any other witness in the case until the

4   case is concluded.

5           THE WITNESS:  Yes.

6           THE COURT:  You may step down.

7           (Witness excused.)

8           MS. MARTIN:  The United States calls Lillian

9   Vega-Caraballo.

10           LILLIAN VEGA-CARABALLO, called by the Government,

11   having been first duly sworn, was examined and testified as

12   follows:

13                         DIRECT EXAMINATION

14   BY MS. MARTIN:

15   Q.  Good afternoon.

16   A.  Good afternoon.

17   Q.  Will you please state your full name and spell your last

18   name for the court reporter.

19   A.  Lillian Vega-Caraballo, that is V-e-g-a -

20   C-a-r-a-b-a-l-l-o.

21   Q.  Mrs. Caraballo, could you speak up a little into the

22   microphone.  Thank you.

23           Mrs. Caraballo, how do you know the defendant?

24   A.  I was married to the defendant.

25   Q.  Are you currently married to the defendant?

1  A.  No, ma'am.

2  Q.  You need to speak up a little more for the court

3  reporter.  How long were you married to the defendant?

4  A.  I was married to the defendant for, um -- we got married

5  in 2002, got divorced in 2004 so --

6  Q.  How long were you together before you got married?

7  A.  Seven years.

8  Q.  And before living together, how long -- now, did you live

9  together before you were married?

10  A.  Yes, ma'am.

11  Q.  Over the course of that, how long did you live together?

12  A.  Well, six years.

13  Q.  Six years.  And before that, how long had you known the

14  defendant?

15  A.  I've known him since we were in high school, '83.

16  Q.  Where did you go to high school?

17  A.  Puerto Rico.

18          MR. DASH:  I'm sorry, Judge.  I can't hardly hear.

19          THE COURT:  Yes, I'm having trouble, too.  I'll ask

20  you to please speak louder.

21          THE WITNESS:  Okay.  Sorry.

22  BY MS. MARTIN:

23  Q.  And Mrs. Vega-Caraballo, do you see your ex-husband in

24  the courtroom today?

25  A.  Yes, ma'am.

1  Q.  Can you please identify him for the court reporter,
2  what's he wearing?
3  A.  He is wearing a gray suit.
4          THE COURT:  I'm still having trouble hearing you,
5  ma'am.  Please try to speak louder.
6          THE WITNESS:  Okay.  He is wearing the gray suit.
7  BY MS. MARTIN:
8  Q.  And after -- when was the last time that you saw the
9  defendant?
10  A.  The last time I saw the defendant, it was, like, maybe
11  2005.
12  Q.  All right.  So about three years ago maybe?
13  A.  Yes, ma'am.
14  Q.  After your divorce did you keep in contact with anyone
15  else in the defendant's family or from the defendant's
16  family?
17  A.  With his parents.
18  Q.  And when was the last time you spoke with his parents?
19  A.  December of last year.
20  Q.  Turning now to March of this year, did you happen to see
21  news coverage of a string of robberies that were occurring on
22  the Peninsula?
23  A.  Yes, ma'am.
24  Q.  And can you tell us what you remember about that press
25  coverage?

1   A.  Um, I saw the defendant's picture all over the

2   television, I mean, the pictures of the assumed bank robber,

3   and, um, and the press conference that the police was -- were

4   having at that time.

5   Q.  So you saw photographs.  And what did you hear about the

6   robberies from the press conference?

7   A.  Well, I heard that he was -- that the person was, um,

8   robbing banks, and that he was very aggressive and violent,

9   and that they had a massive manhunt for him.  So I saw the

10  pictures that were shown in the television, and I identified

11  the person as being my ex-husband.

12  Q.  So you saw some pictures.  Were they pictures taken

13  during the robbery?

14  A.  The robberies, yes.

15  Q.  And for some reason those reminded you of the defendant?

16  A.  That is correct.

17  Q.  What about those pictures reminded you?

18  A.  Um, first of all, the attire that he was wearing, the

19  jacket that he was wearing, and his demeanor in the pictures.

20  There were still pictures.  It wasn't like a video or

21  anything.  But there was one picture in particular that, you

22  know, I knew -- I knew it was him.

23  Q.  I'm going to show you what's been previously admitted as

24  Government's Exhibit 4-D.  Have you seen this picture before?

25  A.  Yes, ma'am.

1  Q.  When did you see it?

2  A.  The newscast.

3  Q.  And does that picture -- what did that picture -- when

4  you saw it, what did you think?

5  A.  That was the picture that I recognized, and it's his

6  demeanor, the way he's standing, I knew for a fact that it

7  was the defendant.

8  Q.  Was there anything else about that photograph that

9  reminded you of the defendant?

10  A.  The jacket, the shoes, the way he's standing, his

11  posture.

12  Q.  And so what did you -- after you saw the newscast, what

13  did you do?

14  A.  After the newscast, I debated.  I debated a lot.  I went

15  online and I saw the -- I went to the television station's

16  website, and I saw the pictures again, and read what was

17  said, you know, in the article online.  And I knew I had to

18  call.  I knew I had to.

19  Q.  You said you debated.  What were you debating about?

20  A.  Debating on calling.

21  Q.  And why did you ultimately decide to call?

22  A.  Because I feared that if I didn't call, if I didn't do

23  something, either the defendant or somebody else would have

24  been hurt and killed.  So when I saw the newscast, when they

25  said that, you know, that there was a massive manhunt for

1   this individual, to me that is, you know, they are looking

2   for him, if they find him, they are going to shoot him.  So

3   that was my first reaction.

4         Then as I heard the newscast and then went to the

5   internet, I read that he was, you know -- he was violent

6   towards other people, and I feared for them, too.  So I knew

7   that I couldn't just keep my mouth shut.  I could live with

8   the fact that, you know, that this is happening, but I

9   couldn't deal with the fact that either him or somebody else

10  would have been hurt and killed.  So I knew I had to call.  I

11  knew I had to do the right thing.

12  Q.  And so who did you call?

13  A.  I called Special Agent Baber.

14  Q.  Mrs. Vega-Caraballo, I'm going to hand up a couple of

15  exhibits for you to look at.  Before we get to the exhibits,

16  during that press conference, did -- was there any additional

17  physical descriptions about this bank robber that reminded

18  you of your ex-husband?

19  A.  I'm sorry.  Can you repeat the question?

20  Q.  During the press conference and from what you saw online,

21  was there any additional descriptions of the bank robber that

22  reminded you of your ex-husband?

23  A.  The height that they gave, his accent, and -- that he

24  spoke with a thick accent, and his height and weight, and, of

25  course, the clothes, what he was wearing.

```
 1    Q.  Now, Mrs. Vega-Caraballo, if you would please look at the

 2    exhibit that's been previously marked for identification as

 3    Government's Exhibit 11-A.  Do you recognize that photograph?

 4    A.  Yes, ma'am.

 5    Q.  And has this picture been altered in any way?

 6    A.  Other than the covering of the face, no.

 7    Q.  All right.  So one of the faces is covered?

 8    A.  (Nods head.)

 9    Q.  Do you know approximately when this picture was taken?

10    A.  I want to say this picture was maybe '98.

11    Q.  This picture was in -- was it in your possession?

12    A.  Yes, ma'am.

13         MS. MARTIN:  Your Honor, Government offers Exhibit

14    11-A into evidence.

15         THE COURT:  All right.  Exhibit 11-A will be

16    admitted.

17         (The photograph was received in evidence and marked

18    as Government's Exhibit No. 11-A.)

19    BY MS. MARTIN:

20    Q.  Can you describe this picture for the jury?

21    A.  The defendant is wearing the hoodie that he was using or

22    that he used in while he was doing the bank robberies, and he

23    has some jeans, and he's with a mutual friend.

24    Q.  So is the person in this photograph, is that a picture of

25    your ex-husband?
```

1    A.   Yes, ma'am.

2    Q.   And why did you happen to have this picture?

3    A.   Because, um, he had brought it back because, like I said,

4    the person that's with him was a mutual friend, and we were

5    together.  He brought them back home.

6    Q.   And after the divorce, you kept the picture?

7    A.   The pictures were left, yes.

8    Q.   And what did you -- did you provide this picture to the

9    FBI?

10   A.   That is correct.

11   Q.   And why did you provide this to the FBI?

12   A.   Because it matched the attire that the defendant was

13   using the day of the newscast, the pictures.

14   Q.   Now, Mrs. Vega-Caraballo, I'd like you to look at

15   Government's Exhibit 11-B, if you would.  Do you recognize

16   that photograph?

17   A.   Yes, ma'am.

18   Q.   What is that a picture of?

19   A.   This is a picture of the defendant with a mutual friend

20   and my children.

21   Q.   And, again, has this been -- this picture been altered

22   since you last saw it?

23   A.   Other than the covering of the faces, everybody else

24   except the defendant, no.

25   Q.   All right.  And, Your Honor, Government offers Exhibit

1    11-B into evidence and ask that it be published.

2            THE COURT:  All right.  Exhibit 11-B will be

3    admitted.

4            (The photograph was received in evidence and marked

5    as Government's Exhibit No. 11-B.)

6    BY MS. MARTIN:

7    Q.  So is this another photograph that was in your

8    possession?

9    A.  Yes, ma'am.

10   Q.  Did you also provide this photograph to the FBI?

11   A.  Yes, ma'am.

12   Q.  Can you tell me why you provided this photograph?

13   A.  Because it has, again, the hood that he used and

14   similar -- the white shoes and the black jeans.

15   Q.  All right.  I've got one last question for you.  Do you

16   remember from that press conference any mention of a reward?

17   A.  I do remember mention of the reward, yes, ma'am.

18   Q.  And did that reward influence your decision to contact

19   the FBI?

20   A.  Absolutely not.  No.

21           MS. MARTIN:  Thank you, Mrs. Vega-Caraballo.

22                     CROSS-EXAMINATION

23   BY MR. DASH:

24   Q.  Good afternoon, ma'am.

25   A.  Good afternoon.

1  Q.  Ma'am, you say that the reward doesn't influence you at

2  all, but that is a $20,000 reward --

3  A.  That is correct.

4  Q.  -- you're potentially going to receive, correct?

5  A.  That is correct.

6  Q.  Okay.  And that reward only comes if Mr. Caraballo is

7  convicted, correct?

8  A.  That's correct.

9  Q.  Now, you said that this first photograph 11-A was taken

10 in about 1998.  What about the second one, 11-B?

11 A.  The second one was at our home, the home that we shared

12 together, and it had to be maybe 2002, 2001, 2002.

13 Q.  Now, I'd like to go back to -- would you pull up 4-D,

14 please -- Government Exhibit 4-D.  You said that one of the

15 things that drew your attention was the shoes?

16 A.  And the jacket.

17 Q.  Okay.  But the shoes was one of them, right?

18 A.  Yes.  Yes, sir.

19 Q.  Is there anything distinguishing about those shoes other

20 than the fact that they're white?

21 A.  That's -- that was the only thing he wore as far as those

22 type of shoes.

23 Q.  There is no markings on them or anything like that that

24 you can see from this picture, correct?

25 A.  No.

1  Q.  And the jacket is just -- you can't tell from this
2  picture the color of the jacket or anything like that?  All
3  you can tell is the plaid aspect of it, correct?
4  A.  Plaid, yes, and the gray hood.
5  Q.  And you also have indicated that you could tell just by
6  the posture that this was your ex-husband?
7  A.  That's correct.
8  Q.  What about -- what is distinguishing about this posture?
9  A.  Everybody has different mannerisms, and that's his
10 mannerism.  That's the way he stands.  I mean, I can't
11 explain it with words.  It's just how people stand, you know.
12 If you've been with somebody long enough, you pick up on
13 their little mannerisms, and he's just standing there in
14 front of the camera, and --
15 Q.  Now, do you know is this picture -- I'm sorry -- is this
16 picture of him just standing there, or was this a series of
17 photographs where he's walking, or do you have any idea about
18 this photograph other than just this photograph sitting or
19 standing here?
20 A.  When I saw -- in the newscast, they showed that picture.
21 They showed another one that he is walking, and that is
22 another picture that I identified immediately.  But, um, this
23 one, it just -- it was a still picture so I don't know if he
24 was in transit or he was walking or --
25 Q.  And the other one that you saw was just a still picture

1  also?

2  A.  Yes, sir.

3  Q.  You did not see any video?

4  A.  No video, no.

5  Q.  No movements or anything like that?

6  A.  No.

7  Q.  And you indicated that you had actually -- you had

8  divorced Mr. Caraballo in 2004, correct?

9  A.  Uh-huh.  The divorce was final in 2004.

10  Q.  But you were actually separated for a significant period

11  of time before that, correct?

12  A.  Yes, sir.

13  Q.  So the last time that you actually spent any time with

14  him was sometime in 2003, correct?

15  A.  Yes, that is correct.

16          MR. DASH:  I don't have any further questions.

17          THE COURT:  All right.

18                     REDIRECT EXAMINATION

19  BY MS. MARTIN:

20  Q.  I'd like to show you just briefly again Government

21  Exhibit 11-B.  Did you refer to the outfit that the

22  defendant's wearing with a particular -- in a particular way,

23  or did you have a particular word that you would use for the

24  defendant's outfit?

25  A.  When I saw the newscast, to me that was the exact outfit

1    that he was wearing in one of the still pictures.  So that's

2    why I provided that picture because I thought that that was

3    exactly the outfit that he was wearing.  But we used to joke

4    around because this jacket was the jacket that he wore to do

5    everything.

6            I mean, this was his jacket.  He never used a coat.

7    So we used to call it his uniform.  So that's why this jacket

8    is so -- I'm so familiar with this jacket.

9            MS. MARTIN:  Thank you.  No further questions, Your

10   Honor.

11           THE COURT:  All right, Mrs. Caraballo.  You are

12   excused as a witness in the case with the understanding

13   that --

14           MR. DASH:  Judge, could we keep her available for

15   recall just in case, please?

16           THE COURT:  All right, Ms. Caraballo.  In that

17   event, you're not excused.  You'll have to remain available

18   to be recalled, presumably, by the defense.  In that case,

19   you should not discuss your testimony with anyone until

20   you're excused, and you'll have to remain outside the

21   courtroom and not talk to anybody about the case, anybody at

22   all, until you're finally excused.

23           THE WITNESS:  Okay.

24           THE COURT:  You may step down at this time, and

25   you'll have to step out of the courtroom.

1              MR. HURT:  Your Honor, as opposed to having her

2    remain in the courtroom, we do have a good cellular telephone

3    number.  Defense counsel has agreed that she may be available

4    by cellphone, if that's agreeable with the Court.

5              THE COURT:  Well, as long as you understand that

6    you're still subject to the requirements of the subpoena to

7    appear in court.  If you want to be available by cellphone,

8    that's fine.  You'll just have to understand that you'll have

9    to come if you're called.

10             THE WITNESS:  Okay.

11             THE COURT:  You may step down.

12             (Witness excused.)

13             THE COURT:  All right, ladies and gentlemen.  I

14   think this would be a good time to take our luncheon recess.

15   I'll ask you to please return directly to the jury room at 2

16   o'clock, and we'll resume at that time.

17             (Jury out at 12:54 p.m.)

18             THE COURT:  All right.  I assume, counsel, that you

19   have witnesses that would otherwise have been called tomorrow

20   morning available for this afternoon?

21             MR. HURT:  Judge, they should all be here.  I will

22   let the Court know that our last two witnesses, who are

23   Charles Matkovich and Jason Brewer, are both scientists; one

24   from the DEA lab and the other from the FBI lab.  Their

25   travel arrangements, which I can check, but I fear we cannot

1   alter at this stage, put them in court here at 9 o'clock

2   tomorrow morning.  I don't think I can get them here any

3   sooner.  They are both brief witnesses.

4           I just wanted to let the Court know we may reach a

5   point -- I think we will be close to the end of the day but I

6   don't have the ability to get them here sooner.

7           THE COURT:  All right.  We'll be in recess till 2

8   o'clock.

9           (Luncheon recess from 12:56 p.m. to 2:02 p.m.)

10          THE COURT:  All right.  We ready for the jury?

11          MR. HURT:  Yes, sir, Judge, if I might just take a

12  second to kind of update the Court on our procedures.  The

13  witness list provided by the United States indicates Special

14  Agent George DeShazor from the FBI is, I think he is our

15  third to last witness.  We believe that we'll be able to

16  introduce those items through other testifying agents who are

17  here.  So I think we are going to be able to not call Special

18  Agent DeShazor.

19          Special Agent Baber went to get some additional

20  evidence that we can introduce prior to that.  I just didn't

21  want to surprise the Court and not calling those witnesses.

22  And I would just offer to the Court that at the rate we are

23  moving, we have five witnesses this afternoon.  I would

24  anticipate that we'll be through before the 5 o'clock hour.

25          THE COURT:  All right.  Okay, Mr. King.

1          (Jury in at 2:03 p.m.)

2          THE COURT:  All right.  Good afternoon, ladies and

3    gentlemen.  We will continue this afternoon with the

4    Government's evidence.

5          Is the Government ready with its next witness?

6          MS. MARTIN:  Yes, Your Honor.  The Government calls

7    Victor Garcia.

8          VICTOR GARCIA, called by the Government, having

9    been first duly sworn, was examined and testified as follows:

10                      DIRECT EXAMINATION

11   BY MS. MARTIN:

12   Q.  Good afternoon, Mr. Garcia.  Could you please state your

13   full name and spell your last name for the court reporter.

14   A.  Victor Maranda Garcia, G-a-r-c-i-a.

15   Q.  And Mr. Garcia, will you speak up a little bit.

16   A.  Victor Maranda Garcia, G-a-r-c-i-a.

17   Q.  Mr. Garcia, how is it that you know the defendant,

18   Mr. Caraballo?

19   A.  Through his ex-wife in 2004.

20   Q.  Did you meet him in 2004?

21   A.  Yes.

22   Q.  And by his ex-wife, do you mean Lillian?

23   A.  Yes.

24   Q.  How did you meet Lillian?

25   A.  She was my customer.

1   Q.   Your customer where?

2   A.   I worked at a hair dresser at the Patrick Henry Mall, and

3   she used to come in to do hair with me.

4   Q.   So how did you meet the defendant through Lillian?

5   A.   She always talk about me, how good I was cutting hair.

6   One day, he came in and told me that he was her ex-husband,

7   and since that day we became friends.

8   Q.   You struck up a friendship?

9   A.   Yes.

10  Q.   Mr. Garcia, I'm going to direct your attention to the

11  screen in front of you.  You'll see what's been previously

12  admitted as Government Exhibit 3-A.  Do you recognize that

13  picture?

14  A.   Yes.  That is my car.

15  Q.   And can you tell me what kind of car you drive?

16  A.   Impala 2000, blue.

17  Q.   I'm sorry.  What year was that?

18  A.   A 2000 Impala, blue.

19  Q.   Blue.  And do you have a personalized license plate on

20  your car?

21  A.   I do.

22  Q.   What does it read?

23  A.   Hair M.D.

24            THE COURT:  I'm sorry.  I didn't hear that.

25            THE WITNESS:  Hair M.D., H-a-i-r-m-d.

1  BY MS. MARTIN:

2  Q.  Like hair doctor?

3        THE COURT:  Hair doctor.  I see.  Okay.

4  BY MS. MARTIN:

5  Q.  Mr. Garcia, did you ever lend your car to the defendant?

6  A.  Yes.

7  Q.  How often did you lend him your car?

8  A.  Very often.

9  Q.  Did -- why did you lend him your car?

10  A.  Well, we became good friends.  And he just come and help

11  me in my shop, so since he -- his car got repossessed, I

12  don't know, I don't know what happened there -- well, I used

13  to lend mine to him.

14  Q.  So was his car unreliable?

15  A.  Yes.

16  Q.  Is that what -- what did he tell you that is why he

17  needed to borrow your car?

18  A.  Well, they repossessed his car, and he used to come,

19  like, every two weeks to get his haircut.  And in-between

20  there, I used to lend him my car because he had to go and do

21  some computer works.  That's as far as I know.

22  Q.  Did you travel outside the country last November 2007?

23  A.  Yes, from the 12th through the 30th.

24  Q.  From the 12th to when?

25  A.  Till the 30th.

1    Q.   30th of November 2007?

2    A.   That's correct.

3    Q.   And how do you remember that time period?

4    A.   I do have papers.  My sister was diagnosed with cancer.

5    She had three weeks to live.

6    Q.   And so did you -- were you traveling to be with her in

7    November of 2007?

8    A.   Yes.

9    Q.   And did you during that time period loan your car to the

10   defendant?

11   A.   Yes.  He took me to the airport, and he kept the car.

12            MS. MARTIN:  That is all the questions I have,

13   Mr. Garcia.  Thank you.

14                        CROSS-EXAMINATION

15   BY MR. DASH:

16   Q.   Good afternoon, Mr. Garcia.  Mr. Garcia, how many times

17   prior to November of 2007 did Mr. Caraballo borrow your car?

18   A.   It was often.

19   Q.   And when he took your car, did he put a lot of miles on

20   it, or was it just for local travel?  Do you know?

21   A.   It was supposed to be for local travel, you know, to do,

22   um -- he told me that he used to go to do some computer

23   repairs.

24   Q.   Did you ever notice any unusual amount of miles on your

25   car during that period of time?

```
 1   A.  I did one time.

 2   Q.  Just once?

 3   A.  Yes.

 4   Q.  Did you talk to him about it, ask him what it was about?

 5   A.  No.

 6   Q.  You don't know where he was going or what he was actually

 7   doing with the vehicle?

 8   A.  Well, that day that I remember, it was because of the

 9   speedometer was erased, and I just pay it no mind.  I thought

10   that he just pushed the wrong button.

11   Q.  So you're talking the odometer or the mileage?

12   A.  The odometer, I usually put the odometer to know how many

13   miles I travel so that I can get an oil change every 3,000

14   miles.

15   Q.  And that was just reset, basically?

16   A.  Right.

17           MR. DASH:  I don't have any further questions.

18           THE COURT:  May he be excused?

19           MS. MARTIN:  Yes, Your Honor.

20           THE COURT:  All right, Mr. Garcia.  You may be

21   excused as a witness with the understanding that you will not

22   discuss your testimony with any other witness in the case

23   until the case is concluded.  You may step down at this time.

24           (Witness excused.)

25           MR. HURT:  United States calls Special Agent Scott
```

1    Baber.

2            SCOTT BABER, called by the Government, having been

3    first duly sworn, was examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. HURT:

6    Q.  Sir, you're Special Agent Scott Baber with the Federal

7    Bureau of Investigation?

8    A.  Yes.

9    Q.  And how long have you been with the FBI, Special Agent

10   Baber?

11   A.  Little over two years.

12   Q.  And prior to that how were you employed?

13   A.  I was employed as a captain in the military police corps,

14   United States Army.

15   Q.  You were the case agent in this matter?

16   A.  Yes, I was.

17   Q.  And how did -- what served as the initial involvement of

18   yourself and your agency in the case that is before the court

19   today?

20   A.  In January of 2007 investigators from Henrico County

21   Division of Police, and the York/Poquoson Sheriff's Office

22   contacted me and asked the FBI for assistance in identifying

23   and apprehending an unknown serial bank robber in the area.

24   Q.  And what did you do as a result of that?  Did you work on

25   some sort of investigative strategy?

1   A.  We did incorporate investigative strategy.  At the time I

2   believe that the local investigators had exhausted all

3   possible leads, and therefore we concluded that maybe the

4   best course of action was to hold a press conference in

5   attempt to elicit help from the general public in identifying

6   the unknown robber.

7   Q.  Did you ultimately hold that press conference?

8   A.  Yes, we did.

9   Q.  Who was present for that press conference?

10  A.  The press conference was the sheriff of the York/Poquoson

11  Sheriff's office, the Chief of Police for the Henrico County

12  Division of Police and the special agent in charge of the

13  Norfolk FBI field office.

14  Q.  Now, you've been in the courtroom for the testimony in

15  this case.  The bank robbery that you've heard details, were

16  those the subject of this press conference?

17  A.  Yes, they were.

18  Q.  And all of those jurisdictions that you have just talked

19  about, York and Prince George's County and Henrico County,

20  those are all in the Eastern District of Virginia?

21  A.  Yes, they are.

22  Q.  Once you held this -- well, as you were holding this

23  press conference, what sort of information did you put out?

24  A.  We disseminated to the public the general description of

25  the unknown robber to include the approximate height and

 1   weight, some of the distinctive characteristics that were

 2   described by some of the witnesses, to include how the

 3   subject spoke.

 4           We also showed photographs from the surveillance

 5   photos in an attempt to identify who the robber might be, as

 6   well as some of the descriptions of the vehicles that

 7   witnesses identified that the robber fled in.

 8   Q.  Do you recall the specific date of this press conference?

 9   A.  I recall it was March 4th of this year.

10   Q.  After this press conference was held, did it appear on

11   the nightly news or on the television?

12   A.  Yes, it did.

13   Q.  And after that appearance on the television, did you

14   receive any phone calls?

15   A.  Yes, I did.  I received a phone call from a woman who

16   identified herself as Lillian Vega-Caraballo.

17   Q.  How many other phone calls did you receive besides that

18   one?

19   A.  None.

20   Q.  When you received this phone call, did you discuss with

21   that person the information they might have?

22   A.  Yes.

23   Q.  Did that person indicate who she believed might be

24   responsible for these bank robbers?

25   A.  Yes.  She indicated she believed it was her ex-husband

1   who she identified as Hector Javier Caraballo.

2   Q.  Based on the information you received from this witness,

3   did you conduct surveillance?

4   A.  Yes.  Beginning the next day, I, along with members of

5   the Henrico County division police, began physical

6   surveillance of Mr. Caraballo, his residence and the vehicle

7   in which he was utilizing at that time.

8   Q.  Well, I'd like to show you what's been marked as

9   Government's Exhibit Number 13.  Do you recognize that item,

10  sir?

11  A.  Yes, I do.  The top residence, the top balcony is the

12  residence of the defendant.

13  Q.  And is that the location in which you conducted

14  surveillance?

15  A.  Yes.

16          MR. HURT:  Your Honor, at this time we would ask

17  that Government's Exhibit 13 be admitted.

18          THE COURT:  All right.  Exhibit 13 will be admitted.

19          (The photograph was received in evidence and marked

20  as Government's Exhibit No. 13.)

21  BY MR. HURT:

22  Q.  Now, you said that in your testimony that the top balcony

23  was the unit you believed was occupied by the person you were

24  surveying?

25  A.  Yes.  Apartment 202.

1   Q.  Now, when you're conducting -- well, first of all, where

2   is this physically located?  What's it near in Newport News?

3   A.  It's adjacent to Patrick Henry Mall area in Newport News,

4   604 River Bend Court is the address.  It's the Waterman's

5   Crossing Apartment complex.

6   Q.  How did you figure out that's where the defendant was

7   located?

8   A.  I received the address information both from

9   Mrs. Vega-Caraballo as well as corroborating that address

10  from other databases that we searched.  Having identified the

11  defendant as the possible subject, we were able to research

12  his current whereabouts and determine that it was, in fact,

13  604 apartment 202.

14  Q.  And when we talk about setting up surveillance, how would

15  you surveil this location or conduct surveillance?

16  A.  With members of the Henrico County Division of Police, we

17  set up surveillance using a multitude of unmarked vehicles

18  just outside of the apartment complex.  There was only one

19  way in and one way out.  We identified his vehicle so we were

20  able to sit outside the apartment complex and await for him

21  to emerge in the vehicle he was driving at the time.

22          And at that time we would then follow the defendant

23  to various locations, changing vehicles to ensure that we

24  were not identified.

25  Q.  How did you identify the vehicle that he was using?

1  A.   That information was provided to us by

2  Ms. Vega-Caraballo, and we also observed on multitudes of

3  occasions Mr. Caraballo entering and utilizing that vehicle.

4  Q.   If I could show you what's been marked and previously

5  admitted as Government's Exhibit 2-E.  You recognize that?

6  A.   Yes.  That's the vehicle that was operated by the

7  defendant.

8  Q.   Did you actually take that picture?

9  A.   Yes, I did.

10  Q.   And where was that picture taken?

11  A.   That's taken in front of the defendant's apartment, 604

12  River Bend Court, Apartment 202.

13  Q.   As you're conducting surveillance of the defendant, did

14  you participate in a daily basis on this in this

15  surveillance?

16  A.   Yes, I did.

17  Q.   Did you ever follow the defendant to parts of Hampton,

18  Virginia?

19  A.   Yes, we did.

20  Q.   And tell the members of the jury how that occurred.

21  A.   On several occasions the surveillance team followed the

22  defendant to an area of Hampton.  The address was in the 30

23  block of Mary Peek Boulevard in Hampton, Virginia, where we

24  observed the defendant entering a residence there and would

25  stay there from time to time, sometimes for just a few

1    minutes and sometimes for a few hours.

2    Q.  And did you also have occasion to follow and observe the

3    defendant leaving Newport News?

4    A.  Yes.  We observed him on several occasions and followed

5    him on several occasions as he traveled westbound on I-64

6    heading up towards the Richmond area in Hanover and the

7    Henrico County area.

8    Q.  Did he, prior to getting on the interstate to travel to

9    Henrico or Hanover Counties, did he ever stop the car and do

10   anything?

11   A.  Yes.  On several occasions we observed the defendant

12   drive the 1988 Toyota Corolla that he was operating, drive

13   behind a building that was adjacent where his residence was

14   located, that had no tinting on the vehicle at the time.  He

15   reemerged on several occasions where what appeared to be a

16   temporary tinting had been erected inside the vehicle.

17          We also observed the defendant exit off of I-64

18   westbound at several exits that were very rural, with very

19   little around there, and then would reemerge onto I-64 with a

20   different license plate than what we had observed once he had

21   left his residence.

22   Q.  Now, the vehicle which is in Government's Exhibit 2-E

23   does not appear to have any window tinting on it.  Does that

24   vehicle and the one -- this vehicle associated with the

25   defendant, does it have permanent window tinting?

1    A.   No, it does not.

2    Q.   Now, after this window tinting would be applied, did you

3    ever observe the defendant stop and remove it or stop, then

4    reemerge with no window tinting?

5    A.   That's correct, yes, we did.

6    Q.   When the defendant would drive this vehicle to either

7    Hanover or Henrico Counties, where would he go?

8    A.   Specifically he frequented the Mechanicsville, City of

9    Mechanicsville in Virginia, and he traveled up and down the

10   primary state route and never exited the vehicle but stopped

11   around the location of several banks, in the parking lot of

12   those banks, with the window tinting up and with a different

13   license plate than what was normally on the vehicle.

14        We observed the defendant drive around these banks,

15   leave the area, go to another bank, sometimes return to that

16   original location where the bank was and stay in that parking

17   lot before he would finally leave the area entirely and go

18   back to either his residence or to the 30 block of Mary Peek

19   Boulevard in Hampton.

20   Q.   When he would return to his residence in the evening, how

21   long would you maintain surveillance?

22   A.   Surveillance was generally conducted between Monday

23   through Friday between the hours of about 7 a.m. and

24   approximately 6 p.m. to give us time both before and after

25   banks might be opened or closed and on Saturdays from

1   approximately 7 a.m. till 1 p.m., again, to give us a window

2   when all banks might be open.

3   Q.  And how long did this surveillance last?

4   A.  Approximately three weeks.

5   Q.  At some point towards the end of the surveillance were

6   you able to get a federal search warrant for the defendant's

7   residence?

8   A.  Yes.

9   Q.  And was that search warrant executed?

10  A.  Yes, it was.

11  Q.  Now, before we go any further, we've talked about the

12  person you surveilled and the person who drove this vehicle.

13  Do you see that person in the courtroom?

14  A.  I do.

15  Q.  Can you point him out for me?

16  A.  Sitting to my left between Mr. Mitchell and Mr. Dash.

17  Q.  And how do you know -- by what name do you know that

18  person?

19  A.  Hector Caraballo.

20  Q.  When the search warrant was executed at this residence,

21  was a firearm located?

22  A.  Yes.

23  Q.  I'd like to show you what has been marked as Government's

24  Exhibit Number 12.  First, if you would look at Number 12, do

25  you recognize that?

1   A.   Yes, I do.

2   Q.   What is that?

3   A.   That is the firearm that was recovered from

4   Mr. Caraballo's residence after we executed the search

5   warrant.

6   Q.   And when that firearm was recovered, did you have an

7   opportunity to test it?

8   A.   Yes.

9        MR. HURT:   First of all, Your Honor, at this time we

10  would move into evidence Government's Exhibit Number 12.

11       THE COURT:   12.  You mean 12 -- I have a 12-A.   12

12  is the weapon itself?

13       MR. HURT:   Yes, sir, that's correct.

14       THE COURT:   All right.   Exhibit 12 will be admitted.

15       (The weapon was received in evidence and marked as

16  Government's Exhibit No. 12.)

17  BY MR. HURT:

18  Q.   When that firearm was recovered from the apartment, were

19  there bullets in it?

20  A.   Yes.   It was loaded.

21  Q.   And those bullets which we see in the picture there,

22  which is -- ultimately be 12-A, were those the same bullets

23  that were in the firearm?

24  A.   Yes.

25  Q.   Now, the firearm that you say you tested, is Government's

1    Exhibit 12, that weapon?

2    A.   Yes.

3    Q.   And how did you go about testing this weapon?

4    A.   I took the firearm and went out behind the Norfolk FBI

5    field office, along with Special Agent Tony Shumaker of the

6    Bureau of Alcohol, Tobacco, Firearms, and Explosives, and we

7    conducted a dry fire of the weapon.  That is, I took the

8    firearm, unloaded, observed and determined that the barrel

9    was clear and unobstructed.

10         I pulled the trigger, noticed that the hammer came

11   back, cylinder rotated, and after enough pressure was applied

12   to the trigger, the hammer fell down and the cylinder part of

13   the revolver made a full rotation.

14   Q.   So the firearm operated as designed?

15   A.   Yes.

16   Q.   Now, did you also have an opportunity to research the

17   manufacturer of this firearm?

18   A.   Yes.

19   Q.   And based upon your research and your prior experience

20   with firearms in the FBI and in the military, is this firearm

21   that's in Government's Exhibit 12 manufactured in the

22   Commonwealth of Virginia?

23   A.   No, it is not.

24   Q.   Now, there were other items that were recovered from the

25   apartment.  Are you familiar, as the case agent, with all the

1    items that were recovered?

2    A.   Yes.

3    Q.   And did you have occasion to take some of those items for

4    further testing?

5    A.   Yes.

6    Q.   I would ask you to look at Government's Exhibit Number

7    27.   There is also a pouch associated with that.   Do you

8    recognize that item?

9    A.   Yes, I do.

10   Q.   And what is contained in that item?

11   A.   Torn U.S. currency.

12   Q.   And is it discolored in any way?

13   A.   Yes, it is.

14   Q.   And what is the color on the currency?

15   A.   It appears to be red.

16   Q.   Now, was that item recovered from the defendant's

17   apartment during the execution of that federal search

18   warrant?

19   A.   Yes, it was.

20   Q.   After you retrieved these items, what did you do with

21   them?

22   A.   After securing the money and keeping it within our chain

23   of custody rules, I submitted the currency to the FBI lab in

24   Quantico, Virginia for further testing.

25   Q.   And what was your request?

1    A.  I requested that the FBI lab conduct a test of the red

2    stain on the currency to determine whether or not it was bank

3    dye that's consistent with security devices used by many

4    banks.

5    Q.  Now, the item was returned to the FBI office here in

6    Norfolk?

7    A.  Yes.

8    Q.  And when it was returned to you, were there additional

9    markings on the bags?

10   A.  Yes, there were.

11   Q.  Now, you also had occasion to take some items that were

12   seized from the apartment for testing for drugs; is that

13   correct?

14   A.  Yes.

15        MR. HURT:  Your Honor, before we get to that, the

16   Government would move into admission Government's Exhibit

17   Number 27.

18        THE COURT:  All right.  Exhibit 27 will be admitted.

19        (The currency was received in evidence and marked as

20   Government's Exhibit No. 27.)

21        THE COURT:  Are you asking for 12-A and 27-A to be

22   admitted?

23        MR. HURT:  If we might also admit the photographs,

24   which are 12-A of the revolver and 27-A of the photograph, as

25   well.

1           THE COURT:  All right.  Those exhibits will be

2     admitted, as well.

3           (The photographs received in evidence and marked as

4     Government's Exhibit No. 12-A & 27-A.)

5           MR. HURT:  Thank you.

6     BY MR. HURT:

7     Q.  Do you have Government's Exhibit 33 before you?

8     A.  No, I do not.

9     Q.  If you would take a look at that pouch which is

10    Government's Exhibit 33.  Do you recognize that item?

11    A.  Yes, I do.

12    Q.  And what is that?

13    A.  These were items that were seized from the defendant's

14    apartment that were suspected of being drug paraphernalia.

15    Q.  So what did you do with those items following the seizure

16    at the search warrant?

17    A.  I sent these off to the DEA lab and requested that they

18    do an analysis of the items and determine whether or not

19    there was drug residue found on any of the items.

20    Q.  And when we say DEA, what does DEA stand for?

21    A.  Drug Enforcement Administration.

22    Q.  Were those items ultimately returned to you?

23    A.  Yes, they were.

24    Q.  And were there additional markings on the bag when they

25    were returned?

1   A.  Yes, there were.

2           MR. HURT:  Your Honor, at this time the government

3   moves the admission of Government's 33 and 33-A, which is the

4   associated photograph.

5           THE COURT:  All right.  Exhibit 33 and 33-A will be

6   admitted.

7           (The drug paraphernalia and photograph was received

8   in evidence and marked as Government's Exhibit No. 33 &

9   33-A.)

10          MR. HURT:  Your Honor, if I might just have one

11  moment.  Thank you, Judge.  I have no further questions.

12                          CROSS-EXAMINATION

13  BY MR. DASH:

14  Q.  Good afternoon, Agent Baber.

15  A.  Good afternoon, Mr. Dash.

16  Q.  Agent Baber, let me first ask you, as far as the firearm

17  or the weapon that was obtained, I think that is Exhibit

18  Number 12, if I recall right, you did not perform a live fire

19  of that weapon to see if it actually functioned as far as

20  expelling a round out of the chamber or anything, correct?

21  A.  That's correct.

22  Q.  And you certainly have ranges available and places

23  available to do those types of testing, correct?

24  A.  Correct.

25  Q.  And as far as the firearm not manufactured in Virginia,

1  do you know precisely where that firearm was manufactured?

2  A.  In the State of Massachusetts.

3  Q.  And do you know, was that firearm, was it purchased by

4  Mr. Caraballo at some point or do you not have that?

5  A.  I do not know if he was the purchaser of it or not.

6  Q.  So you never did a gun trace or anything like that to

7  determine who the purchaser of the firearm?

8  A.  No, I did not.

9  Q.  Did you ever take that firearm and have it tested for

10  either fingerprints or DNA analysis or anything like that?

11  A.  No.

12  Q.  Now, Exhibit Number 33, the drug paraphernalia, that

13  basically is a couple of syringes and couple of other minor

14  little things, correct?

15  A.  Yes.

16  Q.  There isn't a whole lot in there?

17  A.  No, there's not.

18  Q.  And did you take any of those items and have that tested

19  for either DNA or fingerprints or anything along that line?

20  A.  No.  Other than the request from the DEA for the drug

21  residue, there were no other requests for any tests to be

22  made.

23  Q.  And the same with the window tinting and stuff like that,

24  you never took any of those items and checked them for

25  fingerprints, DNA or anything?

1    A.  No, we did not.

2    Q.  Nor the pieces of money that were actually sent up to the

3    lab for the, I guess the dye analysis, you never had that

4    tested for DNA, fingerprints or anything?

5    A.  No, I did not.

6    Q.  Now, you are pretty much familiar with all of the

7    characteristics of the entire investigation, correct?

8    A.  Yes.

9    Q.  And during the course of the search at the residence of

10   Mr. Caraballo, you're familiar with the fact that there were

11   several pairs of shoes that were obtained from that

12   residence, correct?

13   A.  Yes.

14   Q.  In fact, I believe there is something to the neighborhood

15   of about seven, maybe eight different pairs of Nike white

16   shoes, correct?

17   A.  Correct.

18   Q.  Nike and/or Reebok white shoes?

19   A.  That sounds correct, yes.

20   Q.  And during the course of your investigation, you were

21   able to determine that on two different occasions Henrico

22   Police was able to recover shoe prints from the banks that

23   were robbed, correct?

24   A.  That's correct, yes.

25   Q.  In fact, the first one on September 29th of '07, the

1    Citizens & Farmers Bank, they were able to actually recover

2    two shoe prints from countertops and counters up there,

3    correct?

4    A.  I believe that's correct, Mr. Dash.  I don't recall the

5    exact date, but that sounds correct, yes.

6    Q.  And then the other one was pretty much the same bank, the

7    Citizens & Farmers Bank on or about December 21st?

8    A.  That sounds correct, yes.

9    Q.  Okay.  And as part of your investigation, you actually

10   had those shoe prints, as well as these various shoes, sent

11   to the laboratory for analysis to see if they would match,

12   correct?

13   A.  Yes.

14   Q.  And that's something that certainly the FBI laboratory

15   has the capability of doing?  That is one of their

16   specialties is shoe print analysis, correct?

17   A.  Yes.

18   Q.  And you're familiar with the fact that none of these

19   shoes that were tested matched the shoe prints that were at

20   those two robberies in Henrico, correct?

21   A.  That's correct, yes.

22   Q.  Additionally, when you had items tested by the laboratory

23   for the ink, the dye, you had actually sent some of those

24   shoes to see if there was any dye and stuff on the shoes

25   also?

1    A.   Yes.

2    Q.   And some items of clothing that were actually recovered

3    from the residence were also sent to the laboratory to see if

4    they had any traces of dye on them also, correct?

5    A.   That's correct, yes.

6    Q.   And the shoes and the clothing did not have any traces of

7    dye on them, to your recollection, correct?

8    A.   Correct.

9    Q.   Now, I believe you testified that during the surveillance

10   on several occasions, Mr. Caraballo went to a specific

11   residence on Mary Peek Boulevard in Hampton, correct?

12   A.   Yes.

13   Q.   And that residence is actually a specific residence in

14   the 3500 block of North Mary Peek Boulevard, correct?

15   A.   It is actually 35 Mary Peek Boulevard was the address.

16   Q.   And is that a single-family residence or is that an

17   apartment building or do you know?

18   A.   It appeared to be a single-family residence.  Whether it

19   had been divided within for renters, I don't know.  But it

20   appeared to be a single-family residence.

21   Q.   Did you do any check to see who actually lived at that

22   residence and what their relationship was with Mr. Caraballo?

23   A.   We did do some checks at the time and we had no reason to

24   believe that there was necessarily any connection between the

25   defendant and the residence.

1    Q.  So you don't know if that was a friend of Mr. Caraballo's

2    or what exactly he was doing because you weren't inside at

3    any point in time?

4    A.  That's correct.

5    Q.  And I believe you said on some occasions he would be

6    there for just a few minutes, some occasions he would be

7    there for an extended period of time?

8    A.  Correct, yes.

9    Q.  When I say extended period of time, what do you mean as

10   far as the length of time that he would be there?

11   A.  For extended period of time, I believe that that would be

12   up to three to four hours, is probably the most amount of

13   time that we observed the defendant at that address.

14   Q.  And during the time of the surveillance -- and this

15   surveillance basically started on or about the 6th of March

16   and went through about the 16th or 18th of March, correct?

17   A.  I believe it went a little longer than that.  It went up,

18   I believe, just before or right up to the time that he was

19   arrested.

20   Q.  Now, prior to actually going into his residence and

21   conducting a search, you actually did a search of his vehicle

22   also, correct?

23   A.  Yes.

24   Q.  And during the search of the vehicle, you didn't find

25   anything in that vehicle that was noteworthy or that

1    evidentiary of value in the vehicle, correct?

2    A.   Correct.

3    Q.   And the vehicle that we are talking about, just so we're

4    clear on that, that was, I believe, Government Exhibit 2-E,

5    correct, the Toyota Corolla?

6    A.   Yes, the Toyota Corolla, correct.

7    Q.   And as far as the Chevy Impala that we heard about from

8    Mr. Garcia, you didn't do any search on that vehicle or

9    anything like that to see if there was anything of

10   evidentiary value in that?

11   A.   No, we did not.

12        MR. DASH:   I don't have any further questions.

13   Thank you.

14                    REDIRECT EXAMINATION

15   BY MR. HURT:

16   Q.   Special Agent Baber, during the time that you were

17   conducting surveillance on the residence of the defendant,

18   did you ever see him have visitors?

19   A.   No.

20   Q.   At any time during your surveillance, did you see any

21   other person, whether Mr. Caraballo was there or not, go in

22   or out of that apartment?

23   A.   No.

24   Q.   Did any of the records that you checked or information

25   you received suggest that he had either a roommate or someone

1  who stayed there with him frequently?

2  A.   No.

3  Q.   When the search warrant was conducted at the residence of

4  Mr. Caraballo, the defendant, did you locate items or any

5  other indicia that somebody else besides the defendant was

6  staying in that apartment?

7  A.   No.

8  Q.   Now, the items that you sent to the lab for testing

9  regarding the shoes, what did you tell the evidence

10  technicians in your office to do as far as submitting that or

11  collecting that evidence for submission?

12  A.   I asked our evidence technician to submit all the shoes

13  that we recovered from the defendant's residence to send to

14  the FBI lab to determine whether there was a match between

15  those shoes and the shoe print evidence.

16  Q.   There was, during the course of the search warrant, a

17  blue plastic tub, which will be introduced later, which was

18  recovered; is that an accurate description?

19  A.   Yes.

20  Q.   And were there items in that tub?

21  A.   Yes.

22  Q.   Was there a pair of shoes in that tub?

23  A.   Yes.

24  Q.   Did they end up getting submitted to the lab?

25  A.   No, they did not.

1   Q.   And do you know why that is?

2   A.   I believe it was simply oversight because we kept the

3   shoes that were in that blue box in that blue bin with the

4   rest of the items to try to keep it altogether just as we

5   found it.  And so when our evidence technician sent off the

6   shoes, he sent off all of the individual shoes that we bagged

7   separately and had not pulled the shoes out of the blue bin

8   that were in the bin when we found them that way.

9            MR. HURT:  Thank you.

10           MR. DASH:  Judge, I have just a couple follow-ups

11  based on this if I may.

12                    RECROSS-EXAMINATION

13  BY MR. DASH:

14  Q.   Agent Baber, when you were conducting surveillance, you

15  said that you never saw anybody else going into his

16  residence.  But is it fair to say that when you're conducting

17  surveillance, you did not leave somebody back behind to watch

18  his residence when he was not there?

19  A.   That's correct.  We did not do that.

20  Q.   And you didn't do 24/7 type of surveillance, correct?

21  A.   No, we did not.

22  Q.   And as far as the items that were sent to the lab, I

23  mean, you certainly knew that this other pair of shoes was in

24  the evidence that you had taken, correct?

25  A.   Correct.

1  Q.  And certainly the results of the lab analysis, that came

2  back about a month ago, correct?

3  A.  I believe that's correct, yes.

4          MR. DASH:  I don't have any further questions.

5          THE COURT:  All right.  Is that all for this

6  witness?

7          MR. HURT:  From the Government, yes, sir.

8          MR. DASH:  Yes, sir.

9          THE COURT:  All right.  You're excused with the same

10  admonitions as the other witnesses, Agent Baber, that is, you

11  may not discuss your testimony with any other witness until

12  the case is concluded.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  You can step down at this time.

15          (Witness excused.)

16          MR. HURT:  Judge, our next witness is Detective Mark

17  Marshall.

18          MARK MARSHALL, called by the Government, having

19  been first duly sworn, was examined and testified as follows:

20                        DIRECT EXAMINATION

21  BY MR. HURT:

22  Q.  Good afternoon, Detective Marshall.  Could you state your

23  full name and spell your last name, please.

24  A.  Mark A. Marshall, M-a-r-s-h-a-l-l.

25  Q.  And how are you employed?

1   A.   I'm employed with the Hampton Police Division.

2   Q.   And how long have you been with the Hampton Police

3   Division?

4   A.   23 years.

5   Q.   And during that time have you been assigned to narcotics

6   investigation?

7   A.   Yes, I have.

8   Q.   And when was that that you were assigned to that part of

9   the division?

10   A.   From 1997 until present, excepting about six months.

11   Q.   And what is your current assignment?

12   A.   I'm currently assigned to the Peninsula narcotics

13   enforcement task force.

14   Q.   And as such you are also deputized with the Virginia

15   State Police and the Federal Bureau of Investigation?

16   A.   Yes, I am.

17   Q.   And as an experienced detective with the Hampton Police

18   Division, are you familiar with the areas of Hampton,

19   Virginia and the crime rates in those various areas?

20   A.   Yes, I am.

21   Q.   Are you familiar with a street known as Mary Peek

22   Boulevard?

23   A.   Yes, I am.

24   Q.   And is that --

25             THE COURT:  What is the name of the street?

1             MR. HURT:  Mary Peek Boulevard.

2             THE COURT:  Mary Peek?

3             MR. HURT:  Yes.

4             THE COURT:  Okay.

5             MR. HURT:  Mary Peek Drive.

6             THE COURT:  All right.

7    BY MR. HURT:

8    Q.  Detective Marshall, in your experience in the Hampton

9    Police Division, is that a high drug trafficking area?

10   A.  Yes.  Based on drug complaints and search warrants

11   executed, it is higher than the surrounding streets, and most

12   of the streets -- it's compared to most of the streets in the

13   city, it is what we consider high, yes.

14             MR. HURT:  Thank you.  I have nothing further.

15                    CROSS-EXAMINATION

16   BY MR. DASH:

17   Q.  Detective Marshall, are you -- you're not implying,

18   certainly, that every person that lives on Mary Peek Drive is

19   a drug dealer, correct?

20   A.  No, sir.

21   Q.  And are you familiar with the specific address of 35

22   North Mary Peek Drive?

23   A.  Not specifically, no, sir.

24   Q.  So you can't say with any certainty that if an individual

25   who's going and visiting a person at 35 North Mary Peek

1    Drive, that they were going for the purpose of drugs,

2    correct?

3    A.  No, sir.

4              MR. DASH:  All right.  No further questions.

5              THE COURT:  May this witness be excused?

6              MR. HURT:  Yes, sir.

7              THE COURT:  All right, Detective Marshall.  You're

8    excused with the understanding you won't discuss your

9    testimony with any other witness in the case until the case

10   is concluded.

11             THE WITNESS:  Yes, sir.

12             (Witness excused.)

13             MS. MARTIN:  The United States calls Jennifer

14   Collins.

15             JENNIFER COLLINS, called by the Government, having

16   been first duly sworn, was examined and testified as follows:

17                        DIRECT EXAMINATION

18   BY MS. MARTIN:

19   Q.  Good afternoon, Agent Collins.  Could you please state

20   your full name and spell your last name for the record.

21   A.  Jennifer V. Collins, C-o-l-l-i-n-s.

22   Q.  And Ms. Collins, how are you employed?

23   A.  I'm a special agent with the FBI.

24   Q.  How long have you been a special agent with the FBI?

25   A.  A little over six years.

1    Q.  And turning your attention to March 25th, 2008, on that

2    date were you involved of a search pursuant to a search

3    warrant of the defendant's apartment?

4    A.  Yes.

5    Q.  And during that search were you focused on any particular

6    room in the defendant's apartment?

7    A.  Yes.  I was working primarily in the master bedroom and

8    master bedroom closet.

9    Q.  And in the master bedroom and master bedroom closet, did

10   you find anything of significance to this case?

11   A.  Yes.

12   Q.  What did you find?

13   A.  I found a blue rubber-made bin full of a number of items

14   that appeared to be items the defendant had used in the bank

15   robbery.

16   Q.  All right.  I'd like to show you that bin.  It's been

17   marked for identification as Government Exhibit 14.  Do you

18   recognize that as the bin that you recovered from the

19   defendant's apartment?

20   A.  Yes, I do.

21   Q.  And what did you do upon finding that bin?

22   A.  I opened it.  I looked through it and catalogued the

23   items that were inside the bin and then I turned that over to

24   Jack Mohan who is the seizing agent in charge of this.

25   Q.  Explain to the jury what a seizing agent is.

1    A.  The seizing agent primarily takes care of all of the

2    administrative aspects of what happens during a search

3    warrant execution.  So there is a number of agents who

4    participate in the search, and we are all in different

5    locations within a residence or within the premises that is

6    to be searched, and then we take the items that we recover

7    that we think may be of evidentiary value, and we hand them

8    over to the seizing agent who collects all of those items.

9    Q.  And what does the seizing agent then do with those items?

10   A.  The seizing agent then takes those items to our evidence

11   storage room.

12        MS. MARTIN:  Your Honor, the Government now would

13   like to move Government Exhibit 14 and the accompanying

14   picture 14-A into evidence.

15        THE WITNESS:  All right.  Exhibits 14 and 14-A will

16   be admitted.

17        (The Tub and photograph was received in evidence and

18   marked as Government's Exhibit No. 14 & 14-A.)

19   BY MS. MARTIN:

20   Q.  Now, Agent Collins, I'd like to turn your attention to

21   the items inside of that plastic bin, and if you'll bear with

22   me, we will go through those each individually, all right.

23   A.  Okay.

24   Q.  Now, the first item I'd like you to look at is what's

25   been marked for identification as Government's Exhibit 15.

1   What is Government Exhibit 15?

2   A.   Appears to be a wig.

3   Q.   And did you find that wig in the plastic tub?

4   A.   Yes.

5   Q.   Now, going back, Agent Collins.  Did you have an

6   opportunity to look through this plastic tub before your

7   testimony today --

8   A.   Yes, I did.

9   Q.   -- and look at the items in the tub?

10  A.   Yes.

11  Q.   And were all of them in the same condition they were when

12  you found them?

13  A.   Yes.

14          MS. MARTIN:  Your Honor, Government would like to

15  move Exhibit 15 and the accompanying picture, 15-A into

16  evidence.

17          THE COURT:  Exhibits 15 and 15-A will be admitted.

18          (The Wig and photograph were received in evidence

19  and marked as Government's Exhibit No. 15 & 15-A.)

20  BY MS. MARTIN:

21  Q.   Next would you please take a look at what's been marked

22  for identification as Government Exhibit 16.  What is

23  Government's Exhibit 16?

24  A.   It looks like a fake beard, appears to be.

25  Q.   Did you also find that in the tub?

1   A.  I did.

2          MS. MARTIN:  Your Honor, the Government moves to

3   admit Exhibit 16 and 16-A.

4          THE COURT:  Exhibits 16 and 16-A will be admitted.

5          (The Fake beard and photograph were received in

6   evidence and marked as Government's Exhibit No. 16 & 16-A.)

7   BY MS. MARTIN:

8   Q.  I'd like you now to look at the exhibit marked for

9   identification as Government Exhibit Number 17.  What is

10  that?

11  A.  That's a black MBA baseball cap.

12  Q.  Was that also found in the tub?

13  A.  It was.

14         MS. MARTIN:  Your Honor, the Government moves to

15  admit Exhibit 17 and 17-A.

16         THE COURT:  Exhibit 17 and 17-A will be admitted.

17         (The Ball cap and photograph were received in

18  evidence and marked as Government's Exhibit No. 17 & 17-A.)

19  BY MS. MARTIN:

20  Q.  Special Agent Collins, if you'd now look for what's been

21  marked for identification as Government Exhibit 18.  Do you

22  recognize that?

23  A.  Yes.

24  Q.  What is Government's Exhibit 18?

25  A.  This is another baseball cap which says property of USA

1    on the front.

2    Q.  And that was also found in the plastic tub?

3    A.  It was.

4          MS. MARTIN:  Your Honor, the Government moves to

5    admit Exhibit 18 and 18-A.

6          THE COURT:  Exhibits 18 and 18-A will be admitted.

7          (The cap and photograph were received in evidence

8    and marked as Government's Exhibit No. 18 & 18-A.)

9    BY MS. MARTIN:

10   Q.  Now turning to the exhibit marked for identification as

11   Government Exhibit 19, what is that?

12   A.  A pair of black gloves.

13   Q.  And those were found where?

14   A.  In the bin.

15         MS. MARTIN:  Your Honor, the Government moves to

16   admit Government's Exhibit 19 and 19-A.

17         THE COURT:  Exhibits 19 and 19-A will be admitted.

18         (The gloves and photograph were received in evidence

19   and marked as Government's Exhibit No. 19 & 19-A.)

20   BY MS. MARTIN:

21   Q.  Next I'd like you to take a look at what's been marked

22   for identification as Government's Exhibit 20.  You recognize

23   those as something you found in the plastic tub?

24   A.  Yes.  And they are black slip-on shoes.

25         MS. MARTIN:  Your Honor, the Government moves to

1    admit Government's Exhibit 20 and 20-A.

2            THE COURT:  All right.  Exhibits 20 and 20-A will be

3    admitted.

4            (The shoes and photograph were received in evidence

5    and marked as Government's Exhibit No. 20 & 20-A.)

6    BY MS. MARTIN:

7    Q.  Now turning to the exhibit marked for identification as

8    Government Exhibit 22.  Did you find this exhibit?

9    A.  Yes, I did, inside the bin also.

10   Q.  And what is Government Exhibit 22?

11   A.  That is a dark blue shirt.

12   Q.  Can you tell on this shirt who the shirt is made by?

13   A.  Yes.  It is made by Dickie's.

14           MS. MARTIN:  Your Honor, the Government moves to

15   admit Exhibit 22 and 22-A.

16           THE COURT:  Exhibits 22 and 22-A will be admitted.

17           (The shirt and photograph were received in evidence

18   and marked as Government's Exhibit No. 22 & 22-A.)

19   BY MS. MARTIN:

20   Q.  Next if you'd please look at what's been marked for

21   identification as Government Exhibit 23.  What is Exhibit 23?

22   A.  That's a pair of dark blue pants with a belt.

23   Q.  Did you find that also in the plastic bin?

24   A.  Yes, I did.

25           MS. MARTIN:  Your Honor, the government moves to

1  admit Exhibit 23 and 23-A.

2          THE COURT:  Exhibits 23 and 23-A will be admitted.

3          (The pants and photograph were received in evidence

4  and marked as Government's Exhibit No. 23 & 23-A.)

5  BY MS. MARTIN:

6  Q.  Agent Collins, if you'd please next look at Government

7  Exhibit 24.  What is that?

8  A.  That is a Black and Decker power screwdriver.

9  Q.  Did you find that in the tub?

10 A.  I did.

11         MS. MARTIN:  Your Honor, the Government moves to

12 admit Exhibit 24 and 24-A.

13         THE COURT:  All right.  Exhibits 24 and 24-A will be

14 admitted.

15         (The screwdriver and photograph were received in

16 evidence and marked as Government's Exhibit No. 24 & 24-A.)

17 BY MS. MARTIN:

18 Q.  Now I'd like you to turn to the exhibit that's been

19 marked for identification as 28.  What is Exhibit 28?

20 A.  It says, "Window tint film."

21         MS. MARTIN:  Your Honor, the Government moves to

22 admit Exhibit 28 and 28-A.

23         THE COURT:  All right.  Exhibit 28 and 28-A will be

24 admitted.

25         (The tint film and photograph were received in

1   evidence and marked as Government's Exhibit No. 28 & 28-A.)

2   BY MS. MARTIN:

3   Q.  I'd like you now to look at the exhibit that's been

4   marked for identification as Government Exhibit 30.  And do

5   you recognize Government Exhibit 30?

6   A.  Yes.  It's a camouflaged bag that was found inside of the

7   bin.

8   Q.  And can you describe the state of the bag, what --

9   A.  Yes.  There is a hole in it in the bottom of the bag with

10  what appears to be red dye.

11  Q.  Thank you.  Your Honor, the Government moves to admit

12  Government's Exhibit 30 and 30-A.

13          THE COURT:  Exhibits 30 and 30-A will be admitted.

14          (The bag and photograph were received in evidence

15  and marked as Government's Exhibit No. 30 & 30-A.)

16  BY MS. MARTIN:

17  Q.  Next I'd like you to look at what's been previously

18  admitted as Government Exhibit 3-B.  Did you find that -- if

19  you'll look on your screen, Agent Collins, do you recognize

20  that?

21  A.  I do.

22  Q.  And how do you recognize that?

23  A.  It's a license plate that was also found in the bin.

24  Q.  I'd now like to show you what's been previously admitted

25  as Government's Exhibit 12-A.  Do you recognize Government

1   Exhibit 12-A?

2   A.  Yes.

3   Q.  How do you recognize that?

4   A.  That is a gun that was also found inside of the blue bin.

5   Q.  Did you find that gun?

6   A.  Yes.

7   Q.  And was it loaded when you found it?

8   A.  Yes.

9   Q.  Agent Collins, besides the plastic bin and all of its

10  contents, was there anything else that you found of

11  significance to this case during your search?

12  A.  Yes.  There was a blue plaid jacket that I found, and I

13  believe some money that I found.

14          MS. MARTIN:  Your Honor, I'd ask to show the witness

15  what's been marked for identification as Government Exhibit

16  25.

17          THE COURT:  All right.

18  BY MS. MARTIN:

19  Q.  Agent Collins, do you recognize Government Exhibit 25?

20  A.  Yes.  This is the blue flannel jacket that I found in the

21  closet.

22  Q.  After finding the jacket, what did you do with it?

23  A.  The same thing as I did with the bin.  I cataloged --

24  excuse me, I marked it, and I returned it to Agent Mohan, and

25  also I called over the photographer.  I forgot to say that

1    earlier.  The photographer who was on duty took a picture of

2    the jacket, also did that with the bin.

3              MS. MARTIN:  Your Honor, the government moves to

4    admit Exhibit 25 and 25-A.

5              THE COURT:  Exhibit 25 and 25-A will be admitted.

6              (The jacket and photograph were received in evidence

7    and marked as Government's Exhibit No. 25 & 25-A.)

8    BY MS. MARTIN:

9    Q.  Now, Agent Collins, you mention that you also found money

10   during your search of the defendant's apartment.  I'd like

11   you to look at what's been marked as Government Exhibit 26-A.

12   Do you recognize that?

13   A.  Yes.

14   Q.  What is Government's Exhibit 26-A?

15   A.  Photograph of some U.S. currency with red dye on it

16   inside of a blue safe.

17   Q.  And where did you find that?

18   A.  Found that in the master bedroom of the residence.

19             THE COURT:  I'm sorry.  I didn't hear you.  Describe

20   what that was.

21             THE WITNESS:  I'm sorry.  That is a -- it's a

22   photograph of some U.S. currency with red dye on it inside of

23   a blue safe.

24   BY MS. MARTIN:

25   Q.  And, again, Agent Collins, where did you find that safe

```
 1    with the money in it?
 2    A.  That was found in the master bedroom.
 3            MS. MARTIN:  Your Honor, the government moves to
 4    admit Government Exhibit 26-A.
 5            THE COURT:  All right.  Exhibit 26-A will be
 6    admitted.
 7            (The photograph was received in evidence and marked
 8    as Government's Exhibit No. 26-A.)
 9            MS. MARTIN:  I have no further questions, Agent
10    Collins.  Thank you.
11            MR. DASH:  No questions, Your Honor.
12            THE COURT:  All right.  Agent Collins, you may be
13    excused as a witness with the understanding that you will not
14    discuss your testimony with any other witness in the case
15    until the case is concluded.
16            THE WITNESS:  Okay.  Thank you.
17            (Witness excused.)
18            MS. MARTIN:  Your Honor, the government calls Greg
19    Federico.
20            GREGORY F. FEDERICO, called by the Government,
21    having been first duly sworn, was examined and testified as
22    follows:
23                        DIRECT EXAMINATION
24    BY MS. MARTIN:
25    Q.  I'm sorry.  One moment.  All right.  Good afternoon,
```

```
 1   Agent Federico.  Will you please state your full name and
 2   spell your last name for the record.
 3   A.   Gregory Federico, F-e-d-e-r-i-c-o.
 4   Q.   Agent Federico, how are you employed?
 5   A.   I'm a special agent with the Federal Bureau of
 6   Investigation.
 7   Q.   And how long have you been a special agent?
 8   A.   Will be two years in February.
 9   Q.   Turning your attention to the date of March 25th, on that
10   day were you involved in a search pursuant to a search
11   warrant of the defendant's apartment?
12   A.   Yes, I was.
13   Q.   And during that search did you seize any property of
14   significance to this case?
15   A.   I did.
16   Q.   Do you recall what you found?
17   A.   Yes.
18   Q.   Where specifically were you concentrated during the
19   search?
20   A.   In the closet of the master bedroom.
21   Q.   And what did you seize from the closet?
22   A.   I seized a rubber nose.
23   Q.   I'd like you to take a look at what's been marked for
24   identification as Government's Exhibit 21-A and 21.
25   Apologize.  If I could pass this up, as well.
```

```
 1          Agent Federico, do you recognize Government Exhibit
 2    21?
 3    A.  Yes, I do.
 4    Q.  What is Government Exhibit 21?
 5    A.  That is the rubber nose that I found in the closet.
 6    Q.  And where was it in the closet?  Do you recall?
 7    A.  It was in a backpack.
 8    Q.  And what did you do after finding it?
 9    A.  Well, I had it photographed and then turned it over to
10    the seizing agent after I looked at it.
11          MS. MARTIN:  Your Honor, the government moves to
12    admit Exhibit 21 and 21-A.
13          THE COURT:  All right.  Exhibits 21 and 21-A will be
14    admitted.
15          (The rubber nose and photograph were received in
16    evidence and marked as Government's Exhibit No. 21 & 21-A.)
17    BY MS. MARTIN:
18    Q.  Agent Federico, did you find any money during your search
19    of the defendant's apartment?
20    A.  Yes, I did.
21    Q.  And in front of you you'll see what's been marked for
22    identification as Government Exhibit 29-A.  Do you recognize
23    that?
24    A.  I do.
25    Q.  What is Government's Exhibit 29-A?
```

 1   A.  That is a plastic bag containing U.S. currency with a red

 2   stain on it that I also retrieved in the closet of the master

 3   bedroom.

 4        MS. MARTIN:  Your Honor, the government moves to

 5   admit Government's Exhibit 29-A.

 6        THE COURT:  29-A is not a photograph, it's some

 7   money you found with red dye on it?

 8        MS. MARTIN:  No, Your Honor, it is just a

 9   photograph.

10        THE COURT:  It is a photograph.  Okay.  What

11   happened to the money?  Have we got the money or is that

12   another exhibit or what?

13        MS. MARTIN:  That is another exhibit, Your Honor,

14   which we hadn't planned -- we planned just to introduce the

15   photograph.  The -- Agent Federico, when was that photograph

16   taken?

17        THE WITNESS:  During the search warrant.

18        THE COURT:  Photograph of money with red dye on it?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Okay.  That'll be admitted.

21        (The document was received in evidence and marked as

22   Government's Exhibit No. 29-A.)

23   BY MS. MARTIN:

24   Q.  Agent Federico, also involved in that search, was there

25   another agent, Agent George DeShazor?

1   A.  Yes, there was.

2   Q.  And was he -- what room was he searching?

3   A.  The master bedroom.

4   Q.  And did he find in the master bedroom -- will you look at

5   Government's Exhibit 31-A, if you will.

6   A.  I have it.

7   Q.  Do you recognize that?

8   A.  I remember there being license plates found during the

9   search warrant.

10  Q.  Did Agent DeShazor find those license plates?

11  A.  I believe he found some license plates.

12  Q.  Do you know whether that photograph was taken -- when it

13  was taken?

14  A.  It was taken during the search warrant.

15          MS. MARTIN:  Your Honor, the government moves to

16  admit Exhibit 31-A.

17          THE COURT:  All right.  Exhibit 31-A will be

18  admitted.

19          (The photograph was received in evidence and marked

20  as Government's Exhibit No. 31-A.)

21  BY MS. MARTIN:

22  Q.  Finally, Agent Federico, will you take a look at

23  Government Exhibit 32 and 32-A.  Do you recognize Government

24  Exhibit 32-A as being something recovered during the search?

25  A.  Yes.  It's the -- Special Agent DeShazor found make-up

1   during the search in the -- by the dresser of the master

2   bedroom.

3          MS. MARTIN:  Your Honor, the Government moves to

4   admit Government Exhibit 32 and 32-A.

5          THE COURT:  Exhibit 32 and 32-A will be admitted.

6          (The make-up and photograph were received in

7   evidence and marked as Government's Exhibit No. 32 & 32-A.)

8          MS. MARTIN:  Thank you, Agent Federico.

9                    CROSS-EXAMINATION

10  BY MR. DASH:

11  Q.  Good afternoon, Agent Federico.

12  A.  Good afternoon, sir.

13  Q.  This apartment that was searched, it was a two-bedroom

14  apartment, correct, to your knowledge?

15  A.  Yes.

16  Q.  So there is two bedrooms, living room, kitchen, at least

17  one, maybe two bathrooms?

18  A.  Yes, sir.

19         MR. DASH:  No further questions.

20         THE COURT:  I assume he may be excused, counsel?

21         MS. MARTIN:  Yes, Your Honor.

22         MR. DASH:  Yes.

23         THE COURT:  Agent Federico, you're excused as a

24  witness with the understanding that you won't discuss your

25  testimony with any other witness in the case until the case

1   is concluded.

2          THE WITNESS:  Yes, Your Honor.

3          (Witness excused.)

4          THE COURT:  Do you have any more witnesses

5   available, counsel?

6          MR. HURT:  Unfortunately, I do not, Judge.

7          THE COURT:  All right, ladies and gentlemen.  We

8   have two more witnesses that the Government has indicated

9   wants to call who are technical witnesses who work, I

10  believe, at the FBI -- or one of them at the DEA lab and one

11  of them at the FBI lab, and they had made arrangements to

12  travel here tomorrow expecting that they wouldn't be called

13  until tomorrow.

14         The evidence has gone somewhat faster than expected

15  so we don't have any more witnesses now.  So what we're going

16  to do now, I'm going to work with the attorneys for the rest

17  of the day on instructions on the law applicable to the case,

18  which I'll give you tomorrow.  So we'll utilize that time or

19  the remaining time today for that purpose which hopefully

20  will save us some time tomorrow.

21         I'm going to excuse you now for the rest of the day.

22  And, again, you've heard most of the evidence to be presented

23  by the Government.  So, again, I warn you that it's premature

24  to consider any of the issues in the case or allow anybody to

25  discuss the case with you.  We can't do that until we hear

1    all the evidence and the argument of the attorneys and the

2    Court's instruction.

3            So it takes a little longer than usual but hopefully

4    we will be able to make up for it tomorrow.  So you're

5    excused until 10 o'clock tomorrow morning.

6            (Jury out at 3:14 p.m.)

7            THE COURT:  All right, counsel.  As far as the

8    general instructions are concerned, I would be glad to

9    consider any that you have.  I have a set of general

10   instructions that I normally grant in all felony criminal

11   cases that I'll try to put in order.

12           One of them discusses the presumption of innocence,

13   and it has a provision in there that talks about whether or

14   not the defendant testifies.  I don't know if you're

15   comfortable advising the Court what you anticipate in that

16   regard or not at this time, Mr. Dash.

17           MR. DASH:  Judge, if I could defer that decision

18   until tomorrow, I'd appreciate it.  I still need to think

19   about a couple of things tonight and talk it over with

20   Mr. Caraballo.

21           THE COURT:  All right.  Well, I'm just going to

22   submit an instruction that presumes he's not going to

23   testify.  If he elects to testify, we'll just change it.

24           MR. DASH:  Yes, sir.

25           THE COURT:  All right.  In the instruction dealing

```
 1    with counts one, six and nine submitted by the Government, it

 2    speaks of put in jeopardy the lives of bank employees and

 3    customers.  This deals with BB&T.

 4         Now, there was one customer who was -- I only recall

 5    one incidence where there was a customer in the bank, and I

 6    can't remember was that BB&T or somewhere else?

 7         MR. HURT:  That was River City, Your Honor, Mr.

 8    Gooding, River City Bank.

 9         THE COURT:  I don't think the word "and customers"

10    belongs in the instruction dealing with BB&T.

11         MR. HURT:  Government agrees, Your Honor.

12         THE COURT:  All right.

13         MR. HURT:  Sorry to interrupt.  May Special Agent

14    Baber be excused while we do the instructions?

15         THE COURT:  Yes.

16         MR. HURT:  Thank you, Judge.

17         THE COURT:  In the finding instruction on counts

18    one, six and nine, for some reason, it has Bank of McKenney

19    in there.  I assume that shouldn't be in there?

20         MR. HURT:  I agree, Your Honor.  That's an error.

21    It is also at jury instruction 21.

22         THE COURT:  These are the Court's general

23    instructions.  You can be looking at those while I'm working

24    on these others.  And would you call Beth and tell Beth or

25    ask Beth if she can come here at 9 instead of 10 because tell
```

1  her we have some instructions that need to be redone, and if

2  she can do those starting at 9, it will help us.  She's going

3  to come directly here tomorrow.

4         All right.  Certain of these robberies, the

5  defendant is charged with brandishing a firearm during and in

6  relation to a crime of violence, namely a bank robbery, but

7  the defendant wasn't charged with the bank robbery itself.

8         MR. HURT:  That's correct, Your Honor.

9         THE COURT:  All right.  But your instruction says as

10  to counts 2 through 5, 7, 8, 10 and 11, the first element is

11  that he committed the crime of bank robbery as charged in

12  count 1, 6, 9, 12 and 13.  Well, he wasn't charged with bank

13  robbery in counts 12 and 13.

14         MR. HURT:  Judge, I agree.  I think we need to

15  remove --

16         THE COURT:  Well, plus the fact that in order to

17  find him guilty of brandishing a firearm, they would have to

18  find him guilty of the bank robberies, even though he's not

19  charged with them, were they not?

20         MR. HURT:  Judge, I think they would have to find --

21  my reading of the law on 924(c) is the jury is required to

22  find the -- find facts beyond a reasonable doubt to support

23  the underlying crime.  It is not necessary that they find him

24  guilty of that offense in a formal charge.

25         THE COURT:  Well, no.  They don't have to find him

1    guilty of the formal charge, but they have to find him guilty

2    of the elements of a bank robbery --

3         MR. HURT:  Yes, sir.

4         THE COURT:  -- in order to find him guilty of

5    brandishing a firearm during and in relation to a crime of

6    violence because the only crime of violence was the bank

7    robbery.

8         MR. HURT:  Yes, sir.

9         MR. DASH:  We agree.

10        THE COURT:  All right.  What is C&F, Citizens &

11   Farmers Bank?

12        MR. HURT:  Yes, sir.

13        THE COURT:  All right.  The June 30th, which is the

14   subject of count four, is River City Bank.  What's the

15   correct name of that bank?

16        MR. HURT:  Judge, I believe it is just River City

17   Bank.  They have since changed names because they were

18   purchased by another company, but at the time of the robbery,

19   it was the River City Bank.

20        THE COURT:  Okay.

21        MR. DASH:  That is my recollection of the evidence

22   also, Judge.  I believe she testified.

23        THE COURT:  I'm sorry?

24        MR. DASH:  It is my recollection of the evidence, I

25   believe the witness testified it was called River City Bank.

```
 1            THE COURT:  The August 24th incident, which --
 2    August 24th is the correct date.  It says on your witness
 3    list June 24th, but I think the evidence was August 24th.
 4            MR. HURT:  Yes, sir, that's correct.
 5            THE COURT:  The name of that bank, and I assume we
 6    call it a bank, is Franklin Savings and Loan?
 7            MR. HURT:  Judge, it is actually Franklin Federal
 8    Savings and Loan.
 9            THE COURT:  Okay.  All right.  Put that on the
10    podium and make sure I've got those counts matched up
11    correctly.  I'll ask both counsel to look at them.
12            All right.  I don't think you can combine the
13    essential elements of the separate gun charges into one
14    instruction.  It's way too -- I mean, I don't see how you can
15    do it.  So I tried to do one instruction as to three counts
16    where bank robbery is charged, each of which relate to BB&T.
17    And I've done a portion of another one as to the other five
18    counts, and I say a portion of it because I covered it as to
19    Citizens & Farmers, which was involved in three of those
20    five.  And I would put a similar provision in there as to
21    Franklin and River City.
22            So I'm going to pass these up.  Counsel can look at
23    them.  And counts 12 and 13 are in that instruction, and
24    counts 12 and 13 have nothing to do with the gun charge.
25            MR. HURT:  Yes, sir.
```

1          THE COURT:  Does that seem understandable?

2          MR. HURT:  Yes, sir, Judge.

3          MR. DASH:  Yes, sir.

4          THE COURT:  All right.  You've got in here crime of

5     violence is defined to include attempted bank robbery.  That

6     really is not relevant.

7          MR. HURT:  Judge, I believe that the River City

8     Bank -- I'm sorry, at the Franklin Federal Savings & Loan, he

9     did approach the window, put the gun up to the glass, tried

10    to rob the bank, but was unsuccessful.  That is charged, I

11    believe, as an attempt.

12         THE COURT:  Well, if that's right, then, the other

13    instruction I showed you has to be changed.  The River City

14    was the one where he never got the money?

15         MR. HURT:  Judge, I believe it was Franklin Federal

16    Savings and Loan.

17         THE COURT:  Franklin.  I mean, I can find it in my

18    notes but --

19         MR. HURT:  I'm sorry, Judge?

20         THE COURT:  I'm sure I can find it in my notes but

21    does anybody know that?

22         MR. HURT:  We were just agreeing.  It is Franklin

23    Federal Savings.  I believe the witness was Ms. Vicki Sharp.

24    Her testimony was that he approached the glass but was

25    unsuccessful in getting any money because they would not let

1    him into the teller line.

2              MR. DASH:  That was count five on August 24th.

3              THE COURT:  All right.  So it was Franklin Federal?

4              MR. HURT:  Yes, sir.

5              THE COURT:  All right.  There is no firearm involved

6    in counts 12 and 13 of the indictment, right?

7              MR. HURT:  That's correct, Your Honor.

8              THE COURT:  All right.  Uses and carries a firearm

9    is not an element of counts 1, 6, 9, 12 and 13, which is what

10   you have in your instruction.  It is an element of counts 2,

11   3, 4, 5, 7, 8 and 11, right?

12             MR. HURT:  Judge, I believe in counts 1, 6 and 9,

13   that was charged as armed bank robbery, which has the maximum

14   penalty of 25 years as opposed to unarmed bank robbery at 20

15   years.

16             THE COURT:  It doesn't say armed, it just says by

17   force, violence and intimidation.

18             MR. DASH:  Judge, at the end it says through the use

19   of a dangerous weapon.

20             THE COURT:  Huh?

21             MR. DASH:  The indictment, at the end of the

22   indictment says through the use of a dangerous weapon.

23             THE COURT:  Well, you don't have anything about a

24   dangerous weapon in your essential elements instruction.

25             MR. DASH:  In the Government's, you mean?

1        THE COURT:  Yeah.  So if that's the case, then you'd

2    have to say the taking was by force, violence and

3    intimidation through the use of a dangerous weapon in your

4    finding instruction.  So you'd have to add at the end of

5    paragraph 2 of your essential elements instruction "through

6    the use of a dangerous weapon."

7        MR. DASH:  Judge, if I may, our instruction number

8    18 included that information.  We added a fourth element,

9    actually, and in our proposed instruction number 18.

10       THE COURT:  All right.  These are the instructions.

11   They apply to counts one, six and nine.  Just put those on

12   the podium, have counsel look at them.

13       All right.  Here are the instructions as to the

14   other counts.  One of them was incomplete, as I explained

15   that before my secretary tries to type it.

16       All right.  Let's move it along.

17       MR. DASH:  Judge, on this last instruction that is

18   listed here, the phrase "uses or carries a firearm, means

19   having a firearm or firearms available to assist or aid in

20   commission of the crimes alleged."  We agree with counts 2,

21   3, 4, 5, 7, 8 and 11, but we think counts 2, 6, 9, 12 and 13

22   ought to be stricken.

23       THE COURT:  What instruction is that?

24       MR. DASH:  It's the last one in this stack.

25       THE COURT:  Okay.  Let me see it.  What do you say

1  ought to be stricken?

2        MR. DASH:  Count one is the bank robbery.  Count six

3  and nine are bank robberies, and that particular instruction

4  talks about using and carrying in relation to a crime of

5  violence.  So the bank robbery counts and the attempted bank

6  robbery counts themselves should not be included.

7        THE COURT:  Well, 12 and 13 shouldn't be, obviously.

8  But that's what I just asked you before, and you said the

9  Government said they should be.  So you changed your mind?

10        MR. DASH:  Apparently we were miscommunicating.

11        THE COURT:  Because it says, remember, we talked

12  about with a dangerous weapon?

13        MR. DASH:  Right.

14        THE COURT:  The dangerous weapon was a firearm.

15  Wasn't anything else.  Wasn't a knife.  It was a firearm.

16        MR. DASH:  That's true.

17        THE COURT:  Either it was a firearm or it wasn't

18  anything.

19        MR. DASH:  That is fine, Judge.  I mean, that is

20  just a definition of using and carrying.

21        THE COURT:  That's right.  But, I mean, we are

22  saying he had a dangerous weapon available --

23        MR. DASH:  That's true.

24        THE COURT:  -- in the finding instruction so that

25  dangerous weapon happened to be a firearm.

1          MR. DASH:  Yes, sir.

2          THE COURT:  So it seems to me it ought to be in

3     there.

4          MR. HURT:  Judge, we were just looking at it in

5     terms of the 924(c) language, but I think we both agree with

6     the Court that as to a firearm as to counts one, six and

7     nine, that language would apply even though not being in the

8     statute.

9          THE COURT:  I think it would because of the

10    dangerous weapon --

11         MR. DASH:  Yes, sir.

12         THE COURT:  -- element of that offense, but 12 and

13    13 should be stricken.

14         All right.  Here is 12, 13, 14.  Let me look at that

15    again.  I want to make sure I didn't have too many of them in

16    there.

17         MR. DASH:  Judge, I have no problems with counts 12

18    and 13, but I do have an issue that I'd like to address

19    regarding count 14.

20         THE COURT:  Okay.

21         MR. DASH:  We believe the law as it stands in count

22    14 that, not only does the Government have to prove that he

23    was a user of an unlawful drug, but we believe that the

24    unlawful use is more than just like a one-time use.  We

25    believe the law as it stands today means that it has to be

1   proven that the use was consistent, prolonged and close in

2   time to his firearm possession and that the use was done with

3   regularity over an extended period of time and close in time

4   to the firearm possession.  We included that in our

5   instruction number 30 at the bottom.

6          Now, all we're asking is that unlawful user be

7   further defined under the law.  There is -- your proposed

8   instructions here, there is no definition of what an unlawful

9   user is.

10         THE COURT:  All right.  Let me see your

11  instructions.

12         MR. DASH:  Yes, sir.  We actually included it in our

13  elements but it could be included as a separate.

14         THE COURT:  Let me have all of them back.  What do

15  you have to say about this?  I haven't had occasion to look

16  at that issue recently and so I don't know what -- I'm not

17  familiar with the authority.

18         MR. HURT:  Judge, I believe the defense's recitation

19  of the law is correct.  We have no objection if the Court is

20  inclined to add that.

21         THE COURT:  Okay.  All right.  We will be adjourned

22  until 10 o'clock tomorrow.

23         (Hearing adjourned at 4:56 p.m.)

24

25

1                        <u>CERTIFICATION</u>

2

3        I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7            X_____x

8                     Jody A. Stewart

9                     X_____x

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter